# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

### Northern Division

James Owens,                              *

      Plaintiff,                     *

v.                                        *        Civil Action No. 11-cv-3295

Baltimore Police Department, *et al.,*    *

      Defendants.                   *

\* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
## MOTION TO STAY DISCOVERY AND BIFURCATE CLAIMS

Joshua R. Treem (#00037)
Laura Ginsberg Abelson (#29363)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 1700
Baltimore, MD 21202
Tel: 410-962-1030
jtreem@browngold.com
labelson@browngold.com

Charles N. Curlett, Jr. (#28246)
Sarah F. Lacey (#28874)
LEVIN & CURLETT LLC
201 N. Charles St., Suite 2000
Baltimore, MD 21201
Tel: 410-685-4444
Fax: 410-685-2222
ccurlett@levincurlett.com
slacey@levincurlett.com

*Attorneys for Plaintiff*

# **TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................1

II.    STATEMENT OF FACTS ......................................................................................2

    A.    Constitutional violations by the Police Defendants ....................................3

    B.    The Individual Police Defendants and Mr. Brave induce Mr. Thompson to change his story and conceal the changes from Mr. Owens. ......................................................................................................4

    C.    Mr. Brave directs the Individual Police Defendants to coerce Mr. Thompson into providing yet a fourth version of his story. ...................6

    D.    Mr. Brave withholds impeachment evidence related to a jailhouse informant.....................................................................................................8

    E.    Mr. Owens is exonerated, but the State detains him for an additional year before dismissing the charges against him......................9

III.   PROCEDURAL HISTORY....................................................................................10

IV.   ARGUMENT .........................................................................................................11

    A.    Discovery should proceed against all Defendants pending the Police Defendants' proposed certiorari petition. ....................................11

          i.    The Police Defendants must establish "good cause" to obtain a Rule 26(c)(1) protective order.....................................11

          ii.   The Police Defendants fail to establish a reasonable likelihood that their certiorari petition will be granted..................................................................................12

                 a.    Limitations ................................................. 13

                 b.    Qualified Immunity...................................... 20

          iii.  The Police Defendants fail to make a particular and specific showing of the irreparable harm they will incur if discovery is not stayed. ....................................21

          iv.  Because the requested stay will substantially injure and unfairly prejudice Mr. Owens, the purported "benefits" of a stay will not outweigh the costs of delay, and the interest of justice favors proceeding with discovery...................................................................24

    B.    Bifurcation is not proper because it creates unnecessary litigation and does not prejudice the BPD.................................................................24

          i.    Bifurcation of discovery would create unnecessary litigation. ........................................................................25

ii.    Evidence related to Mr. Owens' *Monell* claims will be admissible in a trial against the Individual Police Defendants. ...................................................................26

iii.   A verdict for the Individual Police Defendants would not necessarily prevent the second phase of litigation. ...................................................................28

V.    CONCLUSION...............................................................................................................31

## I.    INTRODUCTION

This case arises from the pervasive and gross misconduct by Detectives Jay Landsman, Thomas Pelligrini, and Gary Dunnigan (the "Individual Police Defendants"), the Baltimore Police Department (the "BPD") (together with Dets. Landsman, Pelligrini, and Dunnigan, the "Police Defendants"), and Marvin Brave, that led to James Owens' conviction for a murder he did not commit, and subsequent incarceration for more than twenty years.  During those twenty years, Mr. Owens repeatedly discovered that the evidence presented against him at trial had been tainted by police and prosecutorial misconduct as well as junk science.  In 2006, when the Circuit Court for Baltimore City granted his petition for post-conviction testing of DNA evidence, the results confirmed what any objective observer could see from reviewing the case file:  the Defendants in this case had manufactured evidence to convict an innocent man based on nothing more than a hunch based on a tip from a pathologically lying witness.

Mr. Owens now seeks the most efficient resolution of his civil claims possible, yet the Police Defendants continue to throw up every roadblock possible to prevent him from being compensated for their misdeeds.  They ask the Court to stay the case pending the outcome of their Hail Mary petition for a writ of certiorari to the Supreme Court, based on a far-fetched claim of a circuit split on the statute of limitations issue and their objection to an interpretation of qualified immunity that is clearly consistent with other circuits and with existing Supreme Court jurisprudence.  Further, they now ask the Court to bifurcate the case and stay half of the claims in this case, even though the issues are inextricably intertwined, a bifurcation would not provide the possibility of avoiding a second litigation, and a bifurcation would surely lead to endless disputes over the limits of discovery in the initial phase of the case.  The Police Defendants should not be permitted to delay justice any longer.

## II.     STATEMENT OF FACTS

Mr. Owens was wrongfully convicted of the murder of Colleen Williar in 1988.  He served more than twenty years in prison and was ultimately exonerated based on DNA evidence in 2008.

At no point did the State have any physical evidence connecting Mr. Owens to the crime scene or to Ms. Williar.  Instead, the State largely relied on the testimony of wholly unreliable witnesses, whose testimony the Individual Police Defendants and Mr. Brave, the Assistant State's Attorney who tried Mr. Owens, manufactured and engineered to fit the few facts they did have, while knowing that neither witness could truthfully implicate Mr. Owens in the murder.

These witnesses were: 1) James Thompson, who, seeking a reward, turned in a knife to the police that he claimed was the murder weapon, and who was later tried and convicted himself for the Williar murder (it was Mr. Thompson who originally implicated Mr. Owens); and 2) Larry Oliver, a jailhouse informant who corresponded extensively with Mr. Brave concerning the leniency he would receive in return for his testimony against Mr. Owens.

The allegations in the Complaint are based on the sworn testimony of the four individual defendants in this case at the subsequent trial of Mr. Thompson, as well as case-file documents that were produced to Mr. Owens through his state appeal and post-conviction proceedings. Through these documents, Mr. Owens learned that the Individual Police Defendants and Mr. Brave had withheld exculpatory evidence that showed definitively that these witnesses lied on the stand – repeatedly – during Mr. Owens' trial, and the Individual Police Defendants and Mr. Brave had not only allowed this perjured testimony, but manufactured and induced it.

The Individual Police Defendants had interrogated Mr. Thompson, at Mr. Brave's direction, eliciting no fewer than seven different and materially conflicting versions of the events that supposedly surrounded Ms. Williar's death.  These interrogations occurred up to and even

during Mr. Owens' trial, when Mr. Brave realized he was losing his case and directed the

Individual Police Defendants to re-interrogate Mr. Thompson under the threat of prosecution for

the Williar murder and to obtain a statement that matched the physical evidence at the scene.

(Compl. 44 ¶¶ 47-52.)  None of these conflicting statements were disclosed to Mr. Owens'

counsel, depriving him of the ability to effectively cross examine the witnesses.

Mr. Oliver, the jailhouse informant who testified against Mr. Owens only to help himself,

had communicated on many occasions with Mr. Brave about potential leniency he would receive

in return for testifying against Mr. Owens.  Yet Mr. Brave knowingly elicited false testimony

from Mr. Oliver that he had received nothing in return for his testimony and allowed him to

testify that he chose to testify against Mr. Owens because "it was the right thing to do." (Compl.

27-29 ¶¶ 30-31.)  None of these prior communications, which would have been used by Mr.

Owens' trial counsel to discredit Mr. Oliver, were disclosed to the defense.  (Compl. 24 ¶ 32.)

### A.    Constitutional violations by the Police Defendants

The deception by the Police Defendants began the day after Ms. Williar's body was

discovered, when Mr. Thompson first presented himself to police officers.  The police knew

almost immediately that Mr. Thompson was not a credible witness, but continued to pursue his

testimony anyway.

Having heard that a $1,000 reward had been offered for any information related to the

murder weapon (a knife), Mr. Thompson brought a clean knife to the police.  (Compl. 19 ¶ 17.)

He told them that he had found it in a grassy area across the street from Ms. Williar's apartment,

that the knife had had blood on it when he found it, that he had placed it in his back pocket and

carried it home, where he cleaned it.  (*Id.*)

The police, including the Individual Police Defendants, knew immediately that Mr.

Thompson's statement was false.  (Compl. 18 ¶ 19.)  They questioned Mr. Thompson the next

day, confronting him with the fact that it would have been impossible for him to have found the

knife late at night across from the crime scene without knowing that the police were

investigating – as Mr. Thompson claimed – given that several police cars had been stationed

outside Ms. Williar's residence with their lights on at that time, that several officers had been

canvassing the area looking for a weapon, and that a helicopter had been circling the area.  (*Id.*)

Mr. Thompson retracted his initial statement and told the police instead that Mr. Owens

had given him directions to find the knife.  (Compl. 18 ¶ 20.)  On the basis of Mr. Thompson's

new statement, Mr. Owens was indicted for the murder of Ms. Williar.

> **B.      The Individual Police Defendants and Mr. Brave induce Mr.**
> **Thompson to change his story and conceal the changes from Mr.**
> **Owens.**

On the morning Mr. Thompson was scheduled to testify at Mr. Owens' trial, Mr. Brave

told Mr. Thompson that his story – in which Mr. Owens told him the location of the knife – was

not believable.  (Compl.  21-23 ¶¶ 26, 28.)  Mr. Brave knew he needed a more plausible story.

To get it, Mr. Brave lied to Mr. Thompson, telling him that he only needed to "tell the truth" and

everything would be ok.

So Mr. Thompson changed his story again.  He now told Mr. Brave (and the jury the next

day) his third version of the story – that the knife belonged to him.  (Compl.  22-23 ¶¶ 27-28.)

Mr. Thompson testified that Mr. Owens had taken the knife from his house days before the

murder and brought it back the morning after the murder.  Mr. Thompson testified that he put the

knife in his back pocket and that he and Mr. Owens then cleaned it together.  He testified that

Mr. Owens denied committing the murder, but told Mr. Thompson that he had had sex with Ms.

Williar.  (Compl.  22 ¶ 27.)

Mr. Brave, however, knew that Mr. Owens had an alibi that established the falsity of Mr.

Thompson's account.  As Mr. Brave was well aware, the Individual Police Defendants had

interviewed Mr. Owens' employer and established that Mr. Owens was at work when, according to Mr. Thompson, he supposedly brought the knife back to him.  (Compl.  24-25 ¶ 35.)  Mr. Brave did not disclose this exculpatory information to Mr. Owens' counsel, but instead suborned perjury. (*Id.*)

Mr. Brave also allowed Mr. Thompson to lie on the stand about his reasons for having come forward to the police.  Mr. Brave knew that Mr. Thompson had come forward in the hope of obtaining a reward that was offered by the police for information relating to the crime. (Compl. 25 ¶ 37.)  Mr. Brave never revealed to Mr. Owens or his counsel that Mr. Thompson had in fact sought the reward.  (Compl. 25 ¶ 38.)  Mr. Owens' counsel, however, was aware that such an award had been offered and asked Mr. Thompson about it on cross examination.  Mr. Thompson denied it.  Mr. Brave did not correct the record or otherwise inform the Court.  And because he had never disclosed this information to the defense, Mr. Owens' counsel was unable to cross-examine Mr. Thompson effectively.  This information would have been vitally important in attacking the credibility of the State's most important witness.

Mr. Brave later admitted that he knew that Mr. Thompson had lied on the stand and that he did nothing to stop it.  (Compl. 26 ¶ 39.)  He knew Mr. Thompson's story "smelled fishy" and worried the jury would not believe it.  (*Id.*)  Mr. Brave knew his case was falling apart.  (Compl. 26 ¶ 40.)  But, instead of dismissing the case against Mr. Owens, or otherwise informing the court or Mr. Owens' counsel of the perjured testimony that he had elicited from the witnesses, Mr. Brave went home for the weekend and concocted a way to salvage his case against an innocent man.

**C.    Mr. Brave directs the Individual Police Defendants to coerce Mr. Thompson into providing yet a fourth version of his story.**

Recognizing that a conviction was at risk of slipping away, Mr. Brave made a last-ditch effort to salvage his prosecution of Mr. Owens.  On a Sunday night, the eve of the resumption of trial, Mr. Brave directed the Individual Police Defendants to obtain samples of Mr. Thompson's pubic hair and blood to compare them to evidence from the crime scene.  (Compl. 26 ¶¶ 40-41.) When Mr. Brave learned on Monday morning that the samples from Mr. Thompson were a probable match (Compl. 26-27 ¶ 42), he directed the police to interrogate Mr. Thompson yet again.  (Compl. ¶¶ 40-41.)  He wanted them to use the information as leverage against Mr. Thompson to implicate Mr. Owens more directly.  (Compl. 27 ¶ 44.)  Not only had Mr. Thompson by this time lied repeatedly to the jury, but he was now implicated in the crime.

The Individual Police Defendants met with Mr. Thompson while the trial proceeded. (Compl. 27 ¶ 45.)  They told him he had been implicated in the crime, that they knew he had lied on the stand, and that they "did not know what would happen to him."  (*Id.*)  Mr. Thompson recognized that he had to implicate Mr. Owens in the murder if he had any hope of avoiding prosecution himself.  (Compl. 27-28 ¶¶ 46-47.)

Over the next two hours, Mr. Thompson proceeded to give the Individual Police Defendants five new, different, and conflicting versions of his story.  (Compl. 28-29 ¶¶ 47-52.) With each version, the police fed him additional information about the crime scene that allowed him to correct his statements and change his story as needed to conform to the physical evidence. (*Id.*)

First, Mr. Thompson told the Individual Police Defendants that he and Mr. Owens had not murdered Ms. Williar, but that they broke into Ms. Williar's house after the murder and before her body was discovered.  (Compl. 28 ¶ 48.)  The police told Mr. Thompson this story

was not sufficient because there was physical evidence that he had been there during the murder. (*Id.*)

Mr. Thompson next told the police that he and Mr. Owens had broken into Ms. Williar's home together, but that he had stayed on the first floor.  (Compl. 28 ¶ 49.)  The police told Mr. Thompson that there was evidence he had been on the second floor.  (*Id.*)

Mr. Thompson said that he had been on the second floor, but that he had hidden in the bathroom during the murder.  (Compl. 28 ¶ 50.)  The police then told him there was physical evidence linking him to the crime.  (*Id.*)

Next, Mr. Thompson told the police he been in the room while Mr. Owens raped Ms. Williar, but that he had not participated.  (Compl. 28-29 ¶ 51.)  The police then provided Mr. Thompson with one additional fact:  they told him that his pants must have been down because his pubic hair had been found at the scene.  (*Id.*)

Mr. Thompson then gave his fifth version of the story during that interrogation session. He told police that Mr. Owens had raped and killed Ms. Williar while he masturbated at the foot of her bed.  (Compl. 29 ¶ 52.)  The police were finally satisfied that they had obtained a version of the story that would match the physical evidence and implicate Mr. Owens.

Having achieved their goal of coercing Mr. Thompson into implicating Mr. Owens, Mr. Landsman passed Mr. Brave a note during trial with the details of only the fifth version of the story they received that day.  (Compl. 30 ¶ 57.)   After receiving Mr. Landsman's note, Mr. Brave recalled Mr. Thompson to the stand.  (Compl. 32-33 ¶¶ 65, 68.)

None of the first four versions of the story that Mr. Thompson gave the detectives during the Monday morning interrogation were ever disclosed to Mr. Brave or to Mr. Owens' counsel. (Compl. 30 ¶¶ 57-59.)  The strength of Mr. Brave's closing argument was predicated entirely on

Mr. Thompson's fabricated testimony.  Mr. Brave emphasized that Mr. Thompson "just wanted to tell the truth," (Compl. 33 ¶ 68) an argument that would have been refuted by the disclosure of the four other inconsistent statements he gave police when he was supposedly ready to "tell the truth."

The Individual Police Defendants' failure to turn over the evidence of Mr. Thompson's many inconsistent statements, and the circumstances in which they were coerced, violated Mr. Owens' constitutional right to a fair trial and was a willful, conscious, and bad faith disregard for their constitutional duties.  They knew that impeachment evidence concerning Mr. Thompson's statements would have jeopardized the prosecution of Mr. Owens and chose to allow the prosecution of an innocent man to continue.  (Compl. 29 ¶ 53).

> **D.     Mr. Brave withholds impeachment evidence related to a jailhouse informant.**

While the prosecution acknowledged that Mr. Thompson was the "star witness" in the case against Mr. Owens, there was one additional key witness, Larry Oliver.  (Compl. 23 ¶¶ 29-30.)  Mr. Oliver was a jailhouse snitch who testified at trial that Mr. Owens confessed to him. He did this because he hoped the State's Attorney would provide rewards or leniency in his own criminal case.  (Compl. 23-24 ¶ 31.)  Mr. Brave had promised as much.  But Mr. Brave failed to inform the defense of the price he had paid for Mr. Oliver's testimony.

To the contrary, Mr. Oliver testified at trial that he was not promised anything in return for his testimony and was coming forward because it was the "right thing to do."  He also said he would not mind if Mr. Brave did not "even say anything to the judge in his pending assault and cocaine possession case."  (Compl. 23 ¶ 30.)

Not only did Mr. Brave fail to inform the defense of his arrangement with Mr. Oliver, he actively sought to prevent its discovery.  As Mr. Brave wrote in a memo prior to trial that was

not disclosed until years later, to maintain the façade of credibility of his witness as well as the necessary leverage, Mr. Brave had taken possession of the court and State's Attorney's files on Mr. Oliver.  (Compl. 23 ¶ 31.)  Mr. Oliver had sent Mr. Brave almost a dozen letters asking for help in getting released, for help changing his conditions of confinement, and for other rewards in return for Mr. Oliver's testimony against Mr. Owens.  (Compl. 23-24 ¶ 31.)  Mr. Brave made the deal and buried it.  Mr. Owens only learned of the arrangement when Mr. Brave's pretrial memo detailing the bargain with Mr. Oliver was discovered after he had been convicted.

Despite knowing that Mr. Oliver's testimony was perjured, Mr. Brave failed to disclose any of this impeachment information to Mr. Owens' counsel.  (Compl. 24 ¶ 32.)  Worse, he repeatedly solicited perjured testimony from Mr. Oliver, falsely establishing that Mr. Oliver did not seek favorable treatment in exchange for his testimony even though Mr. Brave knew that was exactly what Mr. Oliver sought.  (Compl. 23 ¶ 30.)

### E. Mr. Owens is exonerated, but the State detains him for an additional year before dismissing the charges against him.

After serving almost 20 years of his life sentence, Mr. Owens successfully petitioned the court to have the blood from the pocket of Mr. Thompson's pants and the semen found at the crime scene tested for DNA.  (Compl. 33 ¶ 73.)  The DNA results showed that the blood was not Ms. Williar's, and the semen belonged to neither Mr. Thompson nor Mr. Owens.  (Compl. 24 ¶ 33.)  On June 7, 2007, the Circuit Court for Baltimore City granted Mr. Owens' motion for a new trial based on the new DNA evidence.

Mr. Owens, however, continued to be detained as the State's Attorney for Baltimore City prepared for his second trial, which was scheduled for October 15, 2008.  In advance of his second trial, Mr. Owens moved to exclude the prior testimony of Mr. Thompson, because he had learned, in the intervening years, of the impeachment evidence that had been withheld from him

by Mr. Brave and the Individual Police Defendants.  On July 15, 2008, the Circuit Court for

Baltimore City denied that motion.

Mr. Owens remained in detention awaiting his new trial until the day it was scheduled to

begin, October 15, 2008.  On that date the State's Attorney entered a *nolle prosequi*.  The

charges against Mr. Owens were dropped, and he was released.

### III.   PROCEDURAL HISTORY

Mr. Owens filed this action in the Circuit Court for Baltimore City on October 12, 2011.

(Doc. 2.)  On November 16, 2011, the Defendants removed the case to the U.S. District Court.

(Doc. 1.)  The Defendants moved to dismiss the claims against them.  As the Defendants state in

their Motion, this Court granted their motions to dismiss, holding that Mr. Owens' claims were

time-barred, that the Individual Police Defendants were entitled to qualified immunity, and that

Mr. Owens failed to state a *Monell* claim against the BPD.  (Docs. 40, 45.)  Mr. Brave moved to

dismiss only on the grounds of statute of limitations.  (Doc. 45.)

Mr. Owens timely appealed, and on September 24, 2014, the Fourth Circuit Court of

Appeals reversed this Court's decision on the Motions to Dismiss as to all defendants except the

Baltimore City State's Attorney's Office, and remanded the case for further proceedings.  The

Fourth Circuit denied Appellees' petition for rehearing or rehearing en banc.  No judge requested

a poll on the petition for rehearing en banc.  (Order Denying Petition for Rehearing and

Rehearing En Banc, App. Doc. 68 (Oct. 21, 2014).)

Now, almost nine years after his conviction was originally overturned, and almost

twenty-eight years after he was originally convicted, Mr. Owens finally has the opportunity to

seek compensation for the Defendants' unconstitutional actions.

# IV.   ARGUMENT

### A.   Discovery should proceed against all Defendants pending the Police Defendants' proposed certiorari petition.

#### i.   The Police Defendants must establish "good cause" to obtain a Rule 26(c)(1) protective order.

At the outset, the BPD and the Individual Police Defendants fail to frame the stay portion of their motion under the correct legal standard.[1] This Court holds the inherent power to manage discovery in cases on its docket.  But it is not enough for the Police Defendants to appeal to this inherent power.  Instead, the movants must overcome the "rather high hurdle" of Fed. R. Civ. P. 26(c) to show good cause for a stay.  *See Baron Fin. Corp. v. Natanzon*, 240 F.R.D. 200, 202 (D. Md. 2006); *see also United States v. Any & All Assets of Shane Co.*, 147 F.R.D. 99, 101 (M.D.N.C. 1993) ("The motion to stay, in reality, seeks a protective order pursuant to Fed. R. Civ. P. 26(c) and thus the petitioner must show good cause.").  That Rule provides that "[a] party . . . from whom discovery is sought may move for a protective order," which "may" issue only "for good cause," to protect a party from "undue burden or expense."  Fed. R. Civ. P. 26(c)(1). While the Rule does "'confer[] broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required,'" *Furlow v. United States*, 55 F. Supp. 2d 360, 366 (D. Md. 1999) (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984)), such orders "'should be sparingly used and cautiously granted,'" *Baron Fin. Corp.*, 240 F.R.D. at 202 (quoting *Medlin v. Andrew*, 113 F.R.D. 650, 652 (M.D.N.C. 1987)).

Commensurate with this "heavy burden" of establishing good cause to stay discovery, *Medlin*, 113 F.R.D. at 653, convincing this Court of the substantive merit of the movants'

---

[1] The motion is vague as to whether BPD and the Individual Police Defendants seek a stay of all discovery (*i.e.*, a stay of the entire case) or only of discovery as to the Police Defendants pending their proposed certiorari petition. As Mr. Brave did not join in the motion to stay and has not otherwise indicated any opposition to discovery at this time, discovery should proceed at a minimum as to Mr. Brave.

proposed petition is only their first step.  The movants must also present "particular and specific" facts substantiating the harm they allege will occur in the absence of a protective order.  *Baron Fin. Corp.*, 240 F.R.D. at 202.  In addition, they must "'come forward with a specific factual showing that the interest of justice and considerations of prejudice and undue burden to the parties require a protective order and that the benefits of a stay outweigh the cost of delay.'" *Wymes v. Lustbader*, No. CIV. WDQ-10-1629, 2012 WL 1819836, at *3 (D. Md. May 16, 2012) (Grimm, J.) (quoting 10A John Kimpflen *et al.*, *Fed. Proc., L. Ed.* § 26:334 (2012) (quoting *Kron Med. Corp. v. Groth*, 119 F.R.D. 636, 638 (M.D.N.C. 1988))).

The Police Defendants' motion to stay falls far short of these standards.

> ii.     **The Police Defendants fail to establish a reasonable likelihood that their certiorari petition will be granted.**

To establish a reasonable likelihood that the Supreme Court will review this case, the Police Defendants must show "a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari."  *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010). At the threshold, discretionary review in the Supreme Court ordinarily requires a "compelling" showing that

> (a) a United States court of appeals has entered a decision in conflict with the decision of another United States court of appeals on the same important matter; . . . or has so far departed from the accepted and usual course of judicial proceedings . . . as to call for an exercise of this Court's supervisory power; [or]
>
> . . .
>
> (c) . . . a United States court of appeals has decided an important question of federal law that has not been, but should be, settled by this Court, or has decided an important federal question in a way that conflicts with relevant decisions of this Court.

S. Ct. R. 10.  The Rule further cautions that discretionary review "is rarely granted when the asserted error consists of erroneous factual findings or the misapplication of a properly stated

rule of law."  *Id.*  The Police Defendants' preview of their proposed certiorari petition[2] is hardly "compelling" under Rule 10.[3]

### a.    Limitations

The statute of limitations dispute in this case is very discrete – the question is not *whether* the bar under *Heck v. Humphrey* was removed for Mr. Owens such that his § 1983 claim accrued, but *when*.  Courts agree that when the most analogous state law claim to the § 1983 claim is malicious prosecution, there must be a "favorable termination" to the proceedings.  The Police Defendants assert that an inter-circuit conflict exists between the Fourth Circuit and the Sixth, Seventh, Ninth, Tenth and Eleventh Circuits, which they allege "have all held that the statute of limitations for a *Brady* type or other Section 1983 wrongful conviction claim accrues on the date the Plaintiff has achieved a favorable determination [*sic*] under *Heck* (not the common law), i.e. when the underlying conviction is invalidated."  (Doc. 58-1 at 9.)  In support of their position, the Police Defendants offer a two-page string cite to illustrate the purported conflict.  (*Id.* at 9-11.)  But a critical study of the cited cases reveals no conflict between the Fourth Circuit and the other Circuits.  *See* S. Ct. R. 10(a).[4]  To the extent these courts reach a different conclusion than the Fourth Circuit, each cited case is distinguishable.

---

[2] As of the date of this response, the Police Defendants have yet to file the proposed petition.  Unless an extension is obtained, the petition must be filed on or before January 20, 2015.

[3] Nor do the odds favor the granting the petition.  Based on statistics extrapolated from *Harvard Law Review* over the past five Supreme Court terms, there is approximately a 95.5% chance that the petition will not be selected for review (out of all petitions in cases in which a filing fee was paid, which include government petitions).  *See The Statistics*, tbl. II(B), *in* 124 HARV. L. REV. 411, 418 (2010); 125 HARV. L. REV. 362, 369 (2011); 126 HARV. L. REV. 388, 395 (2012); 127 HARV. L. REV. 408, 416 (2013); *and* 128 HARV. L. REV. 401, 409 (2014), *available at* http://harvardlawreview.org/category/statistics/.  Cases involving state or local government litigants comprised approximately 16% of all dispositions with full opinions during that period (of which there were, on average, fewer than 79 per year), but of those, very few were classified as concerning limitations or qualified immunity issues.  *See The Statistics*, tbl. III, *in* 124 HARV. L. REV. at 422-26; 125 HARV. L. REV. at 373-77; 126 HARV. L. REV. at 399-403; 127 HARV. L. REV. at 420-22; *and* 128 HARV. L. REV. at 413-15.

[4] Nor is there any indication that the Fourth Circuit departed from the usual course of judicial proceedings, S. Ct. R. 10(a), or that the case involved a question of first impression or decided an important federal question in conflict with relevant Supreme Court precedent, *id.* R. 10(c).

## Sixth Circuit

**"*D'Ambrosio v. Marino*, 747 F.3d 378, 385 (6th Cir. 2014) (*Brady*-type claim time barred because it accrued and statute of limitations began the date the conviction was vacated);" (Doc. 58-1 at 9)**

The Sixth Circuit's opinion in *D'Ambrosio* is entirely consistent with the Fourth Circuit's holding in this case. Contrary to the quoted parenthetical, the Sixth Circuit held that this plaintiff's *Brady*-type claims were *timely* — not barred — because they were brought within the applicable period (there, two years) after "his state conviction was vacated *and* the *Heck* bar was lifted." *D'Ambrosio v. Marino* ("*D'Ambrosio III*"), 747 F.3d 378, 385-86 (emphasis added), *cert. denied*, 83 U.S.L.W. 3238, 3346 & 3348 (U.S. Dec. 8, 2014). The federal district court initially granted D'Ambrosio a "conditional" writ of *habeas corpus* in 2008. The writ "required the state either to set aside [his] conviction and sentence or retry him." *Id.* at 382. As in Mr. Owens' case, the state chose to pursue the prosecution. The state also "continued to fail to disclose exculpatory evidence" and failed to notify either the state court or D'Ambrosio of the death of its key witness. *Id.* Thereafter, the federal district court issued an "unconditional" writ of *habeas corpus* in 2010, and the Sixth Circuit affirmed. *D'Ambrosio v. Bagley* ("*D'Ambrosio II*"), 656 F.3d 379, 388 (6th Cir. 2011), *cert. denied sub nom. Bobby v. D'Ambrosio*, 132 S. Ct. 1150 (U.S. 2012). D'Ambrosio filed his § 1983 action in 2011 while the unconditional writ was on appeal. *D'Ambrosio III*, 747 F.3d at 382. The Sixth Circuit found that the earliest point at which the limitations period could have begun was 2010, when the *unconditional* writ had been granted. *Id.* at 385 (citing *D'Ambrosio II*, 656 F.3d at 388). This is because it was only the *unconditional* writ that finally terminated the underlying state criminal proceeding in D'Ambrosio's favor such that it could not be revived. *See id.* at 385-86. Similarly, the underlying state criminal proceeding in Mr. Owens' case was not so terminated until the State

entered the *nolle prosequi*.  The *D'Ambrosio* cases — which now have been denied certiorari *twice* — thus directly *support* the *Owens* majority's holding on limitations.

### Seventh Circuit

**"*Julian v. Hanna*, 732 F.3d 842, 849 (7th Cir. 2013) (indicating that the *Brady*-type claim, but not the malicious prosecution claim *per se*, was time-barred and Plaintiff did not contest the district Courts decision on the issue only that Defendants should be equitably estopped from pursuing the limitations defense);" (Doc. 58-1 at 9)**

The *Julian* case involved a § 1983 malicious prosecution claim with a separate § 1983 *Brady*-type claim.  *Julian*, 732 F.3d at 849.  Judge Posner, writing for the unanimous panel, observed that Julian's § 1983 malicious prosecution claim could not accrue "until the criminal proceeding that gives rise to it ends in the claimant's favor."  *Id.* at 845 (citing *Heck* and other authorities).  That claim therefore was timely brought within Indiana's two-year limitations period.  *Id.*  While the court stated, in *dictum*, that the *Brady*-type claim "may have accrued when Julian was granted a new trial in 2007" because the exculpatory evidence had been disclosed at that time, Judge Posner noted that "ordinarily" such a claim, although *ripe*, would not *accrue* until the underlying charges were dropped, "as otherwise Julian might have had to bring a separate section 1983 suit while defending against criminal charges in a retrial."  *Id.* at 849.  Although the appellate court ultimately found it unnecessary to decide the issue,[5] that happenstance does not raise a conflict between the Seventh and Fourth Circuits.  Judge Posner's reasoning is fully consistent with the *Owens* majority's view that Mr. Owens' claim may have been ripe prior to the entry of the *nolle prosequi*, but that limitations did not begin to run prior to that event.  *See Owens v. Balto. City State's Attorney's Office*, 767 F.3d 379, 389-92 (4th Cir. 2014).

---

[5] Rather than rely on the statute of limitations argument, Julian sought to equitably estop the defendants from shielding themselves with the statute; he alleged that they had threatened him not to file.  *Julian*, 732 F.3d at 849.

**"*Del Real v. Gomez*, 330 Fed. App'x 110, 111 (7th Cir. 2009) (Cause of action for wrongful prosecution accrued, and the statute of limitations for his § 1983 suit began to run, when the state appellate court vacated the prisoner's conviction.);" (Doc. 58-1 at 9-10)**

The plaintiff in *Del Real* successfully obtained post-conviction relief in state court in March 1999.  Three months later, the prosecutor "announced" the plaintiff "would not be retried."  *Del Real*, 330 F. App'x 110, 111 (7th Cir. 2009) (unpublished).  The plaintiff brought suit in August 2006.  *Id.*  The appellate court affirmed the district court's dismissal of the suit as untimely under Wisconsin's six-year limitations period, holding that "the state appellate court's decision (or, perhaps, the issuance of its mandate) caused Del Real's claim . . . to accrue."  *Id.*  It is obvious, however, that whether the period was calculated from March or June 1999, it had run more than one year prior to the filing of Del Real's suit.  Therefore, the Seventh Circuit panel's statement regarding accrual was *dictum*.  Given that the disposition is an unsigned, unpublished order with no precedential effect, *see* 7th Cir. Local R. 32.1(b), it does not create a conflict between the Seventh Circuit and the *Owens* majority.[6]

### Ninth Circuit

**"*Jackson v. Barnes*, 749 F.3d 755, 761 (9th Cir. 2014) ("Under *Heck* . . . Jackson's Fifth Amendment claim accrued when his initial conviction was overturned in March 2004."[)]" (Doc. 58-1 at 10)**

*Jackson*, decided in April 2014, considered the application of *Heck* and the statute of limitations to a prisoner's § 1983 claim based on a Fifth Amendment violation.  *Jackson*, 749 F.3d at 758.  The prisoner's first trial was tainted by the admission of an illegal confession.  Six months after the Ninth Circuit issued a writ of *habeas corpus* and reversed the conviction on that ground, the prisoner filed his § 1983 suit in federal court.  *Id.* at 759.  Unlike this case, the state

---

[6] Moreover, the *Del Real* disposition has been relied on only by the lower court that was reversed in *Julian*, *see Julian v. Hanna*, No. 11-cv-1536, 2013 WL 64516 (S.D. Ind. Jan. 4, 2013), *rev'd*, 747 F.3d 842, and was discussed by the Sixth Circuit in *D'Ambrosio*, 747 F.3d at 384, which was decided five months after the Seventh Circuit issued its opinion in *Julian* but did not cite to *Julian*.

in *Jackson* successfully retried the prisoner *without* using the illegal confession.  *Id.*  The federal district court subsequently held that the claim had not accrued under *Heck* because of the second conviction and granted summary judgment for the state in the prisoner's civil suit.  The Ninth Circuit reversed, holding that the § 1983 suit necessarily concerned the use of the illegal confession only in the first trial.  Accordingly, the *Heck* bar had been removed *and* limitations began to run on the date the Ninth Circuit had reversed the first conviction, and the prisoner's § 1983 claims were timely.  *Id.* at 761.

    *Jackson* is inapposite for two reasons.  First, in that case the analogous tort was not malicious prosecution; therefore, *final* termination of the criminal proceedings in the prisoner's favor was *not* required to start the limitations period or remove the *Heck* bar.  *See id.* at 761 & n.3 (citing *DiBlasio v. N.Y.*, 102 F.3d 654, 657 (2d Cir. 1996)).  Second, in that case the state did not rely on the illegal confession in the prisoner's second trial.  *Id.* at 760-61.  Here, however, the Circuit Court for Baltimore City granted Mr. Owens a new trial due to new DNA evidence, not to remedy the constitutional violations that tainted his first trial.  And because that court subsequently denied Mr. Owens' motion to exclude Mr. Thompson's testimony in the new trial, the new trial would have been tainted like the first — if not for the state's entry of a *nolle prosequi*.  That event finally terminated the criminal proceedings in Mr. Owens' favor, thus simultaneously commencing the limitations period *and* removing the *Heck* bar.  *See Owens*, 767 F.3d at 390.[7]  There is no inter-circuit conflict between the Ninth and Fourth Circuits based on *Jackson* and *Owens*.

---

[7] As the discussion in *Jackson* further makes clear, the Second and Tenth Circuits' opinions in *Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014) (en banc), and *Smith v. Gonzales*, 222 F.3d 1220 (10th Cir. 2000), are likewise distinguishable on the facts.  *See Jackson*, 749 F.3d at 760-61 (observing that *Heck* did not bar the claims in either *Poventud* or *Smith*).

**"*Rosales-Martinez*, 753 F.3d at 896 (*Brady*-type claim accrued and statute of limitations began to run when his conviction was vacated.);"  (Doc. 58-1 at 10)**

In *Rosales-Martinez v. Palmer*, 753 F.3d 890 (9th Cir. 2014), decided two months after *Jackson*, the Ninth Circuit reversed the district court's grant of a Rule 12(b)(6) motion to dismiss on limitations grounds.  It held that the limitations period began on the date the plaintiff's underlying conviction was vacated because that was the date the *Heck* bar to the plaintiff's suit would have been removed.  *Rosales-Martinez*, 753 F.3d at 895.  The Court did not address this issue in this case – whether the claim would accrue on the date the plaintiff's conviction was vacated or the date the case finally terminated because, for Rosales-Martinez, it was the same day.  Moreover, the court took judicial notice that on the same day, the plaintiff had pled guilty to one of the four original charges brought against him, thus suggesting the continuing validity of a portion of the original conviction.  *Id.* at 897.  Therefore, the appellate court instructed the district court to reconsider whether the claims remained valid under *Heck* and *Jackson* because of the existing conviction.  *Id.* at 899.  The *Rosales-Martinez* opinion does not establish an inter-circuit conflict between the Ninth and Fourth Circuits on the limitations issue.

## Tenth Circuit

**"*Smith v. Gonzales*, 222 F.3d 1220, 1222 (10th Cir. 2000) (Ex-convict's § 1983 claim based on prosecution's violation of Brady v. Maryland by withholding exculpatory evidence in state murder trial accrued, for statute of limitations purposes, when conviction was vacated in federal habeas corpus proceedings and case was remanded with instructions to either conduct new trial or order ex-convict's release from prison; as of that date, § 1983 suit would not have demonstrated invalidity of murder conviction, as it had been vacated, and retrial necessarily could not have implicated same constitutional violations.);"[8]  (Doc. 58-1 at 10)**

Like *Jackson*, *Smith* is factually inapposite and consonant with the *Owens* majority opinion.  Smith successfully petitioned the Tenth Circuit for a writ of *habeas corpus* and vacatur of his conviction based on the prosecution's failure to disclose exculpatory evidence.  *Smith*, 222

---

[8] This text is copied verbatim without citation from the Westlaw headnote preceding the appellate court's opinion.

F.3d at 1222.  Because the *habeas* ruling "effectively prevented [the prosecution] from withholding the same exculpatory evidence if the State decided to retry Smith," the Tenth Circuit found the *Heck* bar was removed *and* limitations began to run as of the date of that ruling.  *Id.* *Smith* is distinguishable from this case because, as discussed above, Mr. Owens' conviction was vacated based on DNA evidence and court documents reflect that the state planned to use Mr. Thompson's tainted testimony in Mr. Owens' second trial, until it entered a *nolle prosequi*.

Notably, the *Smith* court observed that *Robinson v. Maruffi*, 895 F.2d 649 (10th Cir. 1990), a pre-*Heck* decision involving a § 1983 claim sounding in *malicious prosecution*, was *consistent* with *Heck* although factually distinguishable from *Smith*.  *Smith*, 222 F.3d at 1223 (stating that the *Robinson* claim was *not* time-barred; it did not accrue until the plaintiff's acquittal "because, until that time, he 'remained subject to . . . serious charges and went on trial for his life again . . . when the malicious prosecution conspiracy again resulted in presentation of the false case against him'") (quoting *Robinson*, 895 F.2d at 655).  The *Smith* court's discussion of *Robinson* suggests that if the Tenth Circuit were presented with Mr. Owens' case, it would allow his § 1983 claims to proceed, consistent with the *Owens* majority opinion.  *Cf. Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1215 (10th Cir. 2014) (noting that "[f]ollowing *Wallace*, we determine the accrual date of Plaintiff's claim by looking to the accrual date for the common-law tort most analogous to her § 1983 claim"), as quoted in *Owens*, 767 F.3d at 389.[9]

---

[9] *Smith*, according to the Police Defendants, has been followed by the Second Circuit.  (Doc. 58-1 at 11 ("*Poventud*, 750 F.3d at 130-31 (citing *Smith*, 222 F.3d at 1222).").)  Chief Judge Traxler cited *Poventud v. City of New York*, 750 F.3d 121, 130–31 (2nd Cir. 2014) (en banc) for the broad proposition that "'[u]nder the common law any final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination for purposes of a malicious prosecution action.'"  *Owens*, 767 F.3d at 405 (Traxler, C.J., dissenting).  But *Poventud* is distinguishable because the Second Circuit found the plaintiff's claim was *not* analogous to malicious prosecution.  Thus the plaintiff in that case did not require a favorable termination of the underlying criminal proceedings to maintain his suit.  *Poventud*, 750 F.3d at 136 ("[H]ad Poventud's complaint sounded in malicious prosecution, rather than in a procedural *Brady*-based claim, that claim would have been barred because of the favorable termination element of the malicious prosecution tort.") (citation omitted).  More to the point, *Poventud* did not address the statute of limitations issue beyond its brief citation to *Smith*.

### Eleventh Circuit

**"*Porter v. White*, 483 F.3d 1294, 1304, n. 6 (11th Cir. 2007) (*Brady*-type claim accrued and statute of limitations began to run when his conviction was vacated.)"  (Doc. 58-1 at 10)**

The plaintiff in *Porter* successfully obtained a writ of *habeas corpus* from the Eleventh Circuit, which set aside his first conviction due to the state's failure to disclose two favorable police reports.  Armed with the police reports at his retrial later the same year, Porter achieved an acquittal.  *Porter*, 483 F.3d at 1296-97.  The Eleventh Circuit observed that Porter's claims were timely under the Florida statute of limitations because his claims did not accrue until the *Heck* bar was lifted when his *habeas* petition was granted.  *Id.* at 1304 n.6.  As in *Jackson* and *Smith*, the court had no reason to consider whether it was the grant of *habeas* or some other "favorable termination" of the proceedings that triggered the accrual of the § 1983 claim.  *Porter* does not support the existence of an inter-circuit conflict between the Eleventh and Fourth Circuits.

### b.      Qualified Immunity

The Police Defendants assert that their forthcoming petition will be meritorious because "the Supreme Court has never explicitly extended *Brady* obligations to law enforcement officers."  (Doc. 58-1 at 11.)  The citations they provide in support of this contention do not establish a compelling reason for the Supreme Court to grant discretionary review under Rule 10(a) or (c).[10]

The Supreme Court's well-established test for qualified immunity does not mandate that only the Supreme Court's decisions can put officials on notice of either constitutional rights or the clear establishment of the scope of those rights.  *See Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999).  Indeed, the Supreme Court has rejected the idea that an official action

---

[10] Moreover, the fact that *no* Fourth Circuit judge voted to grant the petition for rehearing en banc — not even Chief Judge Traxler — confirms that at least according to these jurists, review of the *Owens* decision is not needed "to secure or maintain uniformity of the court's decisions" or to review a "question of exceptional importance."  *See* Fed. R. App. P. 35(a).

is protected by qualified immunity unless the "action in question has previously been held [to be] unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Nor is "judicial unanimity" required to place a constitutional question "beyond debate." (Doc. 58-1 at 12.) Whether or not the *Jean I* and *II* judges "fervently disagreed," in 1998 and 2000, respectively, "about the existence, contours and scope of an officer's duty," *see Owens*, 767 F.3d at 410 (Traxler, C.J., dissenting), does not establish the nonexistence of that duty in 1987-88. The majority correctly reasoned through the cases from *Brady* through *Goodwin* and rejected the Police Defendants' fallacious argument on the import of *Jean I* and *II*. *See Owens*, 767 F.3d at 399-401 (majority op.).

In sum, the Police Defendants' petition for certiorari is unlikely to be granted. The remaining factors to be considered to obtain a stay of discovery do not and cannot outweigh the proposed certiorari petition's patent lack of merit.

> ### iii.     The Police Defendants fail to make a particular and specific showing of the irreparable harm they will incur if discovery is not stayed.

"Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing" to warrant a stay of discovery. *Baron Fin. Corp.*, 240 F.R.D. at 202 (quoting *Merit Indus., Inc. v. Feuer*, 201 F.R.D. 382, 384-85 (E.D. Pa. 2001)). Here, the Police Defendants primarily raise the broadest allegation of harm: that they will be deprived of the "full benefit" of their limitations and qualified immunity defenses if discovery is not stayed. (Doc. 58-1 at 13-14.) But the Police Defendants have already received the benefit of the efforts of this Court, two years ago, and of the Fourth Circuit this year, to determine the viability of these defenses prior to allowing discovery to proceed. It does not

follow from the fact that their defenses were rejected on (non-discretionary) review in the Fourth

Circuit that they will be further deprived of the "full" benefit of these defenses.[11]

The BPD does make one attempt to more specifically assert irreparable harm if discovery

is not stayed.  It claims that "it seems likely that the discovery in this case for the § 1983 *Monell*

claims against the BPD will be an enormous task (including significant searching and producing

e-discovery)."  (Doc. 58-1 at 20.)  But the BPD fails to clothe this bare assertion with particular

facts.  Moreover, the BPD did not oppose Mr. Owens' request for a minimum of 70 hours of

depositions in the parties' joint proposed modifications to the Scheduling Order.  The BPD did

not request a reduction or other special limitation on the amount of written discovery available

under the Federal Rules.  The BPD, which presumably has knowledge of how it maintains its

ESI, agreed that it was likely, given that the bulk of the events in this case occurred more than 25

years ago, that there would be minimal ESI to search.  Thus, any claim of *undue* burden or

expense to the BPD in discovery is premature at this time.[12]

In addition, Defendants' failure to move the Fourth Circuit for a stay of its mandate on

denial of their petition for rehearing or rehearing en banc further undermines their claim of

irreparable harm.  *See* Fed. R. App. P. 41(d)(2) (providing that a motion "to stay the mandate

pending the filing of a petition for a writ of certiorari . . . . must show that the certiorari petition

would present a substantial question and that there is good cause for a stay").  Proceeding with

full discovery at this time, when the chance of success on the proposed petition is very low, is

both appropriate and efficient.

---

[11] The viability of the Individual Police Defendants' qualified immunity defense could be reconsidered on summary
judgment if these defendants can show, *after discovery*, that no genuine dispute of material fact exists as to whether
they committed the alleged violations of Mr. Owens' constitutional rights.  (That such rights were clearly
established is, of course, now the law of the case unless reversed by the Supreme Court.)
[12] Even if this Court were to order a stay of written discovery (which it should not), Mr. Owens should be permitted
to proceed with depositions.  *See Wymes*, 2012 WL 1819836, at *4 (citing 10 Kimpflen *et al.*, *supra*, § 26:191
("Absent a strong showing of good cause and extraordinary circumstances, a court should not prohibit *altogether* the
taking of a deposition.") (emphasis added in *Wymes*)); *see also Baron Fin. Corp.*, 240 F.R.D. at 202.

Although few courts have considered in written opinions the appropriateness of a stay while a petition for writ of certiorari is pending, one district court has discussed the issue in depth, concluding a stay was not appropriate or efficient. *See Lowery v. Cnty. of Riley*, No. 04-3101-JTM-DWB, 2008 WL 3562061, at *1-2 (D. Kan. Aug. 12, 2008). In *Lowery*, the defendants in a § 1983 action moved the district court to stay discovery pending the filing of their proposed petition for certiorari after the Tenth Circuit dismissed the defendants' interlocutory appeal on qualified immunity grounds. *Id.* at *1; *see Lowery v. County of Riley*, 522 F.3d 1086, 1091-92 (10th Cir. 2008). On remand, the defendants argued that permitting discovery to proceed during the pendency of their petition "would effectively deny them the full benefits of the qualified immunity they seek." *Lowery*, 2008 WL 3562061, at *1. The district court considered whether to bifurcate discovery so as to allow *Monell* discovery to proceed during the pendency of the certiorari petition, to stay all discovery, or to allow full discovery. *Id.* The district court rejected the first alternative because "[i]t would be very difficult, if not impossible, to delineate precisely the scope of any discovery that could take place . . . so that it did not include evidence related to the qualified immunity claims." *Id.* at *2. It rejected the second alternative because it viewed the proposed petition as having a very low likelihood of being granted. *Id.* "Considering all the facts," the district court concluded that full discovery was appropriate to avoid further delays. *Id.* The district court emphasized that the case had been pending for more than four years, the defendants had had "ample opportunity to make their case for a finding of qualified immunity," and on balance, the small chance that defendants' petition would prevail did not outweigh the harm to the plaintiffs from continued delay. *Id.* As in *Lowery*, the stay the Police Defendants request should be denied.

iv.      **Because the requested stay will substantially injure and unfairly prejudice Mr. Owens, the purported "benefits" of a stay will not outweigh the costs of delay, and the interest of justice favors proceeding with discovery.**

A stay pending a petition for certiorari is far from automatic, even where issues that pose a bar to suit are concerned.  *See Nken v. Holder*, 556 U.S. 418, 427 (2009) (Roberts, C.J.) ("A stay is an 'intrusion into the ordinary processes of administration and judicial review,' and accordingly 'is not a matter of right, even if irreparable injury might otherwise result to the [movant].'") (citations omitted).  To the contrary, Rule 26(c)(1) requires a movant to show good cause – a "heavy burden," *Medlin*, 113 F.R.D. at 653, that requires the movant to overcome a "high hurdle," *Baron Fin. Corp.*, 240 F.R.D. at 202.  The Police Defendants have failed to make the showing this Rule requires.  Because a stay of discovery against BPD and the Individual Police Defendants – which would, in effect, stay the entire case against the Defendants – will compound, without warrant, the egregious delay already suffered in Mr. Owens' case, the interest of justice weighs against the stay and in favor of discovery.

B.      **Bifurcation is not proper because it creates unnecessary litigation and does not prejudice the BPD.**

Under Fed. R. Civ. P. 42(b), the Court may bifurcate claims "to avoid prejudice, or to expedite and economize."  Bifurcation, however, is not mandatory.  It "is intended to further convenience, avoid delay and prejudice, and to serve the ends of justice.  It is appropriate only when the court believes that separation will achieve the purposes of the rule." *R.E. Linder Steel Erection Co. v. Wedemeyer, Cernik, Corrubia, Inc.*, 585 F. Supp. 1530, 1534 (D. Md. 1984).   To that end, bifurcation is inappropriate if the evidence on liability and damages overlaps.  *See* 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2390 (3d ed. 2010).

The decision of whether or not to bifurcate claims is within the Court's "sound discretion."  *Bowie v. Sorrell*, 209 F.2d 49, 51 (4th Cir. 1953).  It should not be routinely granted.

Fed. R. Civ. P. 42, advisory note.  Moreover, "[t]he burden of proving that bifurcation is warranted rests with the moving party." *Clements v. Prince George's Cnty.*, No. 00–185, 1992 WL 165814, at *1 (D. Md. June 30, 1992).

In the present case, the claims against the Individual Police Defendants and the BPD are so intertwined that bifurcation of discovery will likely create unnecessary litigation, rather than streamlining it.  In addition, unlike in many cases in which this Court has granted motions to bifurcate, the information related to the *Monell* claims in this case is not unduly prejudicial toward the Individual Police Defendants and bifurcation would, in fact, prejudice Mr. Owens in his claims against those defendants.  Finally, because the BPD may be found liable even if the Individual Police Defendants receive qualified immunity, bifurcation would not necessarily avoid a second phase of litigation.

### i.       Bifurcation of discovery would create unnecessary litigation.

Courts have held that where the claims are so intertwined that bifurcation would not limit discovery in the first phase of litigation, bifurcation is not appropriate.  *See, e.g.*, *Ott v. City of Milwaukee*, No. 09-C-870, 2010 WL 5095305, at *3 (E.D. Wis. Dec. 8, 2010); *see also Marryshow v. Town of Bladensburg*, 139 F.R.D. 318, 320 n.6 (D. Md. 1991) ("In a case in which there is substantial overlap of evidence, it may be less, rather than more, efficient to bifurcate the trial.").  Here, as the Fourth Circuit recognized, a significant issue in this case is whether the Individual Police Defendants acted in bad faith to withhold evidence from Mr. Owens.  *Owens*, 767 F.3d at 396-97.  To determine whether they acted with the requisite intent, Mr. Owens is entitled to conduct discovery into the BPD's policies and procedures at the time and whether those policies directed the officers to act as they did in this case, or, conversely whether they failed to follow existing polies and procedures that required them to disclose exculpatory

evidence.  Discovery related to these issues also goes to the heart of Mr. Owens' *Monell* claims.  Bifurcation will not limit discovery on those topics in the first phase of the litigation.

In addition, Mr. Owens has alleged that the Individual Police Defendants were senior members of the BPD and had supervisor power.  They would therefore be witnesses to not only their own conduct, but the policies, practices and customs of the BPD.  Bifurcation would cause them to have to be deposed twice, creating unnecessary duplication of effort.

Moreover, should the Court bifurcate the claims against the BPD, the BPD will inevitably claim that discovery into policies and procedures should be delayed to the second phase of the case.  It is likely that such objections will lead to motions for protective orders and to compel discovery, creating additional litigation that would not be necessary without bifurcated discovery.[13]

### ii. Evidence related to Mr. Owens' *Monell* claims will be admissible in a trial against the Individual Police Defendants.

As discussed above, evidence about the Individual Police Defendants' training and the BPD's policies and customs is relevant to and highly probative of the Individual Police Defendants' intent in withholding evidence from Mr. Owens.  Although the Police Defendants cite several cases from this district in which the Court has bifurcated *Monell* claims based on the prejudicial nature of *Monell*-related evidence, all of those cases deal with false arrest or police brutality claims, which are factually distinguishable from the wrongful conviction claims in this case.  *See, e.g.*, *James v. Frederick County Pub. Schs.*, 441 F. Supp.2d 755, 762 (D. Md. 2006);

---

[13] Consolidated discovery, with a later bifurcated trial, may address this issue.  But it is unnecessary and premature to decide to bifurcate the trial when no discovery has yet occurred.  Defendants could raise the issue again after discovery.  *See Rivas v. Figueroa,* No. 11-23195-CIV, 2011 WL 5592839, at *2 (S.D. Fla. Nov. 15, 2011) ("Even if it is later determined that the risk of unfair prejudice to the individual officer-Defendants is so great as to warrant separate trials as between them and the City of Miami Beach, there is no need to delay discovery into the Plaintiffs' claims against the City at this stage of the case.").

*Robertson v. Prince George's County*, 215 F. Supp. 2d 664, 665 (D. Md. 2002); *Jones v. Ziegler*, 894 F. Supp. 880, 883 (D. Md. 1996); *Dawson v. Prince George's Cnty.*, 896 F. Supp. 537, 540 (D. Md. 1995); *Marryshow*, 139 F.R.D. at 319-320.  Evidence related to the policies and procedures of the BPD would be subject to Fed. R. Evid. 403.  In this case, the evidence would be more probative than prejudicial and would therefore be admissible.

In this case, the allegations in the complaint are based on the sworn testimony of the Individual Police Defendants and Mr. Brave at the trial of James Thompson, during which they admitted to knowing about the several additional versions of Mr. Thompson's testimony that were never disclosed to Mr. Owens and that they did not believe that Mr. Thompson was a credible witness.  The allegations related to Mr. Oliver are derived from Mr. Brave's own file. The transcript from Mr. Owens' trial makes clear that his counsel had no knowledge of any of these facts before or during the trial, when he could have used them to effectively cross examine the witnesses against Mr. Owens.  Because there is virtually no dispute that evidence was withheld, the question is only whether the Individual Police Defendants exercised bad faith in withholding the evidence.

Conversely, in cases where there are questions about excessive use of force, there are often significant disputes over what actually happened in the confrontation between the plaintiffs and law enforcement that bear heavily on whether the plaintiffs can prove their claims.  *See, e.g.*, *James*, 441 F. Supp. 2d at 758 ("The Board argues that James cannot prevail because it is clear that Officer Burton's actions were proper."); *Jones*, 894 F. Supp. at 993 (case bifurcated at "early stage" of case where individual officer ultimately went to trial on issue of whether he had committed a battery); *Williamson v. Prince George's Cnty.*, No. DKC 10-1100, 2011 WL 1065780, at *1 (March 21, 2011) ("the parties offer conflicting versions of the events . . .").  In

those cases, courts have reasonably held that the existence of "prior incidents of police brutality . . . and municipal policymakers' reaction to them" would be highly prejudicial in an individual defendant's trial. *See Dawson*, 896 F. Supp. at 540. How a municipality reacted to an unrelated instance of brutality, committed by a different officer, may be relevant to whether the municipality condoned such actions, but it is not highly relevant to the factual dispute at issue: whether the particular officer defendant actually committed the brutal act.

Here, because there is virtually no dispute that evidence was withheld, the officers' liability hinges on whether they acted in bad faith in withholding the evidence. The BPD's policies, training and customs related to disclosing evidence are highly probative of whether the individual officers knew of their duty to disclose exculpatory and impeachment evidence and therefore whether they intentionally and maliciously withheld the evidence in this case.

The facts of other cases in which evidence has been withheld and on policies related to the disclosure of evidence are also far less inflammatory than the analogous facts in excessive force cases. Even the most unsophisticated jurors can agree that law enforcement officers are not supposed to intentionally and physically harm citizens with whom they come in contact, and the emotional weight of evidence related to other cases in which officers have acted improperly in this way may be highly prejudicial. The average juror is less likely to be familiar with the *Brady* rules and their importance in the criminal justice system, and they are therefore less likely to be affected emotionally by evidence that similar violations have occurred in other cases.

      iii.       **A verdict for the Individual Police Defendants would not necessarily prevent the second phase of litigation.**

Although the Supreme Court has held that there can be no municipal liability where there is no constitutional violation, *see City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), it does not necessarily follow that the BPD can only be liable if the Individual Police Defendants are

found liable.  Several courts of appeals have held that there are circumstances under which individual defendants could assert qualified immunity defenses that would not be available to the municipal entity.  *Thomas v. Cook County Sheriff's Dep't,* 604 F.3d 293, 304–05 (7th Cir. 2010) ("a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an inconsistent verdict"); *Barrett v. Orange Cnty. Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999) ("We agree with our sister circuits that under *Monell* municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants."); *Anderson v. Atlanta*, 778 F.2d 678, 686 (11th Cir.1985) ("*Monell* . . . and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on local government"); *Garcia v. Salt Lake Cnty.,* 768 F.2d 303, 310 (10th Cir. 1985) ("*Monell* does not require that a jury find an individual defendant liable before it can find a local governmental body liable."); *Rivas v. Figueroa*, No. 11-23195-CIV, 2011 WL 5592839, at *2 (S.D. Fla. Nov. 15, 2011).

The Individual Police Defendants have vehemently asserted their qualified immunity defense and propose to continue to attempt to do so even in the Supreme Court.  Because it is an entity, however, the BPD it does not possess qualified immunity from § 1983 claims.  *Owen v. Independence*, 445 U.S. 622, 638 (1980).  Thus, it is possible that the Individual Officer Defendants could prevail on a qualified immunity defense that is not available to the BPD. Consequently, bifurcation would only create substantial additional delay.

Unlike a police brutality claim, where there is clearly no municipal liability where the individual officers did not use excessive force, *see Heller*, 475 U.S. at 799, a claim for the withholding of exculpatory evidence could be predicated on an officer's acting in good faith,

pursuant to municipal policy or custom, which nevertheless could result in the unconstitutional withholding of exculpatory evidence. Although Mr. Owens alleges the Individual Police Defendants acted in bad faith, it is conceivable, at least in theory, that a jury could find that the Individual Police Defendants did not act in bad faith. In that situation, the Court could potentially hold[14] they were entitled to qualified immunity, but the BPD would still face liability for the policies and customs that caused the Individual Police Defendants to wrongfully withhold evidence from Mr. Owens.

The Fourth Circuit definitively held that officers cannot be granted qualified immunity where, as Mr. Owens has alleged in this action, they withhold exculpatory or impeachment evidence in bad faith. *Owens*, 767 F.3d at 396-97 & n.6. But, the court did not reach the question of whether qualified immunity applies where the officers acted in good faith, but still withheld exculpatory evidence that resulted in a violation of the defendant's rights. The Supreme Court has held that a *Brady* violation arises when police withhold relevant exculpatory or impeachment evidence, regardless of whether the prosecutors knew of the evidence, *see Kyles v. Whitley*, 514 U.S. 419, 438 (1995), and regardless of whether the police can argue they acted in good faith. *See Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006). Thus, the BPD's policies, practices, or customs of withholding evidence would create a constitutional violation even if the Individual Police Defendants could potentially raise a qualified immunity defense to such actions. In that case, bifurcation would not prevent the need for a trial on the *Monell* claims.

---

[14] Mr. Owens maintains his position that the Individual Police Defendants would not be entitled to qualified immunity even if they acted without bad faith, which is an open question in the Fourth Circuit. However, if the Court held otherwise, Mr. Owens would still be entitled to proceed against the BPD.

## V.      CONCLUSION

A stay should not be granted because the Police Defendants have failed to show good cause as required by Fed. R. Civ. P. 26(c)(1).  Nor should bifurcation be granted.  In this case, unlike others previously decided in this district, bifurcation does not promote fairness or efficiency.  It will cause duplicative discovery, create additional litigation over discovery issues, and require a second trial with many of the same witnesses.  Consequently, it will cause unnecessary delay.  Mr. Owens has already waited eight years from his exoneration to proceed on this case.  He should not be forced to wait any longer.


Respectfully submitted,

Date:   January 16, 2015                          /s/

_____

Joshua R. Treem (#00037)
Laura Ginsberg Abelson (#29363)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 1700
Baltimore, MD 21202
Tel: 410-962-1030
jtreem@browngold.com
labelson@browngold.com

Charles N. Curlett, Jr. (#28246)
Sarah F. Lacey (#28874)
LEVIN & CURLETT LLC
201 N. Charles St., Suite 2000
Baltimore, MD 21201
Tel: 410-685-4444
Fax: 410-685-2222
ccurlett@levincurlett.com
slacey@levincurlett.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 16, 2015, I caused the foregoing *Response in Opposition to Defendants' Motion to Stay Discovery and Bifurcate Claims* to be filed on the Court's CM/ECF system for service on all counsel of record.

_____/s/_____
Laura Ginsberg Abelson