Exhibit 2

To Defendant Marvin Brave's Memorandum in Support of Motion for Summary Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMES OWENS,            *

   *Plaintiff*,            *

v.            *    Civil Action No: 11-cv-03295-GLR

MAYOR & CITY COUNCIL OF            *
BALTIMORE, *et al.*,
           *

   *Defendants*.
           *

\* \* \* \* \* \* \* \* \* \* \* \* \*

## DECLARATION OF MARVIN EDWARD BRAVE

I, Marvin Edward Brave, under penalty of perjury, declare and state:

1. I am over the age of 18 and am competent to testify to the matters stated below.

2. From 1972 to 1996, I was an Assistant State's Attorney for Baltimore City within the Trial Division of the Office of the State's Attorney for Baltimore City (the "Office").

3. It was the standard practice of the Office that Trial Division Attorneys did not assist with the preliminary investigation of violent crimes, nor did they assist in grand jury proceedings.

4. In keeping with this practice, I was assigned to prosecute Mr. Owens on or around October 2, 1987, after Mr. Owens had been indicted by the grand jury. I was not involved with the Baltimore Police Department's preliminary investigation of Ms. Williar's death. I did not participate in any grand jury proceedings, nor did I have any discussions with then-Assistant State's Attorney Timothy Doory about the Owens prosecution until after I was assigned as the trial prosecutor.

5. I did not have contact with any of the State's witnesses until after I was assigned to prosecute Mr. Owens and, thus, after Mr. Owens had been indicted by the grand jury.

1

6. I first learned of potential trial witnesses from the Prosecution Report prepared by Det. Thomas Pellegrini of the Baltimore Police Department and the material accompanying the Prosecution Report contained within an investigatory file that I received after I was assigned to prosecute Mr. Owens.

7. Exhibit 6 to the memorandum in support of my motion for summary judgment, containing documents Bates stamped OSA000029 through OSA000032, is a true and correct copy of the Prosecution Report prepared by the Baltimore Police Department that I reviewed in preparation for the trial of James Owens.

8. As a prosecutor, I was aware of my duty to disclose material exculpatory and impeachment evidence to the defense.

9. I disclosed information to defense counsel in different ways, including by mail, in person in my office, over the telephone, and at trial.

10. I recall that during preparation for the Owens trial, I met with his defense attorney, David Eaton, on numerous occasions in my office, during which time we discussed the case.

11. Although I do not specifically recall discussing Larry Oliver with Mr. Eaton, I have no doubt that during these discussions we discussed Larry Oliver. I believe that at some point during these meetings, I would have shown Mr. Eaton the letters that Mr. Oliver sent me.

12. In any event, it was my standard practice to disclose at trial, after opening statements, all material relating to witnesses by providing defense counsel with my witness files. During trial preparation, it was my habit to keep meticulous files. I have no doubt that my file for Larry Oliver contained the letters Larry Oliver sent me and also contained an internal memorandum I wrote on February 9, 1988, stating that I had taken possession of Mr. Oliver's court file.

13. Accordingly, I have no doubt that I disclosed to the defense the Oliver letters and memorandum referenced in paragraph 12, at the latest after opening statements at trial.

14. During my preparation for Mr. Owens's criminal trial, as was my standard practice, I met with and spoke to potential witnesses to assess whether I should call them at trial and, if I planned to call them at trial, to prepare their testimony and to assist me in preparing the case for trial.

15. One of the State's key witnesses was James Thompson. Leading up to the day of Mr. Thompson's testimony, I found implausible the portion of Mr.

2

Thompson's statement to the police concerning how he found the knife that was the suspected murder weapon. At no time, however, did I have actual knowledge that Mr. Thompson's statement to the police was false. Although I believed that Mr. Thompson was holding something back, I did not believe that Mr. Thompson was a participant in the murder.

16. On the morning Mr. Thompson was scheduled to testify, I met with him in my office to review his testimony. During that meeting, I pointed out to Mr. Thompson that his statement about how he found the knife was implausible, and I implored him to tell the truth about how the knife really got back into his possession.

17. At that time, Mr. Thompson stated that he had received the knife directly from Mr. Owens on the Monday morning after Ms. Williar's murder when Mr. Owens brought it to Mr. Thompson's home.

18. Although it is never possible to know with certainty if a witness is being fully truthful, I believed that Mr. Thompson's statement likely was the truth, and I also believed that it would be persuasive to the jury. I continued to believe that Mr. Thompson was not a participant in the crime.

19. As a prosecutor and advocate for the State, I believed it was my job to present the strongest case I could present to the jury in order to establish guilt beyond a reasonable doubt. That ultimate goal notwithstanding, I never presented evidence to a jury that I knew to be false.

20. With regard to the testing of James Thompson's blood and hair, I disclosed to defense counsel and the court that the testing was being performed. I further disclosed to Mr. Eaton the police chemist's preliminary conclusion that Mr. Thompson's hairs matched those found on the scene. I made this disclosure when I returned from meeting with Mr. Profili in the crime lab during the lunch recess on Monday, February 29, 1988.

21. I was not present during the police interrogation of James Thompson on February 29, 1988.

22. That afternoon during trial, I received a note written by Det. Jay Landsman, stating that Mr. Thompson had confessed to burglarizing Ms. Williar's home with Mr. Owens.

23. I recall discussing with Det. Landsman the version of events that was the subject of Mr. Thompson's testimony, including Mr. Thompson's statement that he had masturbated over the victim.

24. To the best of my recollection, I was not told by Det. Landsman or anyone else that Mr. Thompson had given inconsistent statements during the course of the interrogation, prior to this final version.

25. To the best of my recollection, I remained in the courtroom or in the corridor just outside the courtroom during the recess before Mr. Thompson testified.

26. To the best of my recollection, the first time I saw Mr. Thompson on February 29, 1988, was when I called him to the witness stand to testify. I had no communications with Mr. Thompson, other than his trial testimony, on February 29, 1988.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

12/23/15
Date

Marvin Edward Brave