IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

JAMES OWENS,                            *

        Plaintiff,                   *

    v.                                  *        Civil Action No. GLR-11-3295

BALTIMORE POLICE DEPARTMENT,            *
*et al.*,
                                    *

        Defendants.         *     *     *     ooo0ooo     *     *     *

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
<u>DEFENDANT BRAVE'S MOTION FOR SUMMARY JUDGMENT</u>**

Joshua R. Treem (#00037)
Andrew D. Freeman (#03867)
Brooke E. Lierman (#17879)
Chelsea J. Crawford (#19155)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 1700
Baltimore, MD 21202
Tel.: 410-962-1030
Fax: 410-385-0869
jtreem@browngold.com
afreeman@browngold.com
blierman@browngold.com
ccrawford@browngold.com

Charles N. Curlett, Jr. (#28246)
Sarah F. Lacey (#28874)
LEVIN & CURLETT LLC
201 N. Charles St., Suite 2000
Baltimore, MD 21201
Tel.: 410-685-4444
Fax: 410-685-2222
ccurlett@levincurlett.com
slacey@levincurlett.com

*Attorneys for Plaintiff James Owens*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iii

TABLE OF EXHIBITS ..................................................................................................... vi

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 3

LEGAL STANDARD........................................................................................................ 10

ARGUMENT ................................................................................................................... 11

      I.      Because Mr. Brave Performed an Investigative and/or Advisory Function When  He Directed the Detectives to Obtain New Evidence from Mr. Thompson and Interrogate Him, Mr. Brave Is Not Entitled to Absolute Immunity. ........................................................................................ 12

              A.      Absolute immunity protects only advocatory conduct. ............................ 12

              B.      For the purpose of immunity analysis, the function performed controls  over the timing of the performance of that function. ................ 14

              C.      Because Mr. Brave advised the Detectives and/or directed their investigative conduct to obtain new evidence from Mr. Thompson, absolute immunity does not attach......................................... 16

      II.     Because He Violated Mr. Owens' Clearly Established Right Not to Be Deprived of Liberty as a Result of the Fabrication of Evidence by a Government Officer Acting in an Investigating Capacity, Mr. Brave Is Not Entitled to Qualified Immunity. ................................................................... 17

              A.      The record contains sufficient evidence from which a reasonable jury  may conclude that Mr. Brave was responsible for the fabrication of  Mr. Thompson's confession. ................................ 18

              B.      Mr. Owens' conviction is the legally cognizable result of Mr. Brave's  role in precipitating Mr. Thompson's false confession. ............. 20

              C.      Mr. Owens' right to be free from a deprivation of liberty caused by the fabrication of evidence was clearly established in 1988............... 24

CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................ 10

*Baker v. State*,
332 Md. 542, 632 A.2d 783 (1993) ......................................................................... 5

*Barbera v. Smith*,
836 F.2d 96 (2d Cir. 1987)...................................................................................... 13

*Brady v. Maryland*,
373 U.S. 83 (1963)........................................................................................... 1, 2, 3

*Buckley v. Fitzsimmons*,
509 U.S. 259 (1993).................................................................................. 13, 14, 15, 20

*Burns v. Reed*,
500 U.S. 478 (1991).......................................................................................... 12, 13

*Butz v. Economou*,
438 U.S. 478 (1978)................................................................................................ 12

*Carter v. Burch*,
34 F.3d 257 (4th Cir. 1994) ............................................................................ passim

*Charbonnages de France v. Smith*,
597 F.2d 406 (4th Cir. 1979) .................................................................................. 11

*Ehrlich v. Giuliani*,
910 F.2d 1220 (4th Cir. 1990) ................................................................................ 15

*Fields v. Wharrie*,
740 F.3d 1107 (7th Cir. 2014) .................................................................. 2, 14, 15, 20

*Forrester v. White*,
484 U.S. 219 (1988)................................................................................................ 12

*Genzler v. Longanbach*,
410 F.3d 630 (9th Cir. 2005) .................................................................................. 13

*Hampton v. Chicago*,
484 F.2d 602 (7th Cir. 1973) .................................................................................. 13

*Imbler v. Pachtman*,
424 U.S. 409 (1976)......................................................................................... 1, 12, 18

*Kalina v. Fletcher*,
  522 U.S. 118 (1997)......................................................................................... 12

*Libertarian Party of Va. v. Judd*,
  718 F.3d 308 (4th Cir. 2013) .......................................................................... 10

*Lyles v. Sparks*,
  79 F.3d 372 (4th Cir. 1996) ............................................................................ 13

*Malley v. Briggs*,
  475 U.S. 335 (1986).......................................................................................... 12

*McGhee v. Pottawattamie Cnty.*,
  547 F.3d 922 (8th Cir. 2008) ..................................................................... 14, 20

*Miller v. Pate*,
  386 U.S. 1 (1967).............................................................................................. 24

*Mooney v. Holohan*,
  294 U.S. 103 (1935).......................................................................................... 24

*Napue v. Illinois*,
  360 U.S. 264 (1959).......................................................................................... 24

*Overstreet v. Ky. Cent. Life Ins. Co.*,
  950 F.2d 931 (4th Cir. 1991) .......................................................................... 11

*Parklane Hosiery Co. v. Shore*,
  439 U.S. 322 (1979).......................................................................................... 24

*Pierce v. Ford Motor Co.*,
  190 F.2d 910 (4th Cir. 1951) .......................................................................... 11

*Polk v. Montgomery Cnty.*,
  782 F.2d 1196 (4th Cir. 1986) ........................................................................ 24

*State v. Thompson*,
  Crim. Nos. 18809133-36 (Cir. Ct. Balt. City July 14, 1988)................................. 23

*Stinson v. Gauger*,
  799 F.3d 833 (7th Cir. 2015) ............................................................... 15, 16, 18

*Thompson v. State*,
  411 Md. 664 (2009) .......................................................................................... 23

*Tolan v. Cotton*,
  134 S. Ct. 1861 (2014)............................................................................... 11, 22

*Van de Kamp v. Goldstein*,
    555 U.S. 335 (2009)..................................................................................... 13

*Washington v. Wilmore*,
    407 F.3d 274 (4th Cir. 2005) .......................................................... 14, 18, 20, 24

*Westfall v. Erwin*,
    484 U.S. 292 (1988)..................................................................................... 12

*Whitlock v. Brueggemann*,
    682 F.3d 567 (7th Cir. 2012) ........................................................................ 23

*Zahrey v. Coffey*,
    221 F.3d 342 (2d Cir. 2000)............................................................. 14, 20, 24

**Statutes**

42 U.S.C. § 1983 ............................................................................................. 1

**Rules**

Fed. R. Civ. P. 56 ........................................................................................... 10

**Constitutional Provisions**

U.S. Const. amend. IV ..................................................................................... 1

U.S. Const. amend. XIV ................................................................................ 1, 3

## **TABLE OF EXHIBITS**

Exhibit 45          Excerpts from Owens Trial
                    58-61; 69; 98; 124; 246; 325-326; 477-478; 487; 489-520; 643; 722; 752-
                    753; 773-774

Exhibit 46          Thompson Trial
                    329; 334-337, 341-45; 346-51; 356-359; 360-363; 368-369; 370; 378; 423-
                    425; 428-429; 438-439; 473-474; 477-478; 483; 486; 491; 500; 659-660;
                    665-666; 667-668; 672-673; 694-698; 705; 717-718; 721-722; 735-739; 760;
                    762; 778-779

## INTRODUCTION

James Owens was wrongfully convicted in Baltimore City in 1988 of the crimes of burglary and felony murder arising from the August 2, 1987, rape and homicide of Colleen Williar. After Mr. Owens served over 21 years in prison, having steadfastly maintained his innocence, DNA testing was performed on the only physical evidence in the case, and he was finally exonerated. In 2011, Mr. Owens brought this civil rights lawsuit under 42 U.S.C. § 1983 because the defendants, individually and in concert with one another, systematically violated his due process rights under the Fourth and Fourteenth Amendments of the United States Constitution and, in so doing, caused his wrongful conviction and imprisonment.

The remaining defendants from whom Mr. Owens seeks compensation for his wrongful conviction and imprisonment are the Baltimore Police Department ("BPD"); three of the BPD's former homicide detectives, Det. Thomas Pellegrini, Det. Gary Dunnigan, and Sgt. Jay Landsman (together, "the Detectives"); and Marvin "Sam" Brave, the former Baltimore City Assistant State's Attorney who prosecuted Mr. Owens.

Mr. Brave seeks summary judgment on two of his defenses. (Brave Mem. Supp. Mot. Summ. J., ECF No. 157-1 (herein "Brave Mem."); *see also* Brave Ans. 2d Am. Compl., ECF No. 162, at 30.) First, he asserts that he is absolutely immune from section 1983 liability under *Imbler v. Pachtman*, 424 U.S. 409 (1976), and *Carter v. Burch*, 34 F.3d 257 (4th Cir. 1994), because those precedents bar suits against prosecutors based on alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963), and because he claims that all of his alleged conduct was advocatory, that is, "intimately associated with the judicial phase of the criminal process." Mr. Brave further claims that even if his conduct was investigatory (or administrative or advisory) in nature, he is still entitled to qualified immunity either because his conduct did not violate Mr. Owens' rights under *Brady*, or because a reasonable prosecutor in 1988 would not have known

that any of the conduct of which Mr. Owens complains would have violated Mr. Owens' clearly established constitutional rights.

These defenses should be rejected, and summary judgment for Mr. Brave should be denied, because the premise of the motion is too narrowly conceived. Mr. Brave's failures to comply with *Brady* are not the "sole source of constitutional injury" Mr. Owens alleges against Mr. Brave. From the filing of this case, Mr. Owens has alleged that Mr. Brave is responsible for the violation of Mr. Owens' due process right not to be deprived of liberty as a result of the fabrication of evidence[1] by a state actor carrying out an investigative function. (*See* Compl., ECF No. 2, at ¶¶ 3, 40-44, 60, 86, & 90; 1st Am. Compl., ECF No. 103, at ¶¶ 3, 38-42, 83, & 87; 2d Am. Compl., ECF No. 147, at ¶¶ 3, 64, 67-68, 75, 83, 102, 110-11, & 114.)

Mr. Brave directed the investigation and interrogation of James Thompson after Mr. Thompson perjured himself in testimony against Mr. Owens on February 26, 1988. Due to Mr. Brave's express direction to the Detectives, that eleventh-hour investigation and interrogation foreseeably resulted in the fabrication of Mr. Thompson's false statements and confession[2] on February 29, 1988. Had one of the Detectives done what Mr. Brave did with regard to directing other detectives to re-question Mr. Thompson to get him to change his story, those actions would have been investigatory, not advocatory. Neither Mr. Brave's office, nor the fact that this

---

[1] The term "fabrication" herein is used to refer to evidence or testimony that is, by definition, false, regardless of whether it was coerced. "Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it." *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014). In contrast, coerced testimony may or may not be fabricated. *See id.*

[2] Mr. Thompson gave the Detectives and/or Mr. Brave at least eight different versions of the "facts" in the seven months from the time of the murder through the end of Mr. Owens' trial. (*See* Pl.'s Mem. Opp. Dets.' Mot. Summ. J., ECF No. 163 (herein "Pl.'s Opp. Dets.' MSJ") at 13-14.) To avoid confusion, the term "confession" herein refers to Mr. Thompson's last version, which is the version of events he testified to on February 29, 1988.

investigation occurred during trial, change that analysis. Mr. Brave then elicited Mr. Thompson's false confession at trial, thereby causing Mr. Owens' conviction. Long before 1988, however, it was clearly established that the Fourteenth Amendment secures the right of a criminal defendant not to be deprived of his liberty on the basis of fabricated evidence. Absolute immunity may shield Mr. Brave's presentation of this fabricated evidence at trial, and either absolute or qualified immunity may shield other aspects of Mr. Brave's conduct premised only on *Brady* violations or the subornation of perjury.[3] But under several other Supreme Court and circuit court precedents, neither absolute nor qualified immunity shields Mr. Brave from section 1983 liability for his role in driving Mr. Thompson to fabricate the confession, and the reasonably foreseeable conviction of Mr. Owens based on Mr. Brave's presentation of that false confession at trial. Accordingly, Mr. Brave is not entitled to summary judgment.

## STATEMENT OF FACTS

Mr. Owens incorporates herein the Statement of Facts and accompanying exhibits filed in support of his response in opposition to the Detectives' motion for summary judgment (ECF No. 163), and writes separately to emphasize the following conduct by Mr. Brave.

### Friday, February 26, 1988

Prior to court on the second day of Mr. Owens' trial, Mr. Brave met with James Thompson, who was scheduled to testify that morning. (Exhibit 45, Owens Trial Tr. 325-26

---

[3] Specifically, these allegations are the withholding of some number of jailhouse informant Larry Oliver's letters; the withholding of the memorandum concerning Mr. Brave's "leverage" over Mr. Oliver and jailhouse informant Samuel Denato; the failure to inform the defense of promises of leniency made to Mr. Thompson; and the failure to disclose to the defense several prior versions of Mr. Thompson's story (an oral version he told to Sgt. Landsman on August 5, 1987, and at least four oral versions he told to the Detectives on February 29, 1988).

(2/26/88 J. Thompson test.); *see also* Exhibit 46, Thompson Trial Tr. 341 (Brave trial test.).)[4]

Mr. Brave had doubted Mr. Thompson's veracity from the beginning. (Ex. 46 at 334-37 (Brave trial test.).) He and the Detectives found implausible Mr. Thompson's claim that he found the knife in the grass early on the morning of Monday, August 3, 1987, still moist with blood. (*Id.* at 335.) They thought Mr. Thompson "was holding something back, that Owens had probably come right to the defendant's [Mr. Thompson's] apartment after having killed the woman and within minutes or within an hour or so after the murder." (*Id.* at 336.) During their meeting before court on February 26, Mr. Brave assured Mr. Thompson he would not be in trouble for telling the truth. (*Id.* at 342-43, 378.) Mr. Thompson then told Mr. Brave, for the first time, that Mr. Owens had brought Mr. Thompson the knife that Monday morning, August 3, 1987. (*Id.* at 343-44.)

According to Mr. Brave, he recognized that Mr. Thompson had changed his story and he immediately pulled two police officers into his office as witnesses to the interview. (*Id.* at 342.) From this action (if it occurred as Mr. Brave claims), it can be inferred that Mr. Brave understood the circumstances had changed from simply preparing Mr. Thompson to testify to evidence previously gathered, to *obtaining new evidence* from Mr. Thompson. That is, the unnamed police officer witnesses gave Mr. Brave insurance: if Mr. Thompson were to refuse to testify in court that Mr. Owens had brought Mr. Thompson the knife, Mr. Brave could call the officers to testify. (*See id.*) Mr. Brave felt that the new story Mr. Thompson told him that morning contained enough truth to be "sellable" to the jury. (*Id.* at 344-45.)

---

[4] Because Plaintiff has filed numerous exhibits in support of his oppositions to the Detectives' and BPD's motions for summary judgment (Exhibits 1-17 and 18-44, respectively), in order to give each exhibit a unique number, the exhibits attached hereto begin at number 45. Pincites refer to the Bates labels on the lower right-hand corner of each transcript page.

Despite his doubts, Mr. Brave called Mr. Thompson to testify as a State's witness rather

than a court's witness.[5] In court, after Mr. Brave dramatically asked Mr. Thompson whether they

had just had a "heart to heart conversation" in which Mr. Thompson promised to tell the truth

(Ex. 45 at 326 (2/26/88 J. Thompson test.)), Mr. Thompson testified to the version that he had

just told Mr. Brave—that Mr. Owens brought Mr. Thompson the knife on the morning of

Monday, August 3, 1987. But Det. Dunnigan was present in the courtroom and realized that Mr.

Owens' work records contradicted Mr. Thompson's new story. (Ex. 46 at 346-50 (Brave trial

test.).) After court, Det. Dunnigan spoke with Mr. Brave concerning Mr. Thompson's obvious

perjury. (*Id.*) Mr. Brave became despondent that he would lose this high-profile case and that the

jury would acquit Mr. Owens. (*See id.* at 672-73, 739 (Brave pretrial hr'g test.).) Mr. Brave later

explained that he

> stewed over it the entire weekend. I was trying to figure out how to make it clear
> to the jury that even though he [Mr. Thompson] lied about this, he lied about that,
> and he lied about that, that he was still telling the truth about [Mr.] Owens saying
> I had sex with the woman.

(*Id.* at 350-51 (Brave trial test.).)

<u>Sunday, February 28, 1988</u>

The entire theory of the State's case had been that the crimes against Ms. Williar were

part of a single, integral episode—burglary, rape, and murder—perpetrated by a single man. (*See*

Ex. 45 at 58-61 (State's opening argument).) Mr. Brave knew that no other potential suspects had

been seriously investigated because it was Mr. Thompson's handing over the knife that had

---

[5] In 1988, under Maryland common law, a prosecutor had the option of calling witnesses as a
"court" witness if he was not willing to vouch for the credibility of the witness. Of course,
vouching for a witness is now error, and the distinction of calling a "court's witness" has been
eliminated. *See Baker v. State*, 332 Md. 542, 552-53, 632 A.2d 783, 787-88 (1993); *Spence v.
State*, 321 Md. 526, 528 n.1, 583 A.2d 715, 716 n.1 (1991). But in 1988, Mr. Brave's decision to
call Mr. Thompson as a State's witness gave his testimony added weight.

"unlocked" the investigation (Ex. 46 at 336 (Brave trial test.); *see also id.* at 659-60 (Brave pretrial hr'g test.); *id.* at 500 (Landsman trial test.); *id.* at 368-69 (Brave trial test.); Ex. 45 at 722 (State's closing argument)). In his opening statement, public defender David Eaton had promised the jury that they would learn that the real killer had left an unmistakable "calling card" at the scene. (Ex. 45 at 69 (defendant's opening statement).) Realizing that Mr. Thompson's obvious lies had left the State vulnerable to a strong defense attack on its shoddy investigation (*see* Ex. 46 at 368-69 (Brave trial test.)), and thinking that the "calling card" to which Mr. Eaton had referred must be the pubic hairs found on the victim's back (*see id.* at 773-74 (Brave pretrial hr'g test.)), Mr. Brave decided to have the Detectives take, for the first time, a step that could have been pursued anytime after Mr. Thompson turned over the suspected murder weapon, before Mr. Owens was arrested. Mr. Brave decided to have them acquire and forensically test samples of Mr. Thompson's pubic hair and blood. (*Id.* at 356-57 (Pellegrini trial test.); *see also id.* at 717 (Dunnigan pretrial hr'g test.) (stating that Mr. Thompson's blood and pubic hair samples had not been taken).)

Late on Sunday evening, Mr. Brave called Det. Pellegrini at the Homicide Unit and instructed him to take Mr. Thompson's pubic hair and blood samples. (*Id.* at 356-57 (Pellegrini trial test.).) His purpose, he said, was to bolster Mr. Thompson's credibility by exculpating him. As Mr. Brave told Det. Pellegrini, "We've got to do this. We've got to preserve—we've got to show that he [Mr. Thompson] is not a participant in this crime." (*Id.* at 356 (Brave trial test.); *see also id.* at 665-66 (Brave pretrial hr'g test.).) After 10:00 p.m., Det. Pellegrini and Mr. Brave telephoned Mr. Thompson (*id.* at 423, 425 (Pellegrini trial test.); *id.* at 356 (Brave trial test.); *id.* at 666 (Brave pretrial hr'g test.)) and asked him to go to a hospital to give the requested samples. Mr. Thompson agreed. (*Id.* at 424 (Pellegrini trial test.).)

Mr. Thompson arrived at the Homicide Unit at approximately 11:00 p.m. (*Id.* at 425.) The samples then were collected at a hospital, and Det. Pellegrini submitted them to BPD Evidence Control at 12:05 a.m. on Monday, February 29 for examination. (*Id.* at 428-29.) It was an urgent request. (*Id.* at 438-39.) Det. Pellegrini ensured that forensic chemist Mark Profili would have the examination request when he arrived at work at 8:00 a.m. Monday morning, because Mr. Brave needed the results as soon as possible with the trial of Mr. Owens set to resume at 9:00 a.m. (*Id.* at 439.)

<u>Monday, February 29, 1988</u>

When he arrived in the lab, Mr. Profili received Mr. Thompson's pubic hair samples and immediately began to compare them with those recovered from the victim's body. The Detectives went to the lab. (*Id.* at 474 (Landsman trial test.).) Mr. Profili told them he was "99 percent sure it's his [Mr. Thompson's] but he cannot be positive" because he did not receive enough plucked hairs for a conclusive analysis. (*Id.* at 718 (Dunnigan pretrial hr'g test.).) Mr. Brave either was present in the lab at this time (in the morning, before court) or met separately with Mr. Profili, and then with the Detectives (during the lunch recess). (*See id.* at 473-74 (Landsman trial test.); *id.* at 667-68 (Brave pretrial hr'g test.); Ex. 45 at 477-78 (bench conf.).)

Mr. Profili also told Mr. Brave that Mr. Thompson's blood type was A, which matched the blood type of saliva evidence found on a cigarette butt in the victim's house. (Ex. 46 at 667-68 (Brave pretrial hr'g test.).) At that point, Mr. Brave realized that Mr. Thompson previously lied about his blood type. (*Id.* at 668.) Coupled with Mr. Profili's preliminary finding that Mr. Thompson's hairs were a "probable" match to those found on the victim's back, Mr. Brave understood this evidence that he had hoped would clear his star witness, could instead be used to inculpate Mr. Thompson. (*See id.* at 358-59 (Brave trial test.).) Aware at this point that Mr.

Thompson was untrustworthy, Mr. Brave directed the Detectives to immediately bring Mr. Thompson in for interrogation with the new information that physical evidence now directly linked him to the scene of the crime. (*See id.* at 360.) They did so.

In the meantime, in a bench conference after the lunch recess, Mr. Brave put on the record that Mr. Thompson's pubic hairs and blood had been sampled. (Ex. 45 at 477-78 (bench conf.).) Mr. Brave promised the court that the crime lab "w[ould] have a report very shortly" on the comparison of plucked hairs from Mr. Thompson to those found at the crime scene. (*Id.* at 477.) Mr. Brave already knew, however, that Mr. Profili had received too few plucked hairs from Mr. Thompson to conclusively report whether or not Mr. Thompson's hairs matched the hairs found on the victim's back. (Ex. 46 at 667 (Brave pretrial hr'g test.).)

Once Mr. Thompson arrived, Sgt. Landsman interrogated Mr. Thompson in a state's attorney's office at the courthouse, with Det. Dunnigan present. Det. Pellegrini was "in and out" of the room. (*Id.* at 777-78 (Pellegrini pretrial hr'g test.).) Sgt. Landsman told Mr. Thompson: "[Y]ou are going to be charged with something. I don't know whether it would be the murder. I don't know what you are going to be charged with. I am going to wait till I talk to Mr. Brave but I am not promising you anything." (*Id.* at 491 (Landsman trial test.).) One of the Detectives told Mr. Thompson that "the hairs found in the house matched his." (*E.g.*, *id.* at 760 (Landsman pretrial hr'g test.); *id.* at 778 (Pellegrini pretrial hr'g test.).) Over the course of approximately an hour, Mr. Thompson then told at least four more versions of his story. (*Id.* at 694-98, 718 (Dunnigan pretrial hr'g test.); *id.* at 483 (Landsman trial test.).)

After the Detectives told him that his pubic hair was found on the victim's buttocks, he said he had been present on the second floor of the house. (*Id.* at 696 (Dunnigan pretrial hr'g test.).) Then, after the Detectives emphasized that his pubic hair was found *on the victim's*

*buttocks*, Mr. Thompson told the "final" version of his story, in which he said that he had burglarized the home, which Mr. Owens ransacked; that he watched Mr. Owens repeatedly punch Ms. Williar in the face; and that he (Mr. Thompson) had masturbated and ejaculated over the victim while Mr. Owens raped her. (*See, e.g.*, *id.* at 696-97, 721; *see also id.* at 762 (Landsman pretrial hr'g test.).) He said that Mr. Owens then stabbed Ms. Williar and threw the knife on the floor, and that he (Mr. Thompson) then picked up the knife. (Ex. 45 at 498 (2/29/88 J. Thompson test.).)

This version revealed no non-public information that the true perpetrator would know, such as the fact that Ms. Williar was strangled with a sock. (*See id.* at 519 (on inquiry by the court, Mr. Thompson denied any knowledge of a sock around the victim's neck).) It also contradicted objective facts that the Detectives, and Mr. Brave, had to know or had been presented in earlier testimony. For example, Ms. Williar's room appeared orderly, not ransacked. (Ex. 45 at 98.) The victim had bruising, but only on her wrist, not her face. (*See id.* at 124, 246.) No semen had been found on the outside of the victim's body or the bed sheets (thus belying Mr. Thompson's claim that he ejaculated). (*See id.* at 643.) No blood spots were found consistent with a knife being dropped on the floor. (*See id.* at 98). Yet the Detectives believed this version of Mr. Thompson's story was enough to "get James Owens," and they stopped the interrogation. (Ex. 46 at 722 (Dunnigan pretrial hr'g test.).)

Sgt. Landsman and Det. Dunnigan made notes of this final version of Mr. Thompson's story. (*See* Pl.'s Opp. Dets.' MSJ 28 n.118.) Sgt. Landsman then went down to the courtroom. He handed Mr. Brave, who was examining a witness, a one-sentence note stating that Mr. Thompson confessed to burglarizing the victim's home with Mr. Owens. (Ex. 45 at 487 (bench conf.).) Sgt. Landsman discussed the confession with Mr. Brave. (Ex. 46 at 362-63 (Brave trial

test.).) This information, a reasonable factfinder can infer, apprised Mr. Brave that his direction to the Detectives, to tell Mr. Thompson that his pubic hair was found in the house, had the desired effect. (*See* Ex. 45 at 516-17 (2/29/88 J. Thompson test.).) A new version of the story, powerfully inculpating both Mr. Thompson and Mr. Owens, had been generated.

The Detectives wanted to take a formal written statement from Mr. Thompson (Ex. 46 at 705 (Dunnigan pretrial hr'g test.); *id.* at 486 (Landsman trial test.)), but Mr. Brave "wanted to whisk Mr. Thompson in and put him on the stand right then and there before everything cooled off." (*id.* at 361 (Brave trial test.).) It can be inferred that Mr. Brave understood that unless Mr. Thompson testified consistent with his confession to the Detectives, the opportunity to secure Mr. Owens' conviction based on that confession would be lost. (*See id.* at 738-39 (Brave pretrial hr'g test.).)

Mr. Thompson testified. Neither Mr. Brave nor Mr. Eaton questioned Mr. Thompson on the four other versions of the story he gave the Detectives that afternoon. (*See* Ex. 45 at 489-520 (2/29/88 J. Thompson test.).)

## **LEGAL STANDARD**

Summary judgment shall be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine dispute concerning a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A judge considering a motion for summary judgment is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 248-49.

10

The entry of summary judgment is not appropriate "even where there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn from them." *Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991) (quoting *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir. 1951)). Where the party opposing summary judgment would have the burden of proof at trial, he is entitled

> to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered.

*Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979), quoted in *Overstreet*, 950 F.2d at 937; *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866-68 (2014) (per curiam) (reversing summary judgment where both lower courts failed to view facts in nonmovant's favor).

## **ARGUMENT**

Mr. Brave instigated the investigation and interrogation of Mr. Thompson in the midst of Mr. Owens' trial. Due to Mr. Brave's direction and/or advice to the Detectives, that investigation and interrogation resulted in the fabrication of Mr. Thompson's confession on February 29. These actions, which occurred entirely after Mr. Thompson testified on February 26, were not connected to the presentation of Mr. Thompson's initial testimony or the presentation of any other evidence that had been known in the case up to that point. As a direct and proximate result of these actions, evidence was fabricated and used at trial to deprive Mr. Owens of liberty, in violation of his due process rights. Neither absolute nor qualified immunity shields Mr. Brave from section 1983 liability for his role in the fabrication of Mr. Thompson's confession and the reasonably foreseeable conviction of Mr. Owens based on the presentation of that fabricated testimony.

11

I.      **Because Mr. Brave Performed an Investigative and/or Advisory Function When He Directed the Detectives to Obtain New Evidence from Mr. Thompson and Interrogate Him, Mr. Brave Is Not Entitled to Absolute Immunity.**

Absolute immunity "contravenes the basic tenet that individuals be held accountable for their wrongful conduct." *Westfall v. Erwin*, 484 U.S. 292, 295 (1988). Qualified immunity "'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" *Burns v. Reed*, 500 U.S. 478, 495 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Thus, those officials "who 'seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope.'" *Malley*, 475 U.S. at 340 (quoting *Butz v. Economou*, 438 U.S. 478, 506 (1978)).

Relying on the Supreme Court's concern for the fate of an "honest prosecutor," *Imbler v. Pachtman*, 424 U.S. 409, 425-56 (1976), Mr. Brave seeks absolute immunity for all of his alleged misconduct, because it occurred subsequent to Mr. Owens' indictment and therefore was, he claims, advocatory conduct "intimately associated with the judicial phase of the criminal process" against Mr. Owens, *see id.* at 430. But "the absolute immunity that protects the prosecutor's role as an advocate is not grounded in any special 'esteem for those who perform these functions, and certainly not from a desire to shield abuses of office' . . . ." *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) (quoting *Malley*, 475 U.S. at 342); *Forrester v. White*, 484 U.S. 219, 226 (1988). The exemption Mr. Brave seeks does not sweep so broadly.

A.      **Absolute immunity protects only advocatory conduct.**

"[T]he immunity afforded to prosecutors attaches to the functions they perform, and not merely to the office." *Carter v. Burch*, 34 F.3d 257, 261 (4th Cir. 1994). Because prosecutors enjoy absolute immunity only for *functions* that are "intimately associated with the judicial phase of the criminal process," *Imbler*, 424 U.S. at 430, that is, advocatory functions, "[t]he focus of

immunity analysis . . . is 'on the *conduct* for which immunity is claimed, not on the harm that the conduct may have caused or the question whether it was lawful,'" *Lyles v. Sparks*, 79 F.3d 372, 377 (4th Cir. 1996) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 271 (1993) (emphasis added in *Lyles*)). The distinction drawn is between advocacy functions as an "officer of the court" and other types of functions (including administrative, advisory, or investigative functions). *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009).

Thus, when a prosecutor advises the police on how to conduct a criminal investigation, he does not enjoy absolute immunity for that conduct. Instead, he may receive only qualified immunity, just as police officers following or carrying out the prosecutor's advice may receive. *Burns*, 500 U.S. at 494-96. Likewise, acquiring evidence for use in a prosecution is a "police-like activity," as opposed to the "quasi-judicial advocacy function" of "'organiz[ing], evaluat[ing], and marshaling'" gathered evidence. *Genzler v. Longanbach*, 410 F.3d 630, 639 (9th Cir. 2005) (quoting *Barbera v. Smith*, 836 F.2d 96, 100 (2d Cir. 1987)). "When a prosecutor performs the investigative functions normally performed by a detective or police officer," the prosecutor may receive only qualified immunity, because "it is 'neither appropriate nor justifiable that, for the same act, [absolute] immunity should protect the one and not the other.'" *Buckley*, 509 U.S. at 273 (quoting *Hampton v. Chicago,* 484 F.2d 602, 608 (7th Cir. 1973)); *accord Goldstein v. Moatz*, 364 F.3d 205, 214 (4th Cir. 1994) ("[A] prosecutor should not be accorded absolute immunity for actions for which a police officer would enjoy only qualified immunity.") (citing *Buckley*, 509 U.S. at 273-74).

The conduct of "coaching" a witness to omit mention of *truthful* exculpatory information from her testimony has been held to be advocatory rather than investigative work. *See Carter*, 34 F.3d at 261, 263. However, where a detective solicits *fabricated* testimony, he is not entitled to

more than qualified immunity, even if he solicited the testimony "under the guidance" of a prosecutor. *See Buckley*, 509 U.S. at 275 & n.6. Consistent with *Buckley*, a prosecutor who is responsible for fabricating witness testimony enjoys no absolute immunity for the fabrication of that testimony despite its subsequent presentation in court, because the fabrication is "investigative" conduct, just as developing evidence is investigative conduct. *See Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000) (prosecutor's alleged fabrication of evidence was investigatory conduct entitled to neither type of immunity); *Washington v. Wilmore*, 407 F.3d 274, 283-84 (4th Cir. 2005) (affirming denial of qualified immunity, where state trooper's alleged fabrication of evidence from suspect interrogation would have resulted in violation of clearly established due process right); *see also Fields v. Wharrie*, 740 F.3d 1107, 1113-14 (7th Cir. 2014); *McGhee v. Pottawattamie Cnty.*, 547 F.3d 922, 933 (8th Cir. 2008) (recognizing that absolute immunity does not extend to a prosecutor "who violate[s] a person's substantive due process rights by obtaining, manufacturing, coercing and fabricating evidence before filing formal charges, because this is not 'a distinctly prosecutorial function'").

    **B.**    **For the purpose of immunity analysis, the function performed controls over the timing of the performance of that function.**

A prosecutor may engage in investigatory conduct, and so lack absolute immunity, even after a defendant is arrested and charged. *Buckley*, 509 U.S. at 274 n.5 ("Of course, a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination, . . . a prosecutor may engage in 'police investigative work' . . . ."); *id.* at 290 (Kennedy, J., concurring in part and dissenting in part) ("[E]ven after there is probable cause to arrest a suspect or after a suspect is indicted, a prosecutor might act to further police investigative work, say by finding new leads, in which case only qualified immunity should apply."). Mr. Brave's memorandum ignores this

aspect of *Buckley*.

In a recent decision, *Stinson v. Gauger*, 799 F.3d 833 (7th Cir. 2015), the Seventh Circuit pointed out that the *Buckley* majority opinion's reference to the time period "before probable cause exists" was merely a "useful shorthand" to distinguish investigative work, a function for which the actor receives only qualified immunity, from trial preparation, a function for which the actor receives absolute immunity. *Id.* at 840 (citing *Buckley*, 509 U.S. at 274 & n.5). Mr. Brave's excerpts from *Carter*, 34 F.3d at 263, and *Goldstein*, 364 F.3d at 215, both of which were decided after *Buckley*, suggest that the Fourth Circuit has extended to prosecutors absolute immunity for all conduct that may be characterized as "gathering information as an advocate" because judicial proceedings have been instituted. But this cannot be so, because the Fourth Circuit cannot absolutely immunize conduct that the Supreme Court defines as worthy of only qualified immunity.[10]

Mr. Brave offers no public policy justification for why a prosecutor who investigates a second suspect after a first suspect has been formally charged should receive absolute immunity for that investigative work if the evidence thereby obtained is used at the first person's trial. Indeed, he cannot, for such a policy would perversely encourage prosecutors to rush to charge the first person they could, without regard to the thoroughness of the pre-charging investigation, so as to maximize their immunity with regard to all subsequent investigation. A prosecutor who engages in advisory or investigatory conduct that results in the violation of a criminal defendant's constitutional rights may not rely on the timing of that conduct to "retroactively immunize himself . . . by perfecting his wrongdoing . . . at trial and arguing that the tort was not completed until he had acquired absolute immunity" through advocatory conduct. *Fields*, 740

---

[10] *Ehrlich v. Giuliani*, 910 F.2d 1220 (4th Cir. 1990), predates *Buckley*.

F.3d at 1113-14; *see also Stinson*, 799 F.3d at 841-42.

> ### C.   Because Mr. Brave advised the Detectives and/or directed their investigative conduct to obtain new evidence from Mr. Thompson, absolute immunity does not attach.

Mr. Brave admits that after he realized that Mr. Thompson gave perjured testimony on February 26, 1988, he considered Mr. Thompson a suspect in the crimes for which Mr. Owens was then on trial. (Ex. 46 at 735 (Brave pretrial hr'g test.).) There is no dispute that the Detectives had not pursued investigation of Mr. Thompson as a suspect up to that time. (*See id.* at 736, 739.) Mr. Brave admits that on February 28, 1988, he told Det. Pellegrini to acquire samples of Mr. Thompson's pubic hair and blood. There is no dispute that this was the State's first attempt to gather physical evidence from Mr. Thompson. Mr. Brave admits that he told the Detectives to bring Mr. Thompson in and confront him with the new information that physical evidence that "look[ed] like a match" was found in Ms. Williar's home. (*Id.* at 360 (Brave trial test.).)

There is no genuine dispute that these facts represent a course of investigative conduct undertaken by Mr. Brave and the Detectives. The fact that this investigation occurred while Mr. Owens' trial was pending is irrelevant to the absolute immunity analysis. The identity of the government officer performing it also is irrelevant.

Had Det. Dunnigan, for example, left court that Friday after Mr. Thompson's first testimony and independently developed evidence corroborating or disputing Mr. Thompson's account—such as by seeking Mr. Thompson's voluntary cooperation to give hair and blood samples, examining those samples, and questioning Mr. Thompson based on the new information thus obtained—it would be obvious that Det. Dunnigan had performed investigative work entitled only to qualified immunity. Likewise, had Sgt. Landsman observed, prior to Mr. Owens' arrest, that Mr. Thompson had already told three different versions of his story of

finding the knife and inculpating Mr. Owens, and then developed that evidence corroborating or

disputing Mr. Thompson's account—such as by seeking Mr. Thompson's voluntary cooperation

to give hair and blood samples, examining those samples, and questioning Mr. Thompson based

on the new information thus obtained—it would be obvious that Sgt. Landsman had performed

investigative work entitled only to qualified immunity. Similarly, under the principles discussed

above, the fact that Mr. Brave directed that this conduct be performed during Mr. Owens' trial

does not change its nature from advisory/investigatory to advocacy work, or raise the immunity

to which it may be entitled from qualified to absolute.

**II.     Because He Violated Mr. Owens' Clearly Established Right Not to Be Deprived of Liberty as a Result of the Fabrication of Evidence by a Government Officer Acting in an Investigating Capacity, Mr. Brave Is Not Entitled to Qualified Immunity.**

Mr. Owens has alleged that Mr. Brave is responsible for the fabrication of evidence—that

is, of Mr. Thompson's confession, not merely for *negligently* presenting false testimony or

*negligently* relying on evidence that others fabricated. Even if Mr. Brave did not know that Mr.

Thompson told the Detectives at least four more versions of his story prior to his confession—a

fact as to which there is a genuine dispute—Mr. Brave did know that when he told the Detectives

to bring Mr. Thompson in, "advise him of his rights and tell him that it looks like we've got a

match here, what's the story?" (Ex. 46 at 360 (Brave trial test.)), he had instructed them to lead

his lying star witness to *conform his story to the new evidence while continuing to inculpate Mr.

Owens*. It can and should be inferred that it was reasonably foreseeable to Mr. Brave that new

lies would result. They did, and the new lies were used at trial to convict Mr. Owens. Qualified

immunity does not shield Mr. Brave from liability for the natural consequences of his acts that

caused a violation of Mr. Owens' clearly established due process rights.

**A.    The record contains sufficient evidence from which a reasonable jury may conclude that Mr. Brave was responsible for the fabrication of Mr. Thompson's confession.**

The fabrication of evidence to deprive a person of liberty, whether done by police or prosecutors performing police functions, violates the due process clause and is not immunized by the introduction of the fabricated evidence at trial. *Washington*, 407 F.3d 274; *Stinson*, 799 F.3d at 841-42 ("[A] prosecutor who fabricates evidence against a suspect and later uses that evidence to convict him violates due process . . . . The constitutional violation occurs when the evidence is fabricated, not when the fabricated evidence is later introduced at trial . . . ."). As set forth above, Mr. Owens has alleged and adequately supported a claim against Mr. Brave for unconstitutionally securing his conviction through fabricated evidence.

Following Mr. Thompson's February 26 testimony, Mr. Brave had a heightened awareness of Mr. Thompson's willingness to lie. Thus, three days later, when he brought Mr. Thompson back to the stand to testify to his "confession," Mr. Brave did not merely choose to believe a factually debatable version of events as reported to him by Sgt. Landsman, or decide to proceed despite "a sharp conflict in the evidence." *Imbler*, 424 U.S. at 426 n.24. Instead, Mr. Brave and the Detectives had turned Mr. Thompson's willingness to lie to their advantage by feeding him sufficient details to manufacture a new story that would be consistent enough with the other evidence and testimony in the case to "get James Owens."

The record permits the factfinder to infer that Mr. Brave's assurances to Mr. Thompson on February 26 (Ex. 46 at 342 (Brave trial test.)) had induced Mr. Thompson to change his story to conform to what Mr. Brave wanted to hear at that time: that the knife had never been in the grass, as Mr. Thompson initially claimed (*see id.*; *see also id.* at 334-36), because Mr. Owens had given Mr. Thompson the knife directly. But when Mr. Thompson testified that not only did Mr. Owens give him the knife, Mr. Owens gave it to him on Monday morning—at a time when

Mr. Owens' timecards established that he had been at work—it was obvious that Mr. Thompson was lying. (*Id.* at 370 (Brave trial test.).)

Mr. Brave claims that he realized that Mr. Thompson's perjury in his February 26 testimony made it appear to the jury that Mr. Thompson was a suspect. (*Id.* at 368-69.) He claims that on February 28 he thought that testing Mr. Thompson's pubic hair and blood samples would bolster Mr. Thompson's credibility by establishing that he was *not* present in the victim's home (*see id.* at 736 (Brave pretrial hr'g test.)), and thus the jury might believe the portion of Mr. Thompson's testimony that was most important to Mr. Brave: Mr. Owens' purported admission to Mr. Thompson that he (Mr. Owens) had had sex with the victim (*see id.* at 334-36 (Brave trial test.)). By midday on February 29, however, Mr. Brave's plan went awry. Mr. Profili informed Mr. Brave that Mr. Thompson's pubic hairs were a probable match to those found on Ms. Williar, which, Mr. Brave understood, gave the State probable cause to arrest Mr. Thompson. (*Id.* at 737 (Brave pretrial hr'g test.).) But Mr. Profili also informed him that a conclusive identification of Mr. Thompson could not be made unless more plucked hairs were obtained for analysis. (*Id.* at 359 (Brave trial test.). Mr. Brave had no time to obtain them. (*See id.* at 737-38 (Brave pretrial hr'g test.).)

Thus Mr. Brave knew, by midday on February 29, that he did not have what he had hoped for: admissible scientific evidence that would exculpate Mr. Thompson. (*Id.* at 736-37.) A jury can infer that Mr. Brave then recognized that to save the case against Mr. Owens he would need *a different story from Mr. Thompson* that more directly inculpated Mr. Owens *while plausibly explaining how Mr. Thompson got the knife*. (*See id.* at 359 (Brave trial test.).) Mr. Brave determined to give Mr. Thompson a chance to change his story. (*Id.* at 360.) Mr.

Thompson obliged. The resulting confession was a fabrication, and its use against Mr. Owens accomplished Mr. Brave's intended purpose.

> **B.      Mr. Owens' conviction is the legally cognizable result of Mr. Brave's role in precipitating Mr. Thompson's false confession.**

To determine whether a government officer's fabrication of evidence caused a section 1983 plaintiff's loss of liberty, the court inquires whether the conviction "was a reasonably foreseeable result of [the officer's] initial act of fabrication." *Washington*, 407 F.3d at 282-83. Where a prosecutor is responsible for fabricating evidence and introducing it in the judicial phase, subsequent immune acts are not sufficiently independent to break the chain of causation. *Zahrey*, 221 F.3d at 353-54; *id.* at 354 n.10 (observing that "[d]eeming the chain of proximate causation broken by the prosecutor's use of evidence he himself fabricated would also, in practical effect, enlarge the scope of the prosecutor's absolute immunity," contrary to *Buckley*); *see also Fields*, 740 F.3d at 1114 ("[The prosecutor] has not demonstrated an entitlement to absolute immunity—nor to qualified immunity for the fabrication, either. For it was established law by 1985 (indeed long before), when the fabrication is alleged to have occurred, that a government lawyer's fabricating evidence against a criminal defendant was a violation of due process."); *McGhee*, 547 F.3d at 932-33 (following *Zahrey*).

Even if Mr. Brave merely harbored doubts about Mr. Thompson's veracity and reservations about whether to put him on the stand as of the morning of February 26, *see Carter*, 34 F.3d at 261, by the afternoon of February 29, the circumstances known to Mr. Brave had shifted dramatically. A reasonable jury can find that Mr. Brave foresaw that putting Mr. Thompson on the stand again would result in the presentation of perjured testimony.

After Mr. Thompson's disastrous testimony on February 26 (which Mr. Brave knew to be false), a number of options existed for Mr. Brave to exercise his discretion in determining

whether to try to save the case against Mr. Owens, and if so, how. For example, Mr. Brave could have ignored the lies or attempted to neutralize them in the State's closing argument. But when Mr. Brave decided to attempt to obtain new evidence from Mr. Thompson—regardless of whether he naively hoped that evidence would bolster Mr. Thompson's credibility by excluding him as a participant in the crimes, or whether he sanguinely recognized that a "match" could be useful—he crossed the line from discretionary, advocatory conduct into police-type investigative conduct. (*See* Ex. 45 at 752-53 (State's closing argument).) Again, had Mr. Brave not been involved in this conduct at all—had the Detectives hatched a plan on their own to test Mr. Thompson's hairs and confront him—it is beyond dispute that their work would be investigatory despite being undertaken at the eleventh hour of Mr. Owens' trial. (*See id.*) No one has suggested (nor is there any basis to suggest) that this type of work would be akin to that typically performed by prosecutors, *i.e.* "discretionary tasks so entwined with judicial proceedings that they require the protection of absolute immunity." *Goldstein v. Moatz*, 364 F.3d at 216 (rejecting absolute immunity for attorney in administrative role who "asserted his authority over the investigative process by ratifying the [agency's] actions and requiring that Goldstein respond . . . within a certain timeframe," thus "act[ing] in the role of supervisor over [the investigating attorney] and the [agency's] investigation"). Mr. Brave directed the investigation and interrogation of Mr. Thompson, and that direction directly and foreseeably resulted in the fabrication of evidence by a witness whose willingness to lie was plain. Mr. Brave's conduct is a legally cognizable cause of Mr. Owens' wrongful conviction.

In the final paragraph of his memorandum of law in support of his motion for summary judgment, Mr. Brave addresses Mr. Owens' allegation that Mr. Brave directed the Detectives to interrogate Mr. Thompson. Mr. Brave asserts that "the 'implication' that they should 'use the

[pubic hair] information to get Mr. Thompson to more directly implicate Mr. Owens and save the case'" (Brave Mem. at 42 (quoting 2d Am. Compl. ¶ 68)) cannot support Mr. Owens' claim that this conduct resulted in the violation of his constitutional rights.

First, Mr. Brave argues that the record does not establish a genuine dispute of material fact that when he told the Detectives to bring Mr. Thompson in, "advise him of his rights and tell him that it looks like we've got a match here, what's the story?" (Ex. 46 at 360 (Brave trial test.)), he conveyed the message that the Detectives were to interrogate Mr. Thompson until they had enough to save the case against Mr. Owens.

Mr. Brave is wrong. As shown above, there is ample evidence from which a reasonable jury could infer not only that this in fact was his implication, but that his implication was understood. The Detectives knew Mr. Thompson was the State's star witness against Mr. Owens. They knew Mr. Thompson had lied in court on Friday. They knew Mr. Thompson had told at least two different versions of the facts prior to Friday's testimony. They knew Mr. Brave wanted Mr. Thompson investigated. They knew Mr. Profili's preliminary examination of the pubic hairs tended to inculpate Mr. Thompson. They knew this was a high-profile case. They knew Mr. Brave expressly wanted them to tell Mr. Thompson that "it looks like . . . a match here." And when they interrogated Mr. Thompson, they fed him information until they felt they had a story sufficient to "get James Owens." (Ex. 46 at 722 (Dunnigan pretrial hr'g test.); *see also* Ex. 45 at 753 (State's closing argument) ("We were presented with a man from heaven [sic], . . . even though Mark Profili couldn't state for certain that that was a match. The detectives obviously told James Thompson that it matched. What does he know, right. And he caved in . . . .").) This Court is bound to view these facts and draw all reasonable inferences therefrom in Mr. Owens' favor, not Mr. Brave's. *Tolan*, 134 S. Ct. at 1866-68. Mr. Brave is not entitled to

summary judgment on this basis. *See Whitlock v. Brueggemann*, 682 F.3d 567, 589 (7th Cir. 2012) (affirming denial of defendants' motion for summary judgment on qualified immunity where arguments "boil[ed] down to an assertion that the undisputed evidence in the record" demonstrated no violation of plaintiff's rights, but "the record by no means compel[led] the conclusion" of no violation).

Second, Mr. Brave asserts that there is no genuine dispute that Mr. Thompson's "statement to the police or subsequent testimony was improperly coerced from him." For support, Mr. Brave cites the pretrial decision of the trial judge in *State v. Thompson*, Crim. Nos. 18809133-36 (Cir. Ct. Balt. City July 14, 1988) (Gordy, J.), finding by a preponderance of the evidence that all of Mr. Thompson's statements and testimony were admissible in his upcoming trial over his numerous constitutional objections. (*See* Brave Mem. Ex. 19.) By claiming that "[t]here is no basis on which to disturb that ruling," Mr. Brave implicitly invokes collateral estoppel to keep Mr. Owens from arguing that Mr. Thompson's February 29 statements and confession were coerced.

Mr. Brave's position should be rejected. The Maryland Court of Appeals already disturbed Judge Gordy's findings. *See Thompson v. State*, 411 Md. 664, 694, 985 A.2d 32, 49-50 (2009) (ordering trial court to reconsider the reliability of Mr. Thompson's confession in light of exculpatory DNA test results). Moreover, Mr. Owens asserts not merely that Mr. Thompson's February 29 statements and confession are unreliable because they were coerced, but that Mr. Brave and the Detectives used Mr. Thompson to fabricate those statements and confession. Under Mr. Brave's direction, the Detectives supplied Mr. Thompson with the facts they wanted him to know and coerced him with promises of leniency until Mr. Thompson said enough that they felt they could "get James Owens." Mr. Owens does not seek to litigate the issue of whether

Mr. Brave and the Detectives violated Mr. Thompson's constitutional rights. Even if there was some overlap of issues between the factors that Judge Gordy considered in analyzing the voluntariness of all of Mr. Thompson's statements, on the one hand, and analyzing whether Mr. Thompson's February 29 statements and confession were fabricated, on the other, Mr. Owens was not a party to litigating the former question. It would be an abuse of this Court's discretion to estop Mr. Owens and grant Mr. Brave summary judgment on this basis. *See Polk v. Montgomery Cnty.*, 782 F.2d 1196, 1201 (4th Cir. 1986) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979)) (identifying five mandatory factors to be considered in determining whether to apply offensive collateral estoppel).

### C.   Mr. Owens' right to be free from a deprivation of liberty caused by the fabrication of evidence was clearly established in 1988.

A state actor's fabricating evidence to convict an innocent person was clearly established to violate due process under the Fourteenth Amendment long before Mr. Brave's conduct in 1988. Citing *Miller v. Pate*, 386 U.S. 1 (1967), the Fourth Circuit has held that the due process right not to be deprived of liberty as a result of the fabrication of evidence by an investigating government officer was clearly established in 1983. *Washington*, 407 F.3d at 283-84. Similarly, citing *Napue v. Illinois*, 360 U.S. 264 (1959), *Pyle v. Kansas*, 317 U.S. 213 (1942), and *Mooney v. Holohan*, 294 U.S. 103 (1935), the Second Circuit has observed that "[a]ny prosecutor aware of these cases would understand that fabricating evidence in his investigative role violates the standards of due process and that a resulting loss of liberty is a denial of a constitutional right." *Zahrey*, 221 F.3d at 356.

As a prosecutor for 16 years before he tried the case against Mr. Owens (Ex. 46 at 329 (Brave trial test.)), Mr. Brave can be inferred to have well understood the constitutional obligation to refrain from manufacturing false evidence, or inducing or directing another to

24

manufacture such evidence, and then introducing that evidence at trial for the purpose of securing a criminal conviction. In short, Mr. Brave is not entitled to qualified immunity from liability under section 1983 for his role in violating Mr. Owens' constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity.

<u>**CONCLUSION**</u>

For all of the foregoing reasons, Defendant Marvin Brave's motion for summary judgment on his defenses of absolute and qualified immunity should be denied.

Respectfully submitted,

Dated: February 12, 2016

*/s/  Sarah F. Lacey*
Charles N. Curlett, Jr. (#28246)
Sarah F. Lacey (#28874)
LEVIN & CURLETT LLC
201 N. Charles St., Suite 2000
Baltimore, MD 21201
Tel: 410-685-4444
Fax: 410-685-2222
ccurlett@levincurlett.com
slacey@levincurlett.com

Joshua R. Treem (#00037)
Andrew D. Freeman (#03867)
Brooke E. Lierman (#17879)
Chelsea J. Crawford (#19155)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 1700
Baltimore, MD 21202
Tel: 410-962-1030
jtreem@browngold.com
afreeman@browngold.com
blierman@browngold.com
ccrawford@browngold.com

*Attorneys for Plaintiff*