# Exhibit 21

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| JAMES OWENS,<br><br>      Plaintiff,<br><br>v.<br><br>BALTIMORE POLICE<br>DEPARTMENT, *et al.*,<br><br>      Defendants. | Case No. GLR-11-3295 |

**Declaration of Stephen B. Tabeling**

I, Stephen B. Tabeling, hereby declare that:

1. I make this declaration on personal knowledge. I am more than 18 years of age.

2. I am a 25-year veteran retired lieutenant of the Baltimore Police Department ("BPD").

3. I began my career at BPD in 1954. At the time, I had only a 7th grade education and I had to take an 8th grade equivalency test. I earned my high school diploma through night school and attended college while continuing my law enforcement career to support my family. I eventually earned an undergraduate degree in political science and a master's degree in psychology from Loyola College in Baltimore. In addition, I have since earned advanced certificates from Loyola in psychology and school management and organization.

4. My BPD career began with a ten-week period of recruit training at the Police Academy. I then spent several years assigned to the central district as a police officer before being promoted to sergeant. I worked all types of crimes, including homicides, before homicide investigation was centralized in the Homicide Unit in the late 1960s. I served as a sergeant in the narcotics squad in the late 1960s. When BPD created a narcotics strike force, I was assigned there for a short period, until it was disbanded. Prior to that, in 1971, I completed 12 weeks of narcotics training in Washington D.C.

5. In 1972, I was promoted to the rank of Lieutenant and assigned to the Homicide Unit. I was there from 1972 to 1977. My responsibilities included investigating homicides as well as supervising and training other detectives. With the approval of Capt. James Cadden, in 1972, I installed the so-called "homicide board" on which the current status of each investigation was posted. Also during my assignment to Homicide, in 1976, I graduated from the FBI Academy.

6. Other than attending the Police Academy, the narcotics school in Washington, D.C., and the FBI Academy, over my years with BPD, I attended annual in-service training sessions, received some training during roll calls, and generally learned on the job.

7. One subject area in which I received very little, if any, training from BPD was the law and its practical application to police work. During roll calls, for example, a lieutenant would read directly from a section of the Maryland Code, without further explaining what it meant or how an officer should apply it.

8. Because of my own growing interest in the law and its practical application to police work, in the 1970s, I subscribed to Lexis and obtained court opinions and law books to read on my own initiative. Over the years, I did benefit from mentoring and informal legal training I received from some of the Baltimore City Assistant State's Attorneys I worked with, but BPD did not provide me with this type of training.

9. I learned on my own the critical importance of thoroughly documenting interviews with witnesses and suspects in order to prove that something did or did not happen. I taught those I supervised that all witness interviews and suspect interrogations should be memorialized in complete detail and filed. I taught those I supervised that there should be one file for a case, and the primary detective on a case should keep an up-to-date summary at the beginning of the file so that anyone else who needs to review the case can do so efficiently and effectively. I also taught that all important information should be brought to the attention of the state's attorney. Discovery then was the state's attorney's responsibility.

10. From 1978 to 1979, Commissioner Pomerleau assigned me to teach at the Police Academy. While I taught on numerous topics, including interviewing, interrogation, and note taking, there was no standard curriculum from which I was expected to teach. Furthermore, to my knowledge, there were no standards that were communicated within the BPD training programs in the late 1970s regarding *Brady v. Maryland* and subsequent decisions that required the State to provide defendants with exculpatory information, including information that undermined the credibility of the State's witnesses. I am unaware of any orders or any other specific training communicating any of those requirements, or the need to make sure that all such information was included in the case file and communicated to the Assistant State's Attorney handling the case.

11. After retiring from BPD in 1979, I was the director of campus security for Johns Hopkins University from 1979 to 1980; the chief of police in Salisbury, Maryland, from 1980 to 1982; self employed from 1982 to 1983; and the director of security for Loyola University from 1983 to about 1996 or 1997. Through the 1980s and 1990s, I taught seminars at numerous police departments, including in Salisbury, Annapolis, Prince George's County, and many in Virginia.

12. I worked with BPD again as a consultant and as a trainer in the Education and Training Section from 2000 to 2009.

13. At the request of former BPD Commissioner Ronald L. Daniel, in January 2000, I personally examined and prepared a report on the state of the Homicide Unit. My report identified numerous deficiencies in all aspects of the Homicide Unit's operation. Among other

things, I observed there was a critical need for training for homicide investigators. I reported that a preliminary assessment of Homicide Unit attendees during the fall 1999 Homicide School indicated great gaps among the student investigators in their knowledge/familiarity and/or mastery of many basic legal and investigative concepts.

14. Furthermore, I noted that the investigatory files were in a general state of disarray. There was no apparent procedure for ensuring that all material about an investigation had been recorded and filed appropriately. Tape recordings of witness statements were not timely transcribed. In a typical file, the summary of the investigation, which was supposed to be at the front of the file, was out of date. I found that the unit's practices with respect to the assembly, storage, retrieval and confidentiality of case folders verged on the chaotic, and that security over case folders was non-existent.

15. After I provided this analysis, BPD asked me to undertake to train all of its police officers and detectives, from recruits through veterans, but not its command staff. I began and continued this work over the next nine years through the Education and Training Section.

16. There was no existing curriculum from which I was expected to teach. I wrote the lesson plans that were used for training, including training on witness interviewing, suspect interrogation, and note taking. My curricula included legal principles and emphasized the practical application of legal principles to situations officers and detectives were likely to encounter. **Attachment A** hereto is a true and correct copy of my lesson plans for recruit training in interviewing and interrogation, as last revised in 2008.

17. I have since learned that the lesson materials I left at BPD have been deleted or destroyed. I do not know what lesson plans or curricula BPD currently uses to train its officers and detectives. I do not know whether BPD currently trains its officers and detectives on the requirements of *Brady v. Maryland*.

18. I am aware that former Lt. Charles "Joe" Key is engaged as an expert for BPD and the detectives who are defendants in this case. I am familiar with Lt. Key's background and experience at the BPD, and I taught him in the tactical squad. To my knowledge, he was never a homicide investigator.

19. I have been informed that Lt. Key testified as follows regarding training provided by BPD as to the requirements of *Brady v. Maryland*:

> "As a recruit we were trained -- I was part of a recruit training over in -- as it was modified over the years -- I forgotten exactly what – during what. But there was always a -- a legal – there's always a legal update every year and inservice, so if you had something that came out during that, then I would have received that. I don't know if there was any specialized training beyond that, but it would have been both at inservice recruit level." Key Dep. 39:20 – 40:6.

20. To my knowledge, in neither the late 1970s nor in the 2000s when I was an instructor at the Police Academy, was there any specific material provided by BPD teaching the requirements of *Brady v. Maryland*.

3

21. Over the years, many in the BPD have criticized me by saying things like, "Tabeling, you worry too much about the law." My long experience in police work convinces me this criticism is unfounded. As I wrote in my book, *You Can't Stop Murder: Truths About Policing in Baltimore and Beyond* (2013), co-authored with Stephen Janis, "nothing is more important to training an effective police officer than teaching a working respect for the Constitution."

I declare under penalty of perjury that the foregoing is true and correct.

Date: 2/10/16

Lt. Stephen B. Tabeling (Ret.)

4