# Exhibit 34

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND
(Northern Division)

JAMES OWENS,

    Plaintiff,

v.

BALTIMORE POLICE DEPARTMENT,
*et al.*,

    Defendants.

Case No. GLR-11-3295

## Declaration of Michele Nethercott

I, Michele Nethercott, hereby declare that:

1. I make this declaration on personal knowledge.

2. I am more than 18 years of age.

3. I have been the Chief Attorney of the Innocence Project of the Maryland Office of the Public Defender since its inception in 2002. The mission of the Innocence Project is to identify cases in which a convicted defendant has a credible claim of factual innocence and to provide representation in such cases if there are viable legal claims that could provide a basis for relief. In that capacity, I have reviewed numerous cases arising out of Baltimore City Circuit Court, and have litigated post-conviction *Brady* claims, in addition to supervising other attorneys who have litigated post-conviction cases that have involved *Brady* claims. Prior to 2002, I was the Chief Attorney of the Forensics Unit of the Maryland Office of the Public Defender and litigated cases at the trial level in Baltimore City Circuit Court.

4. I have been admitted to practice law in Maryland since 1987. My practice is currently limited entirely to criminal defense. Relevant to this declaration and civil action, I have substantial experience working in criminal trial defense, criminal appeals, and post-conviction work.

5. In the course of the last two decades of practicing law, I have regularly represented clients in both trial and post-conviction proceedings involving the Baltimore City State's Attorney's Office (BCSAO) as well as the Baltimore Police Department (BPD) and its officers and detectives. I have also supervised other attorneys who were engaged in trial and post-conviction proceedings involving the BCSAO and the BPD. In the last ten years, I have focused exclusively on post-conviction litigation.

6. As a trial attorney, I have experienced enormous difficulties in obtaining timely and complete compliance with the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963), prior to trial in cases that I have tried in the Circuit Court for Baltimore City. However, it is only in my capacity as post-conviction counsel that I have had the opportunity to prove that *Brady* violations have occurred in the most serious cases on a regular and ongoing basis.

7. I have encountered examples of conduct by BPD and its officers and detectives that constitute violations of *Brady v. Maryland* and its progeny. In other words, I have encountered failures by BPD and its officers and detectives to disclose material exculpatory information to the State's Attorney, resulting in a subsequent failure to disclose the information to the defense.

8. I have personally been involved in cases in which BPD officers and detectives have failed to disclose *Brady* material, including notes, documents, laboratory test results, and information known to BPD officers and detectives that was not memorialized. A description of some of these cases is set forth in the following paragraphs.

9. *State v. Tonya Lucas*, Case Nos.192240031-7 (Balt. City Cir. Ct. 1992).

a. BPD officials withheld a police report relating to Eugene Weddington, the critical witness against the defendant. The report showed that, thirteen months prior to implicating Ms. Lucas in the arson/murder at issue in this case, Weddington had falsely reported to BPD knowledge of a murder that had occurred in Baltimore City. Weddington provided an address where the body could be located and advised that a man he knew only as "Andre" was trying to set him up to take the blame for the murder. When BPD officials investigated the claim, they determined that no such murder had occurred. In Weddington's grand jury and trial testimony, he claimed to have seen Lucas set her house on fire while they were both in living room of her house and claimed that once the fire began, Ms. Lucas ran upstairs while he ran out of the house. Weddington also mentioned the possible involvement of "Andre" in the crime in some of his various accounts of what had occurred on the day of the fire.

b. The police report describing this false report was discovered as a result of a Maryland Public Information Act (MPIA) request that resulted in the disclosure of this document two decades after Ms. Lucas was convicted of six counts of felony murder and given six consecutive life sentences. Additionally, Gary Childs, one of the lead detectives in the Lucas case, testified at trial that he credited Weddington's account of the actions of Ms. Lucas despite Weddington's various credibility problems, including his admitted grand jury perjury in the Lucas case, because Weddington knew details about the configuration of the house and the precise area of the origin of the fire, details that were not in the public domain. However, the handwritten contemporaneous notes memorializing Weddington's statements to Detective Childs, who was apparently his designated handler, contained no details about the layout of the house or the precise

area of the origin of the fire. Without the testimony of Eugene Weddington, the State could not have convicted Tonya Lucas of arson and six counts of felony murder. Tonya Lucas was tried twice on these charges, as the first jury could not agree on a verdict.

c. These facts suggest to me that supervisors in the homicide division were likely to have been aware of the existence of *Brady* material relating to Eugene Weddington and the non-disclosure of those materials. Trial counsel for Ms. Lucas presented a vigorous defense to the charges and repeatedly requested *Brady* information regarding Weddington. It seems reasonable to conclude that BPD was aware of the defense's demand for impeachment information on Weddington.

d. Ms. Lucas raised these *Brady* claims in a Petition for a Writ of Actual Innocence in May 2014. In December 2015, Ms. Lucas's Petition was granted and her convictions were vacated on other grounds, as the post-conviction court did not deem the undisclosed *Brady* material as "newly discovered evidence," a threshold requirement for obtaining relief under Maryland Code of Criminal Procedure § 8-301.

10. *State v. Rodney Addison*, Case No. 197017013 (Balt. City Cir. Ct. 1997)

a. On October 4, 1996, 34-year-old Lewis Jackson, was shot and killed while sitting in his car in Baltimore, Maryland. In the days following the shooting, BPD detectives interviewed several witnesses, including Frances Morgan, who claimed to have seen someone on a bike ride up to the victim's car and shoot him. When shown a photo array, Morgan identified Addison as the shooter. Morgan was the key prosecution witness against Addison at his trial, and the entire case rested on her identification. On March 25, 1998, a judge convicted Addison of second-degree murder and possession of a handgun. He was sentenced to 30 years in prison.

b.  My office discovered undisclosed *Brady* information as a result of a MPIA request years after Mr. Addison was convicted of murder in 1998. Undisclosed documents in the BPD file showed that another witness who viewed a photo lineup that included Addison had identified someone else as the shooter. The witness also said he saw the shooter flee on foot, not on a bike as Morgan had claimed.

c.  The post-conviction court found that the failure to disclose the information described above required that the conviction be vacated. Prosecutors at the trial level indicated that they had complied with their *Brady* obligations, and the prosecutor handling the post-conviction phase of the case indicated that he was not aware of the *Brady* information. In 2005, a motion to re-open post-conviction was granted, and upon presentation of the undisclosed *Brady* materials, all convictions in the case were vacated. The State subsequently nol prossed all charges.

11. *State v. Tyrone Jones, Case Nos. 198205041 and 199007003*, (Balt. City Cir. Ct. 1999)

a.  In June 1998, a 15-year-old boy was shot and killed in Baltimore. Two witnesses provided the initial responding officer with a general description of the clothing worn by the shooter. Police arrested Tyrone Jones, a college student home for the summer, a few blocks from the shooting because his clothing was similar to clothing described by a witness. A third witness later identified Jones in a photo array and at trial. The prosecution also presented evidence that a single particle of gunshot residue (GSR) was found on Jones's hand and that in the opinion of the State's GSR expert that finding indicated that Jones had fired a gun within a two hour period prior to the collection of the samples from his hands. In 1999, a jury convicted Jones of conspiracy to commit murder and he was sentenced to life in prison.

b.  In 2010, in response to a subpoena, the BPD provided post-conviction counsel for Jones access to the homicide investigation file. The file contained information indicating that the only witness who identified Jones at trial had told the BPD officer who arrived at the scene that he had not seen the shooting or the shooter. The prosecutor handling the post-conviction proceedings, and another prosecutor who tried the case, advised undersigned counsel that this information had not been provided to the BCSAO. During several rounds of litigation concerning the reliability of the GSR results that were used to convict Mr. Jones, which occurred from 2003 to 2004, BPD produced some, but not all, documents relating to the contamination of police department facilities and personnel, rendering GSR tests results unreliable for identifying suspects who had recently discharged a firearm. In 2010, in another criminal case in which the issue of GSR contamination was litigated, the BPD finally produced records that included internal e-mail communications and memoranda that were sent from police officers and crime lab personnel to BPD supervisors. The records indicated that BPD personnel were aware that GSR results were potentially unreliable due to widespread GSR contamination of all police facilities and personnel.

c.  Despite specific requests made to BPD by undersigned counsel in the first round of post-conviction litigation, BPD did not provide the documents relating to contamination concerns until the judge presiding over the motion for a new trial ordered the production of these documents. Eventually in 2010, the Baltimore City Circuit Court vacated Jones's conviction based on the State's concession that the non-disclosure of the information relating to the eyewitness entitled him to a new trial. All charges in the case were subsequently nol prossed.

6

12. *State v. Malcolm Bryant*, Case No. 199008011 (Balt. City Cir. Ct. 1999)

    a. Mr. Bryant was convicted in 1999 of murder based entirely on the testimony of one eyewitness. The witness testified that the day after the shooting she participated in generating a composite of the assailant, and that Mr. Bryant resembled the composite. BPD did not disclose to the defense that the witness had generated more than one composite and the circumstantial evidence presented by the contents of the homicide investigation file supports the inference that this information was not shared with BCSAO.

    b. A decade after Mr. Bryant was convicted, this information came to light via a MPIA request submitted by Mr. Bryant's post-conviction counsel. Information contained in the homicide investigation file indicated that two different State's Attorneys assigned to the case during various stages of the prosecution were unable to get information from Detective William Ritz, the lead detective in the case, regarding the composite images generated by the witness.

    c. The case is now awaiting a decision on a Petition for Post-Conviction DNA Testing asserting that Mr. Bryant is entitled to a new trial on the basis of exculpatory DNA test results indicating that he was not the perpetrator of the murder.

13. *State v. Robert Burrell*, Case Nos. 100158011-12 (Balt. City Cir. Ct. 2000)

    a. The case against Mr. Burrell arose out of the shooting death of Cody Chambers on November 10, 1999. According to the State's witnesses, the incident that led to the victim's death was a street fight involving the victim and Burrell. Melissa Chavis testified that she had witnessed the fight and the subsequent shooting. Chavis also testified that she had murdered three men in a hotel room in Baltimore at the behest

of Mr. Burrell after being raped by the three men. She indicated that after she shot the men, Burrell and others cleaned up the crime scene and buried the bodies in Carroll County.

b. Several years after Mr. Burrell was convicted of the murder of Cody Chambers, my office received a response to a MPIA request from the BPD that included a copy of a memo written by BPD Detective Michael Hammell indicating that well before the trial commenced in this case, Melissa Chavis had been re-interviewed by BPD officials after they had been unable to corroborate her account of her commission of the three murders. According to Detective Hammell's memo, dated December 21, 1999, prior to conducting a polygraph examination on Chavis, she admitted to Hammell that she had not been truthful about the murders and that they had occurred in North Carolina not Baltimore. The memo went on to state that the detectives who had listened to Hammell's account of the triple murder concluded that she had lied about critical details of the event, including her claim that the motive for the crime was to punish the men for having raped her. The memo also stated that Chavis advised the BPD detectives that she did not want to spend time in jail, and she terminated the interview without answering any further questions without her attorney present.

c. The police investigative file also contained a report regarding an eyewitness to the fight, Elton Jones, who identified the person fighting and chasing the victim as a man known as "Snow" and provided a general description of the assailant's weight, height, and facial hair that did not match that of Burrell. No other witness in the case indicated that Burrell went by any other nickname than "B.O."

8

  d. At a post-conviction hearing conducted in this case, Burrell's trial counsel testified that he had not received either of the two documents described above, nor had he been advised of the contents of the documents before or during Burrell's trial.

  e. At no point in the post-conviction proceedings did the Office of the State's Attorney indicate that it had possession of these two documents or knowledge of the contents.

14. *State v. Demetrius Smith*, No. 108218005 (Balt. City Cir. Ct. 2008)

  a. On March 24, 2008, Robert Long was found lying on the ground next to railroad tracks near Carroll Park in Baltimore, Maryland. He had been fatally shot in the head. Smith was arrested on July 10, 2008 and charged with first-degree murder after police found two witnesses who said they were in the park at the time of the murder and identified Smith as the gunman. At trial, Michelle McVicker testified that she was walking to her methadone treatment program when she saw Smith and Long engaged in conversation, walking toward the railroad tracks. She was unsure of the location of the murder and could not remember if she heard two shots or three (two shell casings were found next to Long's body). She said that she saw Long running before he was shot, although in a previous statement to authorities, she said he was running after he was shot. A medical examiner testified that Long was shot at close range while he was standing.

  b. Mark Bartlett, a convicted thief and drug dealer, testified that he was standing at a pay phone near the park trying to arrange a heroin purchase when he saw Long and Smith walk out of an alley toward the railroad tracks. Bartlett said that Long came to his door early on the morning of the shooting with two other men and that they

9

wanted to trade heroin for crack cocaine. Bartlett said that he made the deal and recognized the heroin because of its unique packaging. Bartlett said that only Smith sold heroin in that form, and so he believed that, somehow, Long had stolen Smith's stash, which he estimated was worth $7,000. Bartlett said that he saw Smith shoot Long in the face. He told the jury that he had been arrested for a probation violation on May 8, 2008 and reached out to police to tell them about the shooting. He identified Smith in a photographic lineup and in court.

    c.    Detective Steven Hohman testified that he used local informants to locate McVicker. Smith's trial attorney, cross-examining of Detective Hohman, suggested that the real killer was Jose Morales, a long-time drug dealer and conman, for whom Long had worked for years. Thirteen days before Long was killed, he had agreed to cooperate with law enforcement in prosecuting Morales.

    d.    On January 19, 2010, Smith was convicted of first-degree murder and the use of a handgun in the commission of a crime. He was sentenced to life in prison. A federal investigation turned up evidence that Morales had ordered someone to kill Long because he had learned that Long had agreed to cooperate with authorities attempting to prosecute him. The Office of the United States Attorney for the District of Maryland obtained the BPD homicide investigative file in response to a grand jury subpoena.

    e.    Ultimately, that file was shared with undersigned counsel. Information in the file that had not been disclosed to the defense included the following information that had not been disclosed prior to or during the trial of Demetrius Smith: 1) Jose Morales had attempted to contact the detectives assigned to the case, Steven Hohman and Charles Bealefeld, on numerous occasions and had left phone messages asking the

detectives to contact him; 2) the victim's cellphone had been taken by someone after the shooting and was eventually recovered by BPD, but never logged into evidence; 3) cellphone records of Jose Morales placed him in the immediate vicinity of the shooting at the time it occurred and connected Morales to his co-conspirator who actually fired the shots that killed the victim; 4) a witness who was interviewed by BPD detectives told them that he had been with the victim right before the shooting and that the victim had arrived at the area of the park where he was shot by taking a route that was inconsistent with the testimony of the two eyewitness used at the trial of Demetrius Smith; and 5) the veracity of the information this witness provided was demonstrated by a BPD CTTV camera recording that showed him to be in the location that he described as opposed to the CTTV camera images that were wholly inconsistent with the accounts of the two witnesses who identified Demetrius Smith.

f.  This case garnered a great deal of media attention at the time of Demetrius Smith's trial due to the media attention that had been focused on the ongoing criminal activities of Jose Morales. The police investigative file indicates that reports relating to the progress of the investigation were provided to BPD supervisors in the Homicide Unit. Presumably, discussion ensued between the lead detectives and their respective supervisors about the weaknesses of the case against Demetrius Smith before BPD filed a charging document and arrested him. Nonetheless, no steps were taken to ensure that the exculpatory information relating to Demetrius Smith was provided to the prosecutor or to his defense attorney

g.  On August 1, 2012, BCSAO conceded that Smith was entitled to a new trial, and upon the granting of the new trial, all charges relating to the murder of Robert

Long were nol prossed. On September 11, 2012, Morales, was indicted by a federal grand jury on a charge of using his mobile telephone to order the killing of Long. Morales was convicted on the federal charge of using his phone to order Long's murder in October 2013. According to the prosecutors who handled the proceedings that resulted in the vacating of these convictions, the BCSAO was unaware of the *Brady* information previously described herein.

15. In all the cases I have described in this declaration, I have seen no evidence that BPD has enacted any changes in policy or practice to ensure that *Brady* material is provided to the BCSAO in response to the egregious violations previously described. I am not aware of any instance of a BPD detective or uniformed officer being counseled on the issue of *Brady* disclosure obligations or disciplined for conduct that violates the duties imposed upon BPD by the *Brady* doctrine and concomitant state disclosure requirements.

16. In my review of numerous homicide investigation files that span the period of the early 1980's through 2010 and concomitant examination of related pre-trial disclosures, I see no indication that the pattern of non-disclosure has been ameliorated or even addressed by BPD, even in the face of criticism by the media and some judicial officials. I have seen no indication that exonerations of wrongly convicted individuals whose original convictions were marred by serious *Brady* violations by BPD has led to any effort on the part of BPD to recognize and address the problem.

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 1, 2016

Michele Nethercott