# Exhibit 41

```
STATE OF MARYLAND              *    IN THE
                               *
                               *    CIRCUIT COURT
                               *
     VS.                       *    FOR
                               *
                               *    BALTIMORE CITY
ANTWAN PETTIFORD               *
                               *
     Defendant                 *    Case Nos. 194273001
                               *
*    *    *    *    *    *    *    *    *    *    *
```

TRANSCRIPT OF OFFICIAL PROCEEDINGS
(Excerpt of Judge's Decision on
Motion for New Trial)

- - - - -

BEFORE:            THE HONORABLE ELLEN HELLER, Judge

- - - - -

HEARING DATE:      May 22, 2000

- - - - -

APPEARANCES:

For the State    :  MARK COHEN, ESQUIRE
                    DON GIBBLIN, EQSUIRE

For the Defendant:  MICHELLE MARTZ, ESQUIRE
                    FRED WARREN BENNETT, ESQUIRE


Transcriptionist:  Donna R. McCormick
Transcription
  Service:         ACCUSCRIBES TRANSCRIPTION SERVICE
                   P.O. Box 5337
                   Baltimore, MD 21209
                   410-367-3838

Proceedings recorded by video recording, transcript produced by transcription service.

ORIGINAL

*ACCUSCRIBES TRANSCRIPTION SERVICE*
*(410)367-3838*                    *FAX: (410)367-3883*

1   would reprosecute him for this murder, and that part of
2   the decision to reprosecute Antwan Pettiford for the
3   murder was the State's belief that he was the second
4   shooter.
5         By this time, looking at the statement one could
6   say that Dimitrius Smith was the driver or shooter, though
7   it turns out he was most likely the driver; and that Duray
8   Cole (sp) was the first shooter. But the State firmly
9   believed Mr. Pettiford was the second shooter.
10        With this in mind, let me go over the prongs--
11  (1) was this newly discovered evidence; (2) was it
12  evidence that couldn't have been discovered through due
13  diligence of Ms. Martz-Bowles; (3) is it material; and (4)
14  may have produced a different result.
15        Let me take the first two prongs first. This
16  Court does believe the evidence is newly discovered and
17  could not have been discovered by due diligence by
18  counsel. Taking the State's facts as they are and Ms.
19  Angeletti's testimony that she turned it over in a large
20  pile of documents which then was Exhibit No. 21 of the
21  defense that came out through the post conviction of
22  proceeding and response to a subpoena by Ms. Martz, all we
23  know is that a pile of documents came in. Part of them
24  were so-called redacted documents-- documents that Ms.
25  Angeletti would not have turned over for various reasons.

1  One of them being witness security or documents that she
2  would have blacked out, and part of them were documents
3  that she would have turned over. All of them, she said,
4  was the complete homicide file.
5       It's the State's position-- somewhere in this
6  large pile of documents would have been Petitioner's
7  Exhibit No. 10, the so-called Donte Todd statement no. 2
8  which identified Kevin Moore as the second shooter.
9       Even if it was there, however, the Court finds
10 that Ms. Martz-Bowles made every effort-- reasonable
11 effort that a competent attorney could have-- displayed
12 due diligence in making sure that she had in her
13 possession everything that would be exculpatory before she
14 could counsel her client. And the Court finds that she
15 certainly, one, didn't have it in her possession not only
16 by her testimony which I find credible. But as has been
17 pointed out, when one looks at Petitioner's Exhibit 8 and
18 9, there's no mention of it.
19      August 20th, 1998, Ms. Martz writes to Mr.
20 Gibblin and Mr. Cohen to set forth the basis of the guilty
21 plea, the Alford Plea that ultimately takes place, and in
22 nowhere does she mention that statement or the fact that
23 there's an identification of a second shooter.
24 Petitioner's Exhibit No. 8 is a detailed statement of the
25 case. Nowhere is there an indication that she's had any

1   access to it.

2          Indeed she herself testified she didn't know
3   there was such a statement until she was advised by the
4   Sun Paper. And then she went looking for it, and she
5   couldn't find the file. The file wasn't in the Clerk's
6   office. And then when she finally did find the file which
7   was in the possession of the State's Attorney's Office, as
8   it turns out, Sharon May, it was in total disarray. And
9   the stipulation from the State today is that the file was
10  in total disarray, that she had received it from the
11  Clerk's office in total disarray.

12         Suddenly in this total disarray of papers that
13  came from the Clerk's office and that was sitting in such
14  a state, the State's Attorney's Office, suddenly this
15  detailed statement, the identifying statement, is on top
16  of the pieces of paper. It just appeared.

17         As was summarized today, the exculpatory
18  evidence was requested under the Maryland Freedom of
19  Information Act. There were oral and written requests of
20  the State's Attorney. There was a review of transcripts.
21  There was an interview with the original trial counsel,
22  Walter Ballan.

23         There was a cross examination of Detective
24  Patton. And in this case what is so incredulous and
25  incredible is the fact that after the Court through

1  questioning has Detective Patton for the first time
2  identified Donte Todd's statement. No one in the State,
3  be it Detective Patton or a prosecutor, disclosed and
4  identified the second statement. This is unforgiving.
5  We're not dealing in corporate finance where we put
6  someone in a room with boxes of documents and say find out
7  that that you think is material and relevant to your case.
8        I know that the prosecutors sitting before me
9  today are very experienced individuals with high
10 principles of prosecution and justice. And so my
11 statements don't go to what they did or did not know about
12 the case. They were not the prosecutors in this case.
13 But the game isn't about getting a conviction, and the
14 game isn't about adding up another number. And the game
15 isn't about keeping smoking guns and hiding evidence. The
16 game is about disclosing everything we have to make sure
17 all of the information is there when we prosecute someone
18 for someone's killing.
19       And I find here that there was, especially on
20 Detective Patton's part, a deliberate omission to point
21 out that Donte Todd had made a second statement.
22       I also find credible Ms. Martz's testimony that
23 when she said she wanted to stay behind at the original
24 July 28th hearing but Detective Patton was too busy. And
25 therefore, he said he would gather together the

10

1 exculpatory information and give it to her another time.
2 And that when she went on August the 7th, 1998, that that
3 information had already been put together, stapled
4 together what she then put in a binder. And she produced
5 it today, and nowhere is that second statement there.
6        So it wasn't identified before this Court at the
7 original post-conviction hearing that there was a second
8 statement, and I use that word loosely because neither
9 statement was signed. One was in person, and one was on
10 the telephone, but both are summaries of Donte Todd's
11 conversation with the detective.
12        But he didn't disclose it on August 7th. I
13 don't know if he knew it was there and he was inside
14 smirking. That it was in a pile of paper she hadn't
15 discovered, I'm not going to say that because I'm just
16 going to say no one pointed out that it was there. I
17 don't even know that Mr. Gibblin or Mr. Cohen knew about
18 the identification of the second shooter there.
19        But even in July of 1999 he acknowledged that he
20 told the Sun Papers that after May 1, 1994 he never talked
21 to Donte Todd again, and that was directly contradicted by
22 the second statement which he then said he didn't
23 remember.
24        In the context of, what was disclosed back in
25 July of 1998 not to have come forward with the other half

of the story, as the Court said was unforgiving and egregious, I find there it was newly discovered and could not have been discovered through due diligence. I am not imposing on the defense the burden of going through piles of paper, especially in the context of this case when the detective volunteered to put together the exculpatory statements for the Defendant.

Now, would this second statement have produced a different result? That is, would Antwan Pettiford had pled guilty on August 21, 1998? York v. State, looking at the standard at 315 Md. 588 says, the workable standard is, "The newly discovered evidence may well have produced a different result," that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected in this instance. What the defense is saying is that the guilty plea wouldn't have been entered into.

The defense is saying to me today, the standard in the context of this being both an Alford Plea and a Brady violation should be whether there was a reasonable probability that an objectively speaking, not subjectively, that a person wouldn't have pled guilty under either statement, I think the evidence is there.

First, we have to go to the fact that these statements should have been disclosed in 1994. One was

1   access to it.

2           Indeed she herself testified she didn't know
3   there was such a statement until she was advised by the
4   Sun Paper. And then she went looking for it, and she
5   couldn't find the file. The file wasn't in the Clerk's
6   office. And then when she finally did find the file which
7   was in the possession of the State's Attorney's Office, as
8   it turns out, Sharon May, it was in total disarray. And
9   the stipulation from the State today is that the file was
10  in total disarray, that she had received it from the
11  Clerk's office in total disarray.

12          Suddenly in this total disarray of papers that
13  came from the Clerk's office and that was sitting in such
14  a state, the State's Attorney's Office, suddenly this
15  detailed statement, the identifying statement, is on top
16  of the pieces of paper. It just appeared.

17          As was summarized today, the exculpatory
18  evidence was requested under the Maryland Freedom of
19  Information Act. There were oral and written requests of
20  the State's Attorney. There was a review of transcripts.
21  There was an interview with the original trial counsel,
22  Walter Ballan.

23          There was a cross examination of Detective
24  Patton. And in this case what is so incredulous and
25  incredible is the fact that after the Court through

1  of the story, as the Court said was unforgiving and
2  egregious, I find there it was newly discovered and could
3  not have been discovered through due diligence. I am not
4  imposing on the defense the burden of going through piles
5  of paper, especially in the context of this case when the
6  detective volunteered to put together the exculpatory
7  statements for the Defendant.
8      Now, would this second statement have produced a
9  different result? That is, would Antwan Pettiford had
10 pled guilty on August 21, 1998? York v. State, looking at
11 the standard at 315 Md. 588 says, the workable standard
12 is, "The newly discovered evidence may well have produced
13 a different result," that is, there was a substantial or
14 significant possibility that the verdict of the trier of
15 fact would have been affected in this instance. What the
16 defense is saying is that the guilty plea wouldn't have
17 been entered into.
18     The defense is saying to me today, the standard
19 in the context of this being both an Alford Plea and a
20 Brady violation should be whether there was a reasonable
21 probability that an objectively speaking, not
22 subjectively, that a person wouldn't have pled guilty
23 under either statement, I think the evidence is there.
24     First, we have to go to the fact that these
25 statements should have been disclosed in 1994. One was

1  of the killing.
2       In addition, both statement's firsthand
3  testimony of Donte Todd indicate what occurred the same
4  day before the shooting which gave a clear motive for why
5  the shooting ultimately took place later on that day and
6  the fact that Donte Todd had been the original shooter
7  against Dimitrius Smith.  Had they been able to be
8  located, one or some of them, it would have been brought
9  out again that Antwan Pettiford was not known to any of
10 the players.
11      Ms. Martz testified that she discussed with
12 Antwan Pettiford whether he was going to enter in a guilty
13 plea or whether he was going to let the State reprosecute
14 him.  And she testified, and I find this credible, that
15 the State was going to reprosecute him because they
16 believed still on the evidence that they had, he was the
17 second shooter.  And she felt she couldn't identify the
18 second shooter and obviously felt her client was
19 vulnerable in this context.
20      Antwan Pettiford testified that with the -- and
21 as did Ms. Martz-Bowles-- of the second shooter.  I think
22 Ms. Martz Bowles said at the end of the initial hearing in
23 this matter, that suddenly the whole story came together.
24 He would never have entered in a guilty plea to
25 manslaughter had he known the whole story was known to the

14

1  state, an identification of both shooters, the motive.
2  And I accept that, and I indeed I accept that a reasonable
3  person applying an objective standard with all of this
4  evidence would not have entered in a guilty plea the
5  second time and would have taken their chances with the
6  state prosecuting on a new trial.
7      And as came out in this hearing before lunch,
8  the State's evidence is very circumstantial in this case.
9  No one has ever seen Antwan Pettiford as the man who was a
10 shooter of Oscar Lewis.  There is no eyewitness.  What we
11 now are left with are two sisters, one of who's recanted
12 testimony and one of who's identification was months
13 afterwards that he was seen running near the scene of the
14 crime, and the recanting testimony of Darren Warren that
15 he was seen before the crime with one of the guns that may
16 have been used.
17     As York case says, a trial judge is not at
18 liberty to set aside a verdict of guilty, or in this
19 instance a guilty plea and to grant a new trial merely
20 because the judge would have reached a result different
21 than that of the jury's.  Motions for New Trial are not
22 favored and should be granted only in exceptional
23 circumstances-- when the evidence preponderates so heavily
24 against the verdict that it would be a miscarriage of
25 justice to let the verdict stand.