**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | | |
|---|---|---|
| **JAMES OWENS** | * | |
| | * | |
| **Plaintiff** | * | |
| | * | |
| **vs.** | * | **CIVIL ACTION NO:** |
| | * | **1:11-CV-03295-GLR** |
| | * | |
| **BALTIMORE POLICE** | * | |
| **DEPARTMENT, et al.,** | * | |
| | * | |
| **Defendants** | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT**
**BALTIMORE POLICE DEPARTMENT**

## TABLE OF CONTENTS

1.      BPD is entitled to Summary Judgment with respect to Plaintiff's Failure to Train
        Theory ........................................................................................................................ 1

1.1.    Plaintiff's failure to plead a failure to train theory is fatal to his pursuit of that
        theory at summary judgment ...................................................................................... 1

1.2.    Plaintiff cannot prove that BPD policymakers were or should have been aware of
        a pattern of violations that would have given notice of a deficiency in training ........................... 2

1.3.    Plaintiff cannot prove that BPD training was constitutionally deficient on its face ..................... 6

1.4.    Plaintiff's proposed failure to train evidnce cannot create a geniune issue of material fact........8

1.5.    Plaintiff's "tunnel vision" theory of deliberate indifference is unsupported by
        case authority or evidence.......................................................................................... 10

1.6.    Inadequate training cannot be the moving force behind Plaintiff's alleged injury ..................... 11

2.      The BPD is entitled to Summary Judgment because there is no evidence
        admissible or otherwise of the alleged pattern and practice ........................................ 12

2.1.    Plaintiff does not identify a single written decision finding a *Brady* violation by
        the BPD....................................................................................................................... 13

2.2.    Plaintiff does not identify a single witness with admissible personal knowledge of
        a *Brady* violation by the BPD .................................................................................... 15

2.3.    The unproven allegations contained in the two civil complaints identified by
        Plaintiff are not evidence of any violation by the BPD .............................................. 19

2.4.    The hearing transcripts from which Plaintiff quotes do not establish any violation
        of *Brady* by the BPD................................................................................................. 21

2.5.    Plaintiff's reliance on alleged incidents that arose well after his own criminal trial
        is misplaced................................................................................................................. 23

2.6.    Plaintiff's identified examples are too few to establish a pattern and practice ........................... 24

## INTRODUCTION

The BPD has filed a motion for summary judgment arguing that Plaintiff has not created a genuine dispute of fact as to the existence of a policy or practice on the part of the BPD of non-compliance with discovery obligations under *Brady v. Maryland*. In his response, Plaintiff advances two alternative theories. First, he argues that there was a deficiency in the training of BPD homicide detectives on their *Brady* obligations so egregious as to amount to a policy of deliberate indifference to the risk of possible violations, despite having never pled this theory in any iteration of his Complaint. Second and alternatively, he argues that the alleged non-disclosure was part of a pattern and practice of failing to disclose exculpatory information that he asserts was so widespread as to be effectively official policy.

Plaintiff has no evidence tending to prove either of his two theories. All existing evidence supports the BPD's legal position that there was no unconstitutional policy or practice whatsoever. Accordingly, there is no genuine dispute of fact, the BPD is entitled to judgment as a matter of law, and it respectfully requests that its motion be granted.

## ARGUMENT

### 1. BPD is entitled to Summary Judgment with respect to Plaintiff's Failure to Train Theory.

### 1.1. Plaintiff's failure to plead a failure to train theory is fatal to his pursuit of that theory at summary judgment.

Although Plaintiff argues a failure to train theory in his response, Plaintiff never alleged this theory anywhere in any of his several Complaints. *See* ECF No.'s 2, 103, 117, and 147. As a result, the BPD never received proper notice that Plaintiff was going to pursue such a case against it, and Plaintiff may not now argue it in opposition to this motion. *Doe v. Roe,* No. 89–6817, 1990 WL 86285 *2 (4th Cir. June 13, 1990) (holding that district court properly refused to

consider at summary judgment "discovery related to a new, unpleaded theory of [plaintiff's] case, "liability under a "'failure to train' theory," where "the case had been pending for nearly six months and was set for trial within two weeks," and defendants "would be prejudiced by preparing to defend against a **new** cause of action at that late date"). This is true even though Plaintiff for the first time identified this possible theory in his November 11, 2015, response to the BPD's second set of interrogatories.   *See United States v. Cochran*, 79 F. Supp. 3d 578, 586 (E.D.N.C. 2015)( [D]iscovery, however, "is an exercise in fact-finding, and it is the complaint—not depositions or interrogatories—that provides 'fair notice' to defendants of the allegations against them.") (quoting *Stevenson v. City of Seat Pleasant, Md.,*743 F.3d 411, 420 (4th Cir.2014)). It follows that Mr. Owens is precluded from asserting failure to train as a legal theory underlying his case, when he has failed to amend his pleadings to aver such a claim.  Thus, the Court should not consider any arguments or evidence with respect to Plaintiff's failure to train claim, and the BPD is entitled to judgment as a matter of law.

### 1.2. Plaintiff cannot prove that BPD policymakers were or should have been aware of a pattern of violations that would have given notice of a deficiency in training.

In any event, the Court should flatly reject Mr. Owens's failure to train theory, should the Court reach the merits, because he has not generated enough evidence to make out such a claim. It is undisputed that "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quotations and citations omitted). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62. Only "in a narrow range of circumstances" where the

unconstitutional consequences of failing to train are "patently obvious" may a claim of failure to train prevail in the absence of a provable pattern of violations. *Connick*, 563 U.S. at 64.

In his response, Plaintiff identifies three cases, *State v. Walter Lomax*, *State v. Michael Austin*, and *State v. Wendell Griffin*, that he claims would have given BPD policymakers notice that their training on *Brady* compliance was deficient prior to Plaintiff's own trial. Plaintiff's Opp. Papers at 17.  First and foremost, three (3) cases is hardly the type of "widespread and persistent" pattern of constitutional violations that would have put the BPD on notice of an unconstitutional training deficiency.  *See e.g., Connick*, 563 U.S. at 62 ("Those four reversals could not have put Connick on notice that the office's *Brady* training was inadequate with respect to the sort of *Brady* violation at issue here."); *Lytle v. Doyle*, 326 F.3d 463, 474 (4th  Cir. 2003)("The situation here was hardly one that occurred with sufficient frequency such that a failure to properly train officers to handle it reflected a reckless indifference to the Lytles' rights.").

Second, and more to the point, the alleged unconstitutional conduct in the cases cited by Mr. Owens are no where close to his case, *i.e.*, there is no pattern of constitutional violations that are similar to the alleged violations in Mr. Owens's case.  *See Connick,* 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train" (citations  omitted)); *Lytle*, 326 F.3d at 474 ("Further, a failure to train can only form a basis for liability if "it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations." (quoting *City of Canton v. Harris*, 489 U.S. 378, 397 (1989)(O'Conner, J, concurring in part and dissenting in part)).

As to *State v. Walter Lomax*, Case No. 16801754-76 (Balt. Cit. Cir. Ct. 1968), Plaintiff

alleges that certain documents were placed into the BPD's homicide file but never made their way to defense attorneys. Plaintiff's Opp. Papers at 19.  Plaintiff does not dispute, however, that the discovery of the alleged non-disclosure did not occur until 2006. *Id.*  As such, the *Lomax* case cannot have put the BPD on notice in 1989 of any problem with its training or policies. Moreover, Plaintiff has failed to present any evidence that the State's Attorney's Office did not have access to and did not know the contents of the Homicide files, including any documents that were allegedly not disclosed to the defense attorneys. Thus, his only real claim is to a violation by the State's Attorney.  More importantly, Plaintiff only relies on hearsay from the national registry of exonerations, and the Baltimore Sun to support his position regarding *Lomax*, none of which was previously disclosed by Plaintiff, nor is in any way admissible. See Plaintiff's Opp. Papers  at 19, fn. 7, 20; *Maryland Highways Contractors Ass'n, Inc. v. State of Md.*, 933 F.2d 1246, 1251 (4th Cir. 1991)( "First, several circuits, including the Fourth Circuit, have stated that hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment.").

As to *State v. Michael Austin* – a case nearly as ancient as *Lomax* (dating from 1974) – Plaintiff alleges that a police officer voluntarily reported at trial a piece of information that he/she recollected from the investigation. Plaintiff's Opp. Papers at 20. Plaintiff fails to mention whether this piece of information was disclosed to the State's Attorney.  Based on these facts, the court that reviewed Mr. Austin's case concluded, in fact, that there was no evidence of a *Brady* violation at all. *See* Plaintiff's Exhibit to his Opp. Papers (hereafter "Pl. Ex.") 26 at 11. Additionally, Plaintiff does not dispute that Mr. Austin's allegations only came to light in 1992, well after Plaintiff's own trial and conviction. *See* Plaintiff's Opp. Papers at 20. Accordingly, none of this relates in any way to Plaintiff's current case, and none of it could possibly have

given the BPD notice in the 1980s of a constitutional deficiency in its training that would be relevant here.  Most importantly, in *Austin* the Court found no *Brady* violation had occurred, at all, because there was no suppression of evidence. Plaintiff's Opp. Papers at 21, Pl. Ex.  26 at 11.

Finally, as to the allegations regarding Mr. Griffin, it is undisputed that the evidence in question existed in the BPD's homicide file. *See Griffin v. Baltimore Police Dep't*, 804 F.3d 692, 694 (4th Cir. 2015). The only questions in that case is whether the State's Attorney's office disclosed it and if not why the State's Attorney did not disclose it. The Plaintiff can point to no evidence that the file was not provided to the State's Attorney.  In fact, the only evidence from any witness with relevant first-hand knowledge is the declaration of former BPD detective Donald Kincaid who stated that he provided the Office of the State's Attorney with a full copy of the homicide file. BPD Ex. 9, Declaration of Donald Kincaid.[1] Moreover, Mr. Griffin's allegations regarding the detectives suppression of evidence from the State's Attorney is premised soley on "information and belief" and speculation. See Pl. Ex. 29, ¶ 32, 34, 45, 50; *Wilson v. Susquehanna Bancshares, Inc*., No. CIV.A. GLR-14-79, 2014 WL 2094039, at *5 (D. Md. May 19, 2014) (refusing to consider an affidavit made on "information and belief'" without any other basis for personal knowledge). Finally, Mr. Griffin's complaint, including these speculative assertions, was not filed until November 11, 2013.  See Pl. Ex. 29.  Therefore, it could not have possibly provided the BPD with notice of any alleged deficiency or pattern and practice at the time of the Plaintiff's criminal trial.

Plaintiff does not identify any other cases that pre-date his own that could possibly have put the BPD on notice of any deficiency or pattern and practice. In the absence of evidence,

---

[1]     All references to BPD's own exhibits from its initial memorandum in support of its motion for summary judgment are referred to herein as "BPD Ex." The BPD has included three additional exhibits the BPD with this Reply. Those exhibits continue consecutive to the exhibits from its initial memorandum and are cited herein with the same reference.

"conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (citations omitted). Accordingly, no rational jury could find the required "pattern of similar constitutional violations by untrained employees … necessary to demonstrate deliberate indifference for purposes of failure to train." *See Connick*, 563 U.S. at 62.[2]

### 1.3. Plaintiff cannot prove that BPD training was constitutionally deficient on its face.

Having failed to identify evidence of a "pattern of similar constitutional violations by untrained employees," Plaintiff alternatively argues a single incident theory of liability.[3] The undisputed facts of this case exclude that theory, however.

First, this Court has previously held, consistent with Fourth Circuit precedent, that "[a] single incident of misconduct by a police officer is not sufficient to state a claim for inadequate training." *Drewry v. Stevenson*, No. CIV. WDQ-09-2340, 2010 WL 93268, at *4 (D. Md. Jan. 6, 2010); *Doe v. Broderick,* 225 F.3d 440, 456 (4th Cir.2000). While the Supreme Court has observed that, "in a narrow range of circumstances," a pattern of similar violations might not be necessary to show deliberate indifference where the unconstitutional consequences of failing to train are patently obvious, this theory is only even potentially applicable where the employees were not provided with ***any*** training on the constitutional requirements. *Connick*, 563 U.S. at 64; *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n. 10 (1989); *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006) (finding failure to train where plaintiff presented actual evidence that the training of the defendant's police officers on the handling of exculpatory material was "nonexistent."); *Brown v. Bryan County*, 219 F.3d 450, 458 (5th Cir. 2000)

---

[2]     This lack of notice is also fatal to Plaintiff's condonation theory, discussed in Section 2, supra.

(Finding failure to train where the plaintiff presented evidence that a certain law enforcement officer was intentionally not trained in certain areas.).[4]

In contrast to those cases, the unchallenged evidence here is that the BPD had and enforced policies designed to ensure the proper handling of exculpatory material. BPD Ex. 28, Deposition of Gary Childs, 78-79, 82, 93. Also, that the individual officers and other officers received training on these policies and the *Brady* requirements. *See* BPD Ex. 1, Deposition Transcript of Colonel David Reitz, 25-26 (testifying that *Brady* was taught at the police academy in a course called "legal" covering "legal law"); BPD Ex. 3, Deposition Transcript of Gary Dunnigan, 65 (stating that he first learned of his Brady obligations at the police academy in a course on "law"). And that the Individual Officer Defendants fully understood their obligations under these policies. BPD Ex. 3, Deposition Transcript of Gary Dunnigan, 64-65; BPD Ex. 4, Deposition Transcript of Jay Landsman, 42-44; *See also* ECF No. 117-1, Redlined version of Second Amended Complaint at ¶130 (admitting that the individual detectives were fully aware of their obligations). In fact, Plaintiff's own expert agreed that there was not a failure to train in this case. *See* BPD Ex. 30, Waller Deposition at 120: 12-24 ("I don't believe that there was a failure to train[.]").

This policy of full disclosure within BPD's Homicide Unit, and compliance that policy or custom, is corroborated by the Former Chief of the Violent Crimes Unit at the State's Attorney, the Honorable Timothy Doory, who swears by declaration that the joint policy and practice of the BPD and the State's Attorney's Office called for complete production of every homicide file

---

[4]     Other courts have also refused the invitation to apply the single-incident theory to cases where Plaintiff alleged failure to train police officers on *Brady* obligations. *Ramirez v. Cty. of Los Angeles*, 397 F. Supp. 2d 1208, 1227-28 (C.D. Cal. 2005); *Truvia v. Connick*, 577 F. App'x 317, 325 (5th Cir. 2014) *cert. denied*, 135 S. Ct. 1550, 191 L. Ed. 2d 637 (2015). Interestingly, unlike our case, where the officers have actually admitted that they were trained and understood their obligations to disclose exculpatory information, in both *Truvia* and *Ramirez* the officers testified they received no training at all on these obligations. However, the courts held that without prior notice that they needed training in this area; the municipal defendants could not be deliberately indifferent.

to the prosecution as well as keeping prosecutors continually informed of all developments. BPD Ex. 5 at ¶¶13-15. Judge Doory also declares that he and his colleagues at the State's Attorney's Office would educate detectives on the importance of discovery compliance and their obligations. BPD Ex. 29, Second Declaration of Timothy Doory at ¶8. This practice is consistent with the Fourth Circuit's instruction that "the prosecutor bears the responsibility for implementing procedures designed to ensure that police officers turn over all evidence to him." *Jean v. Collins*, 221 F.3d 656, 661 (4th Cir. 2000); *see also Giglio v. United States*, 405 U.S. 150, 154, (1972); *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995). Accordingly, this is not a case where the individual officers who allegedly caused the violation received no training whatsoever on the constitutional standard.  As such, this case does not within the "a narrow range of circumstances" where a pattern of similar violations might not be necessary to show deliberate indifference.

### 1.4.    Plaintiff's proposed failure to train evidence cannot create a genuine dispute as to a material fact.

Plaintiff's sole evidentiary submission as to the BPD's training and practices is a declaration by a former instructor at the BPD's training academy named Stephen Tabeling alongside which he has attached a lesson plan that Mr. Tabeling states dates from 2008. *See* Plaintiff's Ex. 21. As discussed in the BPD's pending motion to strike, neither Mr. Tabeling nor his lesson plans were ever identified during discovery, thus precluding Plaintiff from relying on them for any purpose. *See* Fed.R.Civ.P. 37(c).

Even if this Court could look beyond this discovery violation, Pl. Ex. 21 fails to present any evidence supportive of Plaintiff's case.  An affiant's lack of knowledge on a particular subject matter is plainly not enough to create an issue of fact Rule 56. *Causey v. Balog*, 162 F.3d 795, 803, n. 4 (4th Cir. 1998) ("Rule 56(e) precludes consideration of materials not based on the affiant's first-hand knowledge."); *see also* Fed. R. Civ. P. 56(e).

Mr. Tabeling makes no claim anywhere in his declaration of personal knowledge as to the type of training received by BPD officers during the period relevant to this case, the late 1980s, including training on *Brady* issues. In fact, he specifically states that his knowledge is limited to the 1970s and the 2000s. *See* Pl. Ex. 21 at ¶20. Although he states that he taught interrogation techniques and note taking, nowhere does he state that he ever taught the "legal" or "law" course at the academy – the relevant course according to all of BPD's witnesses on the subject, as discussed above – or that he has any personal knowledge of the content of that course or any other course during the relevant time period. Pl. Ex. 21. at ¶10. Similarly, although he states that he received "very little" training from the BPD on "the law," Pl. Ex. 21 at ¶7, nowhere does he state that the BPD did not have in place policies (like those described above) to ensure adequate disclosure. Instead, he states only that he is "unaware" of any orders or specific training on *Brady*. Pl. Ex. 21 at ¶10. In short, Mr. Tabeling's declaration does not create any conflict of facts with the material submitted by BPD, including importantly, the declaration of Judge Doory. *Cf.*

Moreover, if anything, Mr. Tabeling's personal knowledge partially supports the BPD's version of events. During his tenure as a supervisor in the BPD Homicide Division, Mr. Tabeling claims that he personally instructed his subordinates on procedures designed to ensure compliance with *Brady* obligations, including case file management, keeping proper records, and disclosure obligations. Pl. Ex. 21 at ¶9. He also states that he knows the BPD did officially train its officers on proper record keeping during interviews and interrogations because he briefly taught that course. Pl. Ex. 21 at ¶10. Mr. Tabeling also corroborates Judge Doory's statements that detectives were instructed by the Assistant State's Attorneys they worked with on their discovery obligations, further reinforcing the fact that BPD homicide detectives were trained on

their *Brady* obligations. Pl. Ex. 21 at ¶8.

Finally, the 2008 lesson plans attached to Mr. Tabeling's declaration are completely irrelevant to this case as they are from 2008, some twenty (20) years after the occurrence, and thus say nothing about the content of training and policies during the relevant time period.

In short, Mr. Tabeling's declaration and attachments do not create a genuine dispute as to any material fact.

### 1.5. Plaintiff's "tunnel vision" theory of deliberate indifference is unsupported by case authority or evidence.

Plaintiff attempts to get around this unchallenged evidence – that the BPD had policies in effect to ensure compliance and that the individual officers were trained on their obligations – by arguing that the officers, despite knowing their obligations, were improperly trained to avoid what he terms "tunnel vision" in investigations.[5]  Plaintiff speculates in his response that "this phenomenon might lead investigators to discard information that does not support a hypothesis and to focus on information that does." Plaintiff's Opp. Papers at 16, n. 3.

At the core of Plaintiff's argument is an assumption that police policies, training, practices must be perfectly designed so that detectives will always have the right training for every possible instance. That is an impossible burden, and it has been flatly rejected by the courts. Police policymakers must merely make "**adequate**" efforts to "prohibit or discourage **readily foreseeable conduct** in light of **known exigencies** of police duty." *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987) (emphasis added). It is not enough for a plaintiff to "prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct" as "[s]uch a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the

---

[5] This is a theory never previously discussed in any pleadings or discovery. Thus, Plaintiff cannot pursue it at this juncture. *See* Section 1.1, *supra*.

program to enable officers to respond properly to the usual and recurring situations with which they must deal." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390-91.

In the face of this authority, Plaintiff's response does not cite a single case endorsing his "tunnel vision" theory, let alone one finding that an absence of special training on "tunnel vision" amounts to deliberate indifference where the policymakers have had no notice of a possible problem with training or procedures and otherwise have implemented adequate constitutional safeguards.[6] It is therefore impossible to say that these issues were "readily foreseeable" at the time or that a failure to specifically train on that theory would have "patently obvious" unconstitutional consequences. *See Spell*, 824 F.2d at 1390; *Connick*, 563 U.S. at 64. As such, Plaintiff's "tunnel vision" theory must be rejected.[7]

Because Plaintiff cannot create a genuine dispute of material fact as to either of his two theories alleging a failure to train, the BPD is entitled to judgment as a matter of law on that claim.

### 1.6. Inadequate training cannot be the moving force behind Plaintiff's alleged injury.

Independently and fatally, Plaintiff also cannot prove that the alleged non-disclosure was the proximate result of the alleged unconstitutional policy or lack of training. In order to

---

[6] Rather than rely on case authority (or even discuss how it would apply under this theory), Plaintiff rests his entire "tunnel vision" argument on the existence of two publications cited in a footnote, one dated from 2008 and the other dated from 2006. Plaintiff's Opp. Papers at 16, n. 3. However, there is nothing in Plaintiff's opposition or evidence produced in this case to suggest in any way that the BPD should have even been aware of this theory in the late 1980s, or that such training is constitutionally mandated, or for that matter that the training received by detectives was deficient at all. Moreover , Plaintiff's theory that the failure to train police officers to avoid "tunnel vision"  in their investigations is equivalent to requiring police agencies to train its officers to continue an investigation after probable cause has been developed in the hopes of discovering exculpatory information, which the constitution does not require. *Spiegel v. Cortese,* 196 F.3d 717, 723 (7th Cir.1999)( "no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence.").

[7] Plaintiff's "tunnel vision" theory also cannot be introduced without expert testimony, as it requires specialized knowledge. Rule 702 (a). Plaintiff has not identified any relevant experts on this theory, nor did any of his existing experts opine on this issue in their Rule 26 (A)(2) reports.

establish causation, Plaintiff must show that the injury would have been avoided "under a program that was not deficient in the identified respect." *Gordon v. Kidd*, 971 F.2d 1087, 1097 (4th Cir. 1992), as amended (July 7, 1992). Plaintiff has not and cannot make such a showing.

First, all of the individual officers have testified that they were fully aware of their *Brady* obligations at the time of the occurrence, which Plaintiff has admitted and has not offered any evidence to the contrary.  Therefore, inadequate training could not have caused the violation. *See Martin v. City of Reading*, 118 F. Supp. 3d 751, 772-73 (E.D. Pa. 2015) (finding a lack of dispute as to causation where "Plaintiff has not cited to any evidence to dispute the Reading Defendants' contention that Defendant Errington had read the City of Reading's Taser policy and therefore was aware of the risk of harm that could result from using his Taser on a person susceptible to a dangerous fall[.]").

Second, in order to prevail against the individual officers their conduct had to be deliberate and intentional. *See Jean*, 221 F.3d at 663 (Explaining that to satisfy the bad faith requirement the police officer must have "intentionally withheld the evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial.").  However, intentional constitutional violations cannot by definition be caused by a failure to train. *Connick*, 563 U.S. at 78, fn. 5 (explaining that sine the prosecutor's *Brady* violation "… was a bad-faith, knowing violation, [it] could not possibly be attributed to lack of training."); *see also Bibbins v. City of Baton Rouge*, 489 F. Supp. 2d 562, 583-84 (M.D. La. 2007); *Martin*, 118 F. Supp. 3d at 772-73. Thus, the violation alleged here could not have been proximately caused by the BPD's failure to train the individual officers and the BPD is entitled to judgment as a matter of law.

**2. The BPD is entitled to Summary Judgment because there is no evidence admissible or otherwise of the alleged pattern and practice.**

Plaintiff's also has failed to produce any evidence, admissible or otherwise, that would

create a material dispute of fact with regards to his claim that the BPD had a pattern and practice of failing to disclose exculpatory information to prosecutors, whether intentional or not.[8] Plaintiff has not produced, nor does his response now identify, admissible evidence proving the occurrence of *Brady* violations by the BPD. Not a single decision finding a *Brady* violation by the BPD. Not a single witness with admissible personal knowledge of a *Brady* violation by the BPD. As such, BPD is entitled to summary judgment.

Lacking such evidence, Plaintiff resorts to (1) citing case decisions (many of which were never previously disclosed) that **do not** find violations by the BPD; (2) relying on declarations, largely not based on personal knowledge, by witnesses who were never disclosed during discovery; (3) pointing to two unproven allegations contained in civil complaints against the BPD; and (4) quoting from irrelevant hearing transcripts that also were never disclosed during discovery. This is the entirety of Plaintiff's evidence, and it fails to create a material dispute of fact regarding the ultimate question of whether the BPD had the claimed pattern and practice of deliberately failing to disclose exculpatory information to prosecutors.

### 2.1. Plaintiff does not identify a single written decision finding a *Brady* violation by the BPD.

Plaintiff in his response cites to or quotes from decisions in cases where he alleges a *Brady* violation by the BPD occurred. As BPD pointed out in its original memorandum in support of this motion, in none of these cases – not one – has a court found a *Brady* violation by the BPD.[9] *See* BPD Memorandum at 35-37.

Plaintiff does not dispute this and in fact admits that the possibility of *Brady* violations by the BPD was never an issue considered by those courts. Plaintiff's Opp. Papers at 25-26. Instead,

---

[8]      Plaintiff has certainly failed to put forward any evidence of any other "bad faith" violations.

[9]      Additionally, where possible the BPD has provided sworn declarations by the investigating officers to the effect the full case files for each were provided to the Office of the State's Attorney. *See* BPD Exhibits 9, 13, 20, 22, and 23. Plaintiff cannot and does not dispute this evidence anywhere in his response.

the focus in each case was placed on whether the State's Attorney's Office turned over evidence. But that is not the question at issue here, as it is undisputed that police detectives do not have any constitutional obligation to provide any information directly to the defense: Defense counsel only receives the evidence that the State's Attorney's Office chooses to disclose. *See generally Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964); *Goodwin v. Metts*, 885 F.2d 157, 162 (4th Cir. 1989); *Jean v. Collins*, 221 F.3d 656, 659-61, 676 (4th Cir. 2000) (Murnaghan, J., dissenting).   Consistent with these constitutional obligations, it was the official joint policy of the BPD and State's Attorney's Office that all discovery disclosures made to the defense were made by the Assistant State's Attorneys assigned to the case.  BPD Ex. 29 at ¶5.

Because it is the communication between the prosecutor and the police officer that is at issue, not the communication between the prosecutor and defense, Plaintiff's cases are not relevant here. Plaintiff has offered no evidence that could possibly justify imputing a *Brady* violation by the State's Attorney to the BPD. He has only speculation to support the inference he seeks, but this is not enough cannot create a genuine issue of material fact. *See JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). The only reasonable inference therefore is that the alleged errors were by the State's Attorney alone.

This conclusion is further supported by a comparison of the relevant policies in effect at those two offices. As discussed above, the BPD's undisputed policy called for providing full disclosure to the State's Attorney's Office.  In contrast, the State's Attorney's Office had no such policy. As Judge Timothy Doory explained by declaration, between 1974 and 1996, there was never an official "open file policy" allowing defense attorneys full access to prosecution or police files.   BPD Ex. 29 at 6. Instead, it "was the responsibility of the Assistant State's Attorneys assigned to the case to review the information provided by the police and determine

which, if any, was potentially exculpatory or otherwise discoverable," which he stated was necessarily subjective. *Id*. at 5.  Indeed, it was the official policy of the State's Attorney's Office that witness statements needed only to be disclosed if the Assistant State's Attorney determined they were exculpatory or if the witness was going to testify for the prosecution, in which case the statement needed only to be disclosed by the time the witness took the stand at trial. *Id*. at 7.

Given the stark contrast between the two agencies' official approaches to disclosure as well as the fact that – as Plaintiff admits[10] – almost every one of the cases Plaintiff cites involve documents ultimately located in the BPD casefile and thus available to the prosecutors, the only factually supported inference is that there was no violation by the BPD in any of these cases.

### 2.2. Plaintiff does not identify a single witness with admissible personal knowledge of a *Brady* violation by the BPD.

Plaintiff also relies on signed statements by four local attorneys. Three are criminal defense counsel: Michelle Nethercott (Pl. Ex. 34), Shawn Armbrust (Pl. Ex. 36), and C. Justin Brown (Pl. Ex. 44).[11] And one was a prosecutor: Joseph Wase (Pl. Ex. 28). As described at length in the BPD's pending motion to strike, not one of these individuals was ever identified during discovery, and thus they may not be used in opposition to the BPD's Motion for Summary Judgment.  Rule 37(c). Additionally, as also discussed therein, these declarations consist variously of irrelevant, inadmissible, conclusory and speculative claims and hearsay that

---

[10]    This is true as to the allegations regarding Walter Lomax (Plaintiff's Opp. Papers  at 19); Michael Austin (Plaintiff's Opp. Papers  at 20-21); Wendell Griffin (Plaintiff's Opp. Papers  at 22); Anthony Coleman (Plaintiff's Opp. Papers at 23); Tracey Hawes (Plaintiff's Opp. Papers  at 24); Tyrone Jones (Plaintiff's Opp. Papers  at 28); Sabein Burgess (Plaintiff's Opp. Papers  at 28-29); and Antoine Pettiford (Plaintiff's Opp. Papers  at 30-32). And the documentary record further establishes it to be true in the case of Richard Nicolas. *Nicolas v. Attorney General of Maryland*, Civil No. RDB-06-2637, 2015 WL 1469184 (D. Md. Mar. 30, 2015).
[11]    Plaintiff also relies on the declaration of Michelle Martz (Pl. Ex. 43), who was also never disclosed, however that declaration restricts itself to authenticating the transcripts from the Pettiford matter which were also not disclosed during discovery. Furthermore, she also states that she was post-conviction counsel and therefore lacks first had knowledge of the disclosures made by the BPD detectives to the State's Attorney, and thus does not have first-hand knowledge of the material disclosures. Any testimony should could offer would necessarily be hearsay and inadmissible. Pl. Ex. 36, ECF No. 166-43 and 167-4, at ¶3.

do not establish violations of *Brady* by the BPD.

First, although all three defense attorney declarations make naked statements and conclusions as to the occurrence of violations of *Brady* by the BPD, none of those witnesses claim to have been party to or otherwise have personal knowledge as to the contents of the relevant internal communications between the prosecutor and the police officer in any of these cases. *See* Michelle Nethercott (Pl. Ex. 34, ¶ 7-8), Shawn Armbrust (Pl. Ex. 36, ¶6-7), and C. Justin Brown (Pl. Ex. 44, ¶5-6 ). In fact, all claim or appear to be post-conviction counsel in the cases they identify. *See* Pl. Ex. 34 at ¶4-7; Pl. Ex. 36 at ¶4; Pl. Ex. 44 at ¶7-8. Thus, their statements are clearly based on hearsay or are simply pure speculation, and Plaintiff "cannot rely on this evidence to oppose summary judgment [because] Rule 56(e) precludes consideration of materials not based on the affiant's first-hand knowledge. *Causey v. Balog*, 162 F.3d 795, 803, n. 4 (4th Cir. 1998); *United States v. Roane*, 378 F.3d 382, 400-401 (4th Cir.2004), cert denied by, 546 U.S. 810, 126 S.Ct. 330, 163 L.Ed.2d 43 (2005) ("airy generalities, conclusory assertions and hearsay statements [do] not suffice to stave off summary judgment."); *Wilson v. Susquehanna Bancshares, Inc*., No. CIV.A. GLR-14-79, 2014 WL 2094039, at *5 (D. Md. May 19, 2014) (refusing to consider an affidavit made on "information and belief"" without any other basis for personal knowledge); *June v. Thomasson*, No. CV GLR-14-2450, 2015 WL 7273150, at *3 (D. Md. Nov. 18, 2015); *see also* Rule 56(c)(4); *Evans v. Technologies Applications & Servo Co.*, 80 F.3d 954, 962 (4th Cir. 1996) ("summary judgment affidavits cannot be conclusory, nor based on inadmissible hearsay.")(internal citation omitted).[12]

For example, Ms. Nethercott, who declares herself to be an attorney working for the Innocence Project and a former Assistant Public Defender in Baltimore City, who for the last ten

---

[12]    Hearsay is defined as a statement "the declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).

years, has solely practiced in post-conviction litigation. *See* Pl. Ex. 34 at ¶4.  She describes several cases, in which she was post-conviction counsel, that all fit the exact same model: a criminal defendant is convicted but (usually) post-conviction counsel later obtains the BPD's homicide file and finds information that was allegedly never disclosed to the defense. *See* Pl. Ex. 34 at ¶¶9-14. Even if this were true, it would be no different from the opinions relied on by Plaintiff that support a finding of a violation by the State's Attorney but say nothing about the BPD. Ms. Nethercott's assertions that these violation must have been caused by BPD error is without any basis for personal knowledge, as she does not to allege to have been present for the disclosures made by the BPD to the State's Attorney's in those cases, and are clearly either speculative, conclusory or based on inadmissible hearsay.[13] *See* Pl. Ex. 34 at ¶¶4-7, 9(c), 10(c); 12(b), 13(e), 14(f), 14(g). Thus, her declaration is accordingly of no value. *See Wilson*, 2014 WL 2094039, at *5. Moreover, as to the disclosures made in the Tyrone Jones and Rodney Addison cases, the BPD has put forward admissible evidence from the detectives involved in those cases that the homicide file, which contained the alleged undisclosed exculpatory information, was provided to the State's Attorney.  *See* BPD Ex. No.'s 20, 23.

The declarations of Shawn Armbrust and C. Justin Brown, also criminal defense attorneys, are similarly lacking in any plausible claim of personal knowledge. *See* Pl. Ex. 36 at ¶¶3-6; Pl. Ex. 44. Although both of them claim to having "personally been involved in cases" in which BPD officers and detectives have allegedly violated their discovery obligations, neither declaration provides any *factual* basis for a finding that the declarant has any personal knowledge as to relevant communications between BPD officers and the State's Attorney's Office. *Id.*  In fact, C. Justin Brown affirmatively states that he was post-conviction counsel in

---

[13]     As to paragraphs 10, 11 and 12(a), Ms. Nethercott only addresses the failure of the BPD to disclose information to the defense. These allegations are irrelevant to this case, as it is undisputed that police officers have no duty to disclose information directly to the defense. See Pl. Ex. 34 at ¶10(c), 11(c) and 12(a).

the cases he identifies, not trial counsel. Pl. Ex. 44 at ¶¶7-8. Therefore, his statements can only be based on hearsay or speculation or both, and, accordingly, lack first-hand knowledge. Moreover, as to the disclosures made in the Steven Carter case, the BPD has put forward admissible evidence from the detectives involved in those cases that the homicide file, which contained the alleged undisclosed exculpatory information, was provided to the State's Attorney. *See* BPD Ex. No. 13.

As for Mr. Armbrust, although he asserts that BPD officers failed to disclose notes or information regarding an alternate perpetrator in the case of Sabein Burgess, he also does not claim to have been involved in the original trial. Pl. Ex. 36 at ¶3, 4, 8-9. Instead he states, "relevant to this declaration…I have experience in post-conviction work." Pl. Ex. 36 at ¶ 4. Accordingly, his statements regarding's the BPD officers' actions can only be hearsay or speculation, and again, lack first-hand knowledge. Thus, Mr. Ambrust's statements and conclusions are inadmissible, as well.

In contrast to the defense attorneys who have no relevant personal knowledge but nonetheless speculate wildly as to a pattern of BPD wrongdoing, Mr. Wase, whose affidavit states that he was the prosecutor in the 1975 prosecution of Michael Austin relied on by Plaintiff and thus would at least have a plausible basis for relevant personal knowledge, nonetheless doesn't identify any BPD wrongdoing. Instead, he states only that a "key eyewitness," had originally been shown a photograph of Mr. Austin by police but had not identified him as the perpetrator. Pl. Ex. 28 at ¶9. Mr. Wase states that he had been told that the witness could not make an identification but that he did not know at the time of the original prosecution that the witness had been shown the photograph. *Id*. That said, Mr. Wase does not state that the information was not originally disclosed to him by BPD officers, such as by inclusion of a report

in the homicide file. *See* Pl. Ex. 28 at ¶9. Mr. Wase might not have read the file, or might have forgotten. He doesn't say. As such, it would be pure speculation to infer anything beyond what Mr. Wase actually declared, and Mr. Wase did not identify any violation of *Brady* by the BPD. In fact, the *Austin* post-conviction court found that it would be pure speculation to infer from the record, which included Mr. Wise's Affidavit, that the Homicide file, including the alleged exculpatory information,  was suppressed from the defense, let alone the State's Attorney.  Pl. Ex. 26, p. 11.  Mr. Wase's declaration is accordingly if no value, and the questions it leaves open cannot be answered as he is apparently deceased.[14] Moreover, as argued more fully in the motion to strike, because he is dead, he does not meet did not meet Rule 56(e)'s competency requirements, and should not be considered at summary judgment.

As described, these witnesses do not create a genuine dispute of any material fact and are, in any event, inadmissible under Rule 37(c) because they were never disclosed. Moreover, because Michelle Nethercott (Pl. Ex. 34), Shawn Armbrust (Pl. Ex. 36), and C. Justin Brown (Pl. Ex. 44) only claim to be post-conviction counsel and were not in any way party to the pre-trial disclosures made by the police officers to the prosecutors in the cases they reference, they all lack first-hand knowledge and their conclusory statements are clearly based on hearsay or are simply pure speculation.[15] Thus, these declarations and affidavit cannot be used to generate a material issue of fact because "they do not satisfy Rule 56(c)(4)'s personal knowledge and competence requirements." *June*, 2015 WL 7273150 at *3.

### 2.3.    The unproven allegations contained in the two civil complaints identified by

---

[14]     http://www.legacy.com/obituaries/baltimoresun/obituary.aspx?pid=171933329

[15]     Furthermore, because they each lack first-hand knowledge and perception of the internal communications between the police officers and the prosecutors in the cases they identity, the opinions of Ms. Nethercott, Mr. Armbrust and Mr. Brown are not proper lay opinions under Fed.R.Evid. 701.  *United States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006)(Officers who did not witness the officer's use of force could not provide lay testimony about whether or not it was reasonable, as they would be rendering expert opinion based on second-hand information.). Moreover, none of these post-conviction attorneys were identified as experts by Mr. Owens and thus cannot offer expert opinions under Fed.R.Evid. 702.

**Plaintiff are not evidence of any violation by the BPD.**

Plaintiff relies also on two unproven allegations contained in the civil complaints in the cases of Wendell Griffin and Sabein Burgess. Plaintiff's Opp. Papers at 22, 29; Pl. Ex. 29 and 35. As they relate to the question at issue – whether BPD officers made the requisite communications with the State's Attorney's office – both of those complaints are inadmissible hearsay with no foundation in personal knowledge and may not be considered for summary judgment.

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the ... pleading [s], but [must] ..., by affidavits or as otherwise provided in [Rule 56], ... set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).  Here, Plaintiff seeks to rely on the pleadings of *other* litigants to support his motion for summary judgment. Although a verified, i.e. sworn, complaint can be treated as an affidavit, *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991), Plaintiff's attached exhibits do not indicate that either complaint was verified. In fact, they are not. *See Wendell Griffin v. Baltimore Police Department, et al.*, 1:13-cv-03387-JFM, ECF No. 1; *Sabein Burgess v. Baltimore Police Department, et al.*, 1:15-cv-00834-WDQ, ECF No. 1.

Even if the complaints were to be treated for hearsay purposes as sworn declarations, which they cannot be, the admissibility of a pleading as an affidavit still hinges on the establishment of personal knowledge, *see Griffin*, 952 F.2d at 823, and there is no evidence on which to form a foundation that the plaintiffs in those cases had any personal knowledge themselves of the relevant interactions between the BPD and the State's Attorney.  In fact, Mr. Griffin's allegation regarding suppression of evidence from the State's Attorney is premised on "information and belief," thus admitting that he does not have such knowledge. See Pl. Ex. 29, p

13, ¶45. The complaints therefore prove nothing except that there was an accusation, a fact that isn't relevant here. *See United States v. Bailey*, 696 F.3d 794, 802 (9th Cir. 2012) ("[A] mere accusation of prior conduct is insufficient to support a finding that the prior act was committed and, therefore, does not tend to prove that the defendant committed the act for which he is on trial. In order for evidence of a prior accusation to be admissible, there must be sufficient, independent evidence (besides the accusation alone) to support a finding that the prior conduct occurred.").  The two civil complaints are therefore irrelevant, and inadmissible under Rule 56(c) and cannot be used to create a material issue of fact in this case.

### 2.4.    The hearing transcripts from which Plaintiff quotes do not establish any violation of *Brady* by the BPD.

Finally, Plaintiff quotes from hearing transcripts in two cases, *Coleman v. State* (Balt. City Cir. Ct. Feb 23, 2000) and *State v. Antoine Pettiford* (Balt. City Cir. Ct. 1994). *See* Pl. Exhibits 30, 37, 38, 39, 40, and 41. These transcript extracts contain no evidence of any *Brady* violations by the BPD, and neither were disclosed during discovery, thus cannot be considered here. *See* Rule 37(c).

From the transcript in *Coleman*, the testimony on which Plaintiff relies was by a former BPD detective, detective Sydnor, who stated that his practice was to give a copy of his homicide file to the Assistant State's Attorney at the time of arrest and then to supplement with any new material that he felt was "pertinent to the investigation." Pl. Ex. 30 at H-71:6-25. Detective Sydnor admitted that it was his practice to include all police reports but that he would sometimes not include "every information sheet and every set of notes" but rather only the ones "relevant to this offense." Pl. Ex. 30 at H-92:3-11. He testified that when he would interview a witness he would take notes, and sometimes he would have the witness review the notes and sign them but that this did not occur in every case. Pl. Ex. 30 at H-93-94:25, 1-6. When asked if there were

sometimes things that witnesses would say to him that he did not record, he stated that "if they were important I would have written them down." Pl. Ex. 30 at H-94-95.

Nothing about detective Sydnor's testimony remotely suggests at a practice of ignoring his *Brady* obligations. As he testified, his practice was to record and produce to the State's Attorney everything "pertinent," "relevant," or "important." Pl. Ex. 30 at H-71, 92-94. Although Plaintiff characterizes these statements as "proof of the 'tunnel vision' and nondisclosure that is inevitable when a police department provides no training or oversight on what *Brady* requires," Plaintiff's Opp. Papers at 24, there is no other realistic approach to *Brady* compliance. As the Supreme Court has observed, a proper procedure governing disclosures from the police to the prosecution need only focus on "relevant information." *See Kyles v. Whitley*, 514 U.S. 419, 438 (1995). Accordingly, detective Sydnor's testimony in no way suggests a pattern of hiding exculpatory information. Plaintiff cites no authority to the contrary.

Turning to Plaintiff's quotations from *Pettiford*, the undisputed evidence, as Plaintiff's own response recites, establishes the following chain of events: On post-conviction Mr. Pettiford's trial attorney identified certain pieces of evidence found in the BPD's homicide file that were never disclosed to the defense. Plaintiff's Opp. Papers at 30. When the BPD detective assigned to the case, Robert Patton, testified at the post-conviction hearing, he produced from the BPD homicide file an additional witness statement not previously given to defense counsel but which det. Patton testified he had given to the Assistant State's Attorney. Plaintiff's Opp. Papers at 31. Mr. Pettiford's convictions were thereafter vacated, and he was allowed to re-plead an *Alford* plea to voluntary manslaughter. Plaintiff's Opp. Papers at 32. Thereafter, further review of the BPD's homicide file turned up yet another witness statement from the same witness as before that had not been raised during the prior post-conviction hearing. Plaintiff's Opp. Papers

at 32. The State's Attorney's office argued that the document had in fact been disclosed as part of its production to post-conviction counsel. Pl. Ex. 41 at 6-7. The Circuit Court for Baltimore City did not dispute that this had happened, but nonetheless re-opened Mr. Pettiford's post-conviction and chided both the prosecution and detective Patton for failing to raise the existence of the second witness statement. *Id.* at 6-9; Plaintiff's Opp. Papers at 32-33.

Nothing whatsoever in any of the *Pettiford* hearing transcripts quoted or attached by Plaintiff establishes that detective Patton or any other member of the BPD withheld exculpatory information from the prosecutor.  Detective Patton testified that the documents were produced to the State's Attorney. Pl. Ex. 39 at 87. Plaintiff does not point to any contradictory evidence. Instead, Plaintiff hopes that this Court will conflate the Circuit Court's annoyance with detective Patton for not realizing that if the first statement hadn't been disclosed by the Assistant State's Attorney then the second statement probably wasn't disclosed either and that detective Patton should have brought that up too without being prompted. Whatever we might think of detective Patton's quick-thinking on the stand is irrelevant, however, because the only important question is whether he initially made the proper disclosures to the State's Attorney's Office. The only evidence says that he did. This hearing transcript is therefore not suggestive in any way of the alleged pattern or practice.

### 2.5.     Plaintiff's reliance on alleged incidents that arose well after his own criminal trial is misplaced.

Almost all of Plaintiff's alleged examples of *Brady* violations by the BPD came years, sometimes as much as a decade, after Plaintiff's own 1989 trial. *See* BPD's Memorandum at 37. [16] As explained at length in BPD's initial memorandum, there is no natural temporal

---

[16]     For same reasons discussed in Section 1.2, supra, the *Lomax*, *Austin* and  *Griffin* cases do not establish that the BPD had a prior pattern and practice  so "persistent and widespread" and "so permanent and well settled as to constitute a 'custom or usage' with the force of law"  at the time the violation alleged in this case occurred. *Carter v.*

relationship between these alleged incidents and Plaintiff's case. *See* BPD's Memorandum at 39. Although Plaintiff in his response points to two out-of-circuit decisions for the proposition that these allegations of other non-disclosures arising years after the fact are relevant to a *Monell* inquiry, neither case cited by Plaintiff deals with facts remotely similar to those present here.[17]

In the cases cited by Plaintiff, the courts were dealing with evidence that directly related to the offenses alleged and occurred in the immediate aftermath. *See Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) (admitting evidence of a lack of discipline for the offending employees or subsequent policy changes); *Bordanaro v. McLeod*, 871 F.2d 1151, 1166 (1st Cir. 1989) (admitting evidence of lack proper investigation into plaintiff's claims). In contrast, Plaintiff here wants to bring in evidence of allegations against different individuals related to other unrelated cases made years after the fact. Neither *Grandstaff* nor *Bordanaro* remotely suggested that the net of a *Monell* analysis should be cast so prejudicially wide. Plaintiff's position would amount to entirely new law, and is in direct contradiction with Fourth Circuit and Supreme Court precedent. *See Connick*, 563 U.S. at 63 n. 7; *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). Accordingly, no weight should be given to the examples given by Plaintiff that came years after his own case.

### 2.6. Plaintiff's identified examples are too few to establish a pattern and practice.

Plaintiff's identified examples of other alleged misconduct, being drawn from such a wide time span, are also insufficiently few to justify a finding of any pattern or practice by the BPD. *See* Def. Memorandum at 40-44. Plaintiff has all but ignored this argument in his response.

---

*Morris*, 164 F.3d 215, 218 (4th Cir. 1999).

[17]    Plaintiff also refers obliquely to a D.C. District Court opinion in *Huthnance v. D.C.*, 793 F. Supp. 2d 183, 210 (D.D.C. 2011) *aff'd*, 722 F.3d 371 (D.C. Cir. 2013). That court concluded that post-incident evidence in that case was admissible where the defendant could show no prejudice because it relied on similar evidence in its own case. Because Defendant here is not relying on post-incident evidence of the sort Plaintiff seeks to introduce, there remains the real risk of prejudice against Defendant, and *Huthnance* is thus inapplicable.

He cites no cases and makes no arguments as to the numerous cases cited by Defendant. Instead, he argues without case authority that he should be excused from needing to prove up an actual pattern of violations because "[p]roving a pattern of *Brady* violations is notoriously difficult because [] so many *Brady* violations go unnoticed, and of those that do not escape the attention of discerning trial or post-conviction counsel, some violations are cured without judicial intervention." Resp. at 18.  His only citation for this proposition is to a 1997 law review article whose author, without citation, states that *Brady* violations by prosecutors are "almost never exposed." Resp. at 18 (quoting Joseph R. Weeks, *No Wrong Without A Remedy: The Effective Enforcement of the Duty of Prosecutors to Disclose Exculpatory Evidence*, 22 Okla. City U. L. Rev. 833, 836 (1997)). Given that Plaintiff makes no real argument, the only reasonable conclusion is that Plaintiff's meager history of isolated incidents is insufficient (even assuming they could be proven, which as discussed above they cannot) to establish the persistent pattern and practice required for *Monell* liability.[18]

### CONCLUSION

In conclusion, because Plaintiff cannot create a genuine dispute as to the existence of a policy or practice of unconstitutional behavior by the BPD, his *Monell* claim must fail, and the BPD respectfully requests that this Court grant this motion for summary judgment.

---

[18] Although almost all of Plaintiff's allegations (and non-evidence) of a pattern and practice focus on a possible pattern of not providing existing documents in the BPD case file to prosecutors, the actual circumstances of the alleged non-disclosure have nothing to do with procedures on production of case files. Instead, the allegedly undisclosed statements were made during a last minute interview of a witness in the middle of trial, at the behest of a prosecutor, who suddenly confessed to being an accomplice, before being rushed by the prosecutor onto the stand to recant his own prior testimony given just a few days earlier. Such a case bears no resemblance to any example Plaintiff has raised in support of his claims of a pattern of unconstitutional conduct and "a plaintiff cannot rely upon scattershot accusations of unrelated constitutional violations to prove either that a municipality was indifferent to the risk of her specific injury or that it was the moving force behind her deprivation." *Carter*, 164 F.3d at 218. As such, there is no reasonable connection to any alleged policy or practice, and no rational jury could find otherwise.

Respectfully submitted,

_____/s/_____

Daniel Beck, Federal Bar No. 29646
Colin P. Glynn, Federal Bar No. 19049
Office of Legal Affairs
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Ph.: (410) 396-2496
Fax: (410) 396-2126
Email: colin.glynn@baltimorepolice.org
           daniel.beck@baltimorepolice.org

*Attorneys for Defendant Baltimore Police Department*


## **APPENDIX OF EXHIBITS**

28. Excerpt of Deposition transcript of Gary Childs

29. Second Declaration of Timothy Doory

30. Excerpts of Deposition transcript of Dennis Waller


## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4TH day of April, 2016, a true copy of the foregoing

was filed in accordance with the Electronic Filing Requirement and Procedures as established by

the U.S. District Court for the District of Maryland.

_____/s/_ _____
Daniel Beck, Bar No. 29646