IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMES OWENS,                          :

    Plaintiff,                    :

v.                                    :
                        Civil Action No. GLR-11-3295

BALTIMORE CITY STATE'S                :
ATTORNEYS OFFICE, et al.,[1]
                            :

    Defendants.                   :

                            :

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendants', Gary Dunnigan, Jay Landsman, Thomas Pellegrini's (collectively, "the Officers") Amended Motion for Summary Judgment (ECF No. 159), Defendant Marvin Brave's Motion for Summary Judgment (ECF No. 157), and Defendant Baltimore City Police Department's ("BCPD") Motion to Strike (ECF No. 171) and Motion for Summary Judgment (ECF No. 158). The Motions are ripe for disposition. Having reviewed the Motions and supporting documents, the Court finds no hearing necessary pursuant to Local Rule 105.6 (D.Md. 2016). For the reasons outlined below, the Court will deny the Officers' Motion, grant Brave's Motion, and grant BCPD's Motions.

---

[1] The Court will direct the Clerk to amend the case caption and remove Baltimore City State's Attorneys Office as a Defendant because it is not included in the Second Amended Complaint. (ECF No. 147).

## I.   BACKGROUND

This 42 U.S.C. § 1983 action arises from the investigation and prosecution of Plaintiff James Owens for the 1987 murder of Colleen Williar.   On August 2, 1987, Williar was raped, robbed, and murdered in the second-floor bedroom of her apartment in Baltimore, Maryland.   Defendant BCPD Detective Pellegrini was assigned to the case, Sergeant Landsman oversaw him, and Detective Dunnigan assisted as needed.

On August 3, 1987, Pelligrini went to the crime scene and one of Williar's neighbors, James Thompson, approached him. Thompson told Pelligrini that he found a bloody knife lying in the grass across the street from Williar's apartment the night of August 2, 1987.   Thompson said he put the knife in the back pocket of his shorts, took it home, and cleaned it off. Thompson presented Pelligrini with the knife and shorts.

On August 5, 1987, Thompson gave a formal statement to a BCPD detective.   Thompson stated that he purchased the knife four months prior while Owens was present and that Owens stole the knife before Williar's murder.   Thompson further stated that on the morning of August 3, 1987, Owens came to Thompson's home and told Thompson that he dropped the knife in a neighbor's yard and had sex with Williar.   Also on August 5, 1987, Owens gave a formal statement to the police stating he had no knowledge of

Williar's murder and denied entering her home.  Owens was then arrested and charged with first-degree murder.

Beginning on February 23, 1988, Defendant Marvin Brave, the Assistant State's Attorney responsible for prosecuting Owens's case in the Circuit Court for Baltimore City, Maryland, presented several witnesses, none of whom saw Owens commit the murder.  One witness testified that Owens worked the morning of August 3, 1987.  Another witness, Larry Oliver, Brave's jailhouse informant, testified that Owens admitted to attacking and murdering Williar.[2]  On February 26, 1988, Brave met with Thompson to discuss his trial testimony because he found Thompson was his key witness and he found Thompson's story to be implausible.  During the meeting, Brave assured Thompson that he would not be prosecuted for making a false statement.  Thompson then changed his story, stating that he did not find the knife in his neighbor's yard, but Owens returned the stolen knife to him on the morning of August 3, 1987.  Thompson later testified to the same during Owens's trial.

During Thompson's testimony, Dunnigan realized that Thompson was lying because Owens worked the morning of August 3, 1987 and, therefore, could not have been at Thompson's home handing over a knife.  Dunnigan informed Brave of this

_____

[2] Brave received multiple letters from Oliver requesting rewards in exchange for his testimony at Owens's trial.

inconsistency.  Over the weekend after Thompson testified, Brave contacted Pelligrini on a Sunday night to discuss the pubic hairs found on Williar's body that were not a match to Owens. Due to Thompson's apparent inaccurate testimony during trial, Brave realized that Thompson was not eliminated as a suspect because he never considered Thompson to be possible suspect.  To obtain evidence negating Thompson's involvement and to boost his credibility, Brave told Pelligrini to have Thompson's pubic hair and blood tested.

On the following Monday, February 29, 1988, during a break in trial, Brave, Pelligrini, and Dunnigan met with Mark Profili, the BCPD technician who completed the hair analysis.  Profili stated that he believed the hair found on Williar may have matched Thompson's hair and the saliva found on a cigarette at the crime scene matched Thompson's blood type.  Pelligrini called Thompson and requested that he return to the courthouse for another interview.

During the interview, Landsman advised Thompson of his Miranda rights and told him that his hair and blood was found in Williar's home.  Thompson then stated he was in Williar's house with Owens on August 2, 1987, but only remained on the first floor.  The Officers then told him that his hair was found on the second floor.  Thompson then stated he was on the second floor, Owens went into Williar's bedroom, and Thompson stood on

the stairs.  Thompson further stated he heard a woman pull up towards the home in a car and when she came inside, he hid in the bathroom.  Owens attacked her and Thompson ran out of the house.  The Officer then told Thompson that his pubic hairs were found on Williar's buttocks, which implied that his pants were down.  Thompson then stated he entered the bedroom and masturbated over her body while Owens attacked Williar.  At that point, the Officers decided to stop questioning Thompson and take a full written statement from him.

Landsman walked to the courtroom and passed a note to Brave indicating that Thompson confessed to burglarizing Williar's house with Owens.  There is a dispute, however, regarding whether the Officers told Brave about the multiple stories Thompson told leading to his final confession.[3]  Brave approached the bench with Owens's defense counsel, David Eaton, and read Landsman's note.  Before the Officers could get a written statement from Thompson, Brave called him back to testify.  On the stand, Thompson testified about the final version of his story.  Owens was ultimately convicted of felony-murder and burglary and sentenced to life imprisonment.

---

[3] Compare (ECF No. 1) (demonstrating that the detectives did not tell Brave the multiple stories Thompson told them on February 29, 1988), with (ECF No. 154-7) (stating that Landsman testified that he told Brave "the exact story from beginning to the end.").

In 2006, Owens filed a post-conviction petition for DNA testing in the Circuit Court for Baltimore City. Through DNA evidence, Owens showed that neither he nor Thompson matches for either the blood or semen found at the crime scene. Through an agreement between counsel and the court, the court granted Owens a new trial on June 7, 2007. On October 15, 2008, the Maryland State's Attorney's Office entered <u>nolle prosequi</u> and released Owens from detention.

On October 12, 2011, Owens filed the instant case in the Circuit Court for Baltimore City, alleging violations of his due process rights under the Fourteenth Amendment to the United States Constitution. (ECF No. 1). On November 16, 2011, BCPD removed the matter to this Court under federal question jurisdiction pursuant to 28 U.S.C. § 1331. (<u>Id.</u>). On December 9, 2015, Owens filed a Second Amended Complaint against the Officers, Brave, and BCPD. (ECF No. 147). On December 23, 2015, Brave and BCPD each filed a separate Motion for Summary Judgment (ECF Nos. 157, 158), and on December 28, 2015, the Officers filed an Amended Motion for Summary Judgment (ECF No. 159). On February 12 and 13, 2016, Owens filed Responses to the Motions. (ECF Nos. 163—165). On March 21, 2016, Brave filed a Reply to Owens's Response. (ECF No. 170). On April 4, 2016, the Officers and BCPD each filed a Reply to Owens's Responses. (ECF No. 173).

## II.   DISCUSSION

### A.   <u>Standard of Review</u>

Under Federal Rule of Civil Procedure 56(a), the Court must grant summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.   In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party.   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (citing <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 157 (1970)).   Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).   If the nonmoving party has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

"[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."   <u>Anderson</u>, 477 U.S.

at 247-48.   A "material fact" is one that might affect the outcome of a party's case.   Id. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)).   Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."   Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265.

## B.   Officers' Motion for Summary Judgment

At bottom, a genuine dispute exists regarding whether the Officers informed Brave of the multiple stories Thompson told them during his February 1987 interrogation.   The Court must determine whether the Officers' failure to disclose the multiple stories to Brave would constitute a violation of Owens's due process rights, whether the Officers would be entitled to qualified immunity for such a violation, and whether Owens's claim is barred by the doctrine of collateral estoppel.

### 1.   Brady Violation

The Officers argue that if they did fail to disclose Thompson's multiple stories, such a failure does not constitute an unlawful suppression of evidence under Brady v. Maryland, 373 U.S. 83 (1963).   In Brady, the Supreme Court of the United

States held that a prosecutor's suppression of evidence "favorable to the accused" violates the Due Process Clause of the Fourteenth Amendment when the evidence proves "material to either guilt or punishment." Id. at 87.  The duty to disclose such evidence "encompasses impeachment evidence as well as exculpatory evidence." Strickler v. Greene, 527 U.S. 263, 280 (1999) (citing United States v. Bagley, 473 U.S. 667, 676 (1985)).  The evidence is considered material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. (quoting Bagley, 473 U.S. at 682).

Such a constitutional violation extends to a police officer's suppression of evidence. Barbee v. Warden, Md. Penitentiary, 331 F.2d 842, 846–47 (4th Cir. 1964); see Strickler, 527 U.S. at 280–81 (explaining Brady "encompasses evidence 'known only to police investigators and not to the prosecutor.'" (quoting Kyles v. Whitley, 473 U.S. 419, 438 (1995))).  "[A] police officer violates a criminal defendant's constitutional rights by withholding exculpatory or impeachment evidence from prosecutors." Owens v. Balt. City State's Attorneys Office, 767 F.3d 379, 396 (4th Cir. 2014) (citing Goodwin v. Metts, 885 F.2d 157, 163–64 (4th Cir. 1989)).

To prove a claim for a violation of his due process rights by unlawfully suppressing exculpatory evidence, Owens must

9

demonstrate that "(1) the evidence at issue was favorable to him; (2) the Officers suppressed the evidence in bad faith; and (3) prejudice ensued." Id. at 396-97. Because it is uncontested that Thompson's various stories are favorable to Owens, the Court will turn to the second and third elements of the Brady violation claim.

### a. "Suppressed" in Bad Faith

First, the Officers argue that Thompson's multiple stories were not "suppressed" because the information was readily accessible to Owens. Specifically, the Officers state that Thompson's confession was revealed in open court in Owens's presence and Owens knew Thompson changed his story previously. The Court, however, is not persuaded by this argument. The simple fact that Owens was aware that Thompson's story changed several times during the investigation did not give Owens reason to believe that Thompson would give four versions of his confession during his February 29, 1988 interrogation, as the Officers slowly informed him of the evidence they believed placed him at the crime scene. If the Officers failed to disclose the four versions to Brave, Owens could only be aware of Thompson's stories told to the Officers on August 3 and 5, 1987, on the witness stand on February 26, 1988, and to the Officers as his final confession on February 29, 1988. As such,

the Court concludes that such a failure to disclose could constitute "suppression" under <u>Brady</u>.

Next, the Officers argue Owens cannot demonstrate that they failed to disclose the impeaching evidence in bad faith. Owens, however, has produced evidence showing that the Officers may have acted in bad faith. Though Dunnigan informed Brave of Thompson's inconsistency, the Officers made the decision, after some disagreement, not to inform Brave of the multiple stories they elicited from Thompson. As soon as Thompson stated a version of events placing him at the crime scene with Owens, the Officers decided to stop questioning Thompson and immediately informed Brave that Thompson confessed. "The temporal proximity between Thompson's succession of narratives and the Officers' report to [Brave] lends support to the contention that Thompson's inconsistent narratives were fresh in the Officers' minds, and thus, the Officers' omissions were not accidental, but intentional and malicious." <u>Owens</u>, 767 F.3d at 398. The Court, therefore, concludes that Owens has demonstrated that the Officers exhibited bad faith during their disputed failure to disclose.

> **b.  Prejudice**

The Officers also contend Owens cannot demonstrate that the undisclosed impeachment evidence resulted in prejudice.

> Prejudice ensues if "there is a reasonable
> probability" that the jury would have
> reached a different result had the evidence
> been properly disclosed. The adjective
> "reasonable" is important in this context.
> As the Supreme Court has explained, "[t]he
> question is not whether the defendant would
> more likely than not have received a
> different verdict" had the evidence been
> disclosed. Rather, the question is whether,
> in the absence of disclosure, the defendant
> "received a fair trial, understood as a
> trial resulting in a verdict worthy of
> confidence."

Owens, 767 F.3d at 397 (citations omitted).

Because the impeachment information withheld by the Officers was favorable to Owens, the disclosure of the information would have supported his defense that Thompson raped and murdered Williar, not Owens. "At a minimum, the [impeachment evidence] would have aided Owens in his attempt to discredit Thompson's testimony and sow reasonable doubt in the minds of the jurors." Owens, 767 F.3d at 397.

Also, Thompson was the State's key witness. "Certainly, it is plausible that impeachment of such a key witness could have altered the outcome at trial. . . . Brady does not require that disclosure probably would have modified a trial's result. . . . [I]t is enough that the suppression of evidence cast serious doubt on the proceedings' integrity." Id. at 398 (citing Strickler, 527 U.S. at 289-90). The Court, therefore, concludes

that the Officers' disputed non-disclosure of impeachment evidence resulted in prejudice.

### 2. Qualified Immunity

"Qualified immunity shields government officials from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Hill v. Crum, 727 F.3d 312, 321 (4th Cir. 2013) (quoting Trulock v. Freeh, 275 F.3d 391, 399 (4th Cir. 2001)). When determining whether a defendant officer is entitled to qualified immunity, the court must examine (1) whether the facts alleged show the officer's conduct violated a constitutional right; and, (2) if so, whether the officer's conduct was "objectively reasonable in view of the clearly established law at the time of the alleged event." Id.

As stated above, the Supreme Court held in 1963 that a prosecutor may not suppress exculpatory evidence in a criminal trial. Brady, 373 U.S. at 87. In 1964, the Fourth Circuit extended the constitutional violation to a police officer's suppression of evidence. Barbee, 331 F.2d at 846. In 1976, the Fourth Circuit held that the duty to disclose encompassed impeachment evidence. See Owens, 767 F.3d at 399 (citing cases). As such, by 1988 -- when the Officers failed to disclose Thompson's various stories on February 29 -- they "violate[d] clearly established constitutional law when [they]

suppresse[d] material exculpatory evidence in bad faith." Id. at 401.

Because the Court concludes that a reasonable jury could find that the Officers acted in bad faith, the Officers are not entitled to qualified immunity.

### 3.   Collateral Estoppel

Lastly, the Officers argue that Owens's claim is barred by the doctrine of non-mutual collateral estoppel. Under this doctrine, "once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." United States v. Mendoza, 464 U.S. 154, 158 (1984) (citing Montana v. United States, 440 U.S. 147, 153 (1979)). The doctrine may be used "defensively" by a non-party to the prior litigation. Id. (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322 (1979)); see Welsh v. Gerber Products, Inc., 555 A.2d 486, 489 n.6 (Md. 1989) ("Defensive use of nonmutual collateral estoppel occurs when a defendant seeks to prevent a plaintiff from relitigating an issue the plaintiff has previously litigated unsuccessfully in another action against a different party."). "The applicable law for purposes of preclusion in federal court is the law of the tribunal in which the prior judgment was entered." Haskins v. Hawk, No. ELH-11-2000, 2013 WL 1314194, at *10 (D.Md. Mar. 29, 2013)

14

(citing <u>Migra Warren City Sch. Dist. Bd. of Educ.</u>, 465 U.S. 75, 81 (1984)).  Because the Officers argue Owens's claim is barred by the Maryland Court of Special Appeals's judgment affirming the denial of Owens's motion for new trial, the Court will apply Maryland law.

In Maryland, a party asserting collateral estoppel must satisfy four conditions:

> 1. Was the issue decided in the prior adjudication identical with the one presented in the action in question? 2. Was there a final judgment on the merits? 3. Was the party against whom [collateral estoppel] is asserted a party or in privity with a party to the prior adjudication? 4. Was the party against whom [collateral estoppel] is asserted given a fair opportunity to be heard on the issue?

<u>Colandrea v. Wilde Lake Cmty. Ass'n, Inc.</u>, 761 A.2d 899, 909 (Md. 2000).

On October 20, 1989, the Court of Special Appeals issued an opinion concerning Owens's direct appeal of the Circuit Court for Baltimore City's denial of his motion for a new trial. Owens based his motion on the discovery of new evidence, namely Thompson's recantation of his confession and testimony regarding Owens's involvement in Williar's murder.  The court found that Thompson's "'bizarre' and 'incredulous'" recantation would have produced a different verdict.  It is clear that the Court did not consider whether the Officer's failure to disclose the

impeachment evidence resulted in prejudice.  <u>See</u> <u>Owens</u>, 767 F.3d at 397 (quoting <u>Kyles</u>, 514 U.S. at 434) (stating "prejudice" in the context of a <u>Brady</u> violation looks to "whether, in the absence of disclosure, the defendant 'received a fair trial, understood as a trial resulting in a verdict worthy of confidence'").  The Court, therefore, concludes that Owens's Brady claim is not barred by collateral estoppel.[4]  Accordingly, the Court will deny the Officers' Motion.

## C. <u>Brave's Motion for Summary Judgment</u>

Brave argues that he has absolute immunity from Owens's claim that he failed to disclose exculpatory and impeachment evidence during his criminal trial.  Prosecutors are entitled to absolute immunity from civil liability for alleged conduct "intimately associated with the judicial phase of the criminal

---

[4] The Officers briefly state Owens's claim may be barred by the doctrine of laches because Owens should have known about the undisclosed impeachment evidence by July 11, 1988, the date of the suppression hearing.

"To establish the affirmative defense of laches . . . the defendant must prove: '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" <u>Knickman v. Prince George's Cty.</u>, 187 F.Supp.2d 559, 565 (D.Md. 2002) (quoting <u>White v. Daniel</u>, 909 F.2d 99, 102 (4th Cir. 1990)). "[M]ere delay not resulting in injury to [the] defendant is insufficient to foreclose an award of relief . . ." <u>Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.</u>, 673 F.3d 294, 305 (4th Cir. 2012).

The Officers have not shown that Owens lacked diligence in bringing his claim in spite of the Fourth Circuit's determination that Owens' claim is timely. <u>See</u> <u>Owens</u>, 767 F.3d at 392. Further, the Officers have not demonstrated that they have suffered any prejudice. The Court, therefore, finds that Owens's claim is not barred.

process." <u>Imbler v. Pachtman</u>, 424 U.S. 409, 430 (1976). "In other words, absolute immunity is afforded prosecutors when acting 'within the advocate's role.'" <u>Dababnah v. Keller-Burnside</u>, 208 F.3d 467, 470 (4th Cir. 2000) (quoting <u>Buckley v. Fitzsimmons</u>, 509 U.S. 259, 278 (1993)).

"A prosecutor performing the duties of initiating a prosecution or presenting a case is entitled to absolute immunity in an action for damages claiming that the prosecutor violated the plaintiff's constitutional rights." <u>Ostrzenski v. Seigel</u>, 177 F.3d 245, 249 (4th Cir. 1999). A prosecutor is not entitled to absolute immunity "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer." <u>Id.</u> (quoting <u>Buckley</u>, 509 U.S. at 273).

> There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand.

<u>Buckley</u>, 509 U.S. at 273.

"[P]rosecutors are entitled to absolute immunity from civil liability for the allegation that they withheld exculpatory [or impeachment] <u>Brady</u> material." <u>Brown v. Daniel</u>, Nos. 99-1678, 1679, 1680, 2000 WL 1455443, at *2 (4th Cir. September 29, 2000). "The decision whether to turn [exculpatory] evidence

over to defense counsel would have occurred after [plaintiff's] arrest, but before his conviction, and is clearly part of the presentation of the State's case." Carter v. Burch, 34 F.3d 257, 263 (4th Cir. 1994). Also, prosecutors are absolutely immune from civil liability for making false statements in judicial proceedings and eliciting false and defamatory testimony from witnesses. Burns v. Reed, 500 U.S. 478, 489-90 (1991).

Owens presents evidence that Brave failed to disclose the following evidence: Brave assuring Thompson prior to trial that Thompson would not be prosecuted for making a false statement; Brave's knowledge Thompson's story was not consistent with other evidence; Brave's knowledge that his informant Oliver perjured himself during trial; Brave's receipt of the multiple letters from Oliver requesting rewards in exchange for Oliver's testimony; and Brave's preliminary review of Profili's report matching Thompson's hair to the hair found on Williar. Brave's decision not to turn this potentially exculpatory or impeachment evidence over to Eaton occurred during Owens's trial, and thus was clearly part of his presentation of the State's case against Owens.

Owens also presents evidence that Brave directed the Officers to test Thompson's pubic hair and blood to compare to the hair found on Williar. Brave demonstrates that he ordered

18

the additional testing because he wanted to preserve Thompson's credibility by showing that Thompson was not a participant in the crime.  The Court finds that Brave was acting as an advocate in evaluating evidence and the credibility of his key witness as he presented the State's case against Owens.  The Court, therefore, concludes that Brave is entitled to absolute immunity regarding his failure to disclose this evidence.  As such, the Court will grant Brave's Motion.[5]

---

[5] In his Opposition to Brave's Motion for Summary Judgment, Owens asserts, for the first time, a fabrication of evidence claim against Brave. (ECF No. 165). Notably, the Second Amended Complaint only asserts this claim against BCPD and the Officers in Count 4.   (ECF No. 147).  "When confronted with new facts alleged for the first time in opposition papers, a court must confine its analysis to the facts presented in the complaint." Young v. AT & T Mobility, LLC, No. RDB 09-2292, 2010 WL 2573982, at *2 (D.Md. June 22, 2010) (citing Love v. Smith, No. CCB 04-0370, 2005 WL 1163143, at *1 n.1 (D.Md. May 17, 2005)).

Owens cannot seek to avoid summary judgment by relying on a claim he did not allege in his Second Amended Complaint.  See Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 731 (4th Cir. 2010) ("[I]t is well established that a plaintiff may not raise new claims after discovery has begun without amending his complaint."); see also Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 F.App'x 556, 563 (4th Cir. 2008) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment." (quoting Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004))); Zachair Ltd. v. Driggs, 965 F.Supp. 741, 748 n.4 (D.Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), aff'd, 141 F.3d 1162 (4th Cir. 1998).  As such, the Court will not consider Owens's fabrication of evidence claim as to Brave.

Case 1:11-cv-03295-GLR   Document 179   Filed 09/29/16   Page 20 of 32


**D.   BCPD's Motion to Strike**

Prior to addressing BCPD's Motion for Summary Judgment (ECF No. 158), the Court must first address BCPD's Motion to Strike (ECF No. 171).   In his Opposition to BCPD's Motion for Summary Judgment, Owens submitted, among other items, four declarations from post-conviction attorneys, a declaration from Stephen Tabeling, a former BCPD officer, and an affidavit from Joseph Wase, a former assistant state's attorney.   (ECF Nos. 166-21, 166-34, 166-36, 166-43, 166-44).   Owens also submitted court documents related to three cases from the Circuit Court for Baltimore City.   (ECF Nos. 166-26 through 166-28, 166-30 through 166-32, 166-33, 166-37 through 166-42).   Owens did not identify any of the declarants, affiants, or Circuit Court cases in interrogatory responses.   Owens did not previously turn over any of the court documents either.

At bottom, the Court concludes it must strike these declarations, affidavits, and documents for two reasons.   First, the Court must strike them under Federal Rule of Civil Procedure 37(c)(1) because Owens failed to timely identify these individuals and court cases in his responses to interrogatories requesting relevant facts, a list of persons with relevant knowledge, and relevant documents.   Second, Rule 56(c)(4) also bars the Court from considering the declarations, affidavits, and documents because they set out facts that would be

inadmissible in evidence and because some of the declarants lack personal knowledge.

## 1.    Rule 37(c)(1)

Federal Rule of Civil Procedure 26(e)(1)(A) provides, in pertinent part:

> A party . . . who has responded to an interrogatory, request for production, or request for admission -- must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]

Rule 37(c)(1) provides, in pertinent part, that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."

Courts consider five factors to determine whether a nondisclosure of evidence is substantially justified or harmless: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to

disclose the evidence.   S. States Rack and Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003).

Owens's main argument is that he is substantially justified in failing to disclose the witnesses and documents because he asked BCPD to identify instances of its officers withholding Brady material in his own interrogatories, but BCPD failed to identify any.   BCPD's failure, Owens argues, justifies his surprise identification of court cases relating to Brady violations by BCPD officers and surprise identification of attorneys who worked on those cases.   Even assuming BCPD failed to properly answer Owens's interrogatories concerning Brady violations by its officers, however, Owens is "not excused from [his] obligations under the rules of procedure merely because an opponent has failed to comply with his obligations."   Hoyle v. Freightliner, LLC, 650 F.3d 321, 330 (4th Cir. 2011) (quoting Carr v. Deeds, 453 F.3d 593, 604 (4th Cir. 2006)).

The Court concludes that Owens has not demonstrated that his failure to disclose the witnesses and documents was substantially justified or harmless.   Specifically, BCPD has been prejudiced by the surprise identification of the declarants as witnesses and court documents as evidence.   Had Owens properly and timely identified the declarants as witnesses and documents as evidence, BCPD would have had the opportunity to depose the declarants to assess their degree of knowledge and

obtain evidence to counter their statements and the evidence within the court documents. Without that opportunity, BCPD is unable to meaningfully refute or otherwise challenge the veracity of the statements contained in the declarations and the of evidence contained in the court documents. And, at this late stage in the litigation, BCPD cannot cure the impact of Owens's newly introduced evidence without causing significant disruption to this case. Discovery is closed, BCPD's summary judgment motion is fully briefed, and this matter has been pending for almost five years.

The Court, therefore, concludes that Rule 37(c)(1) does not permit Owens to use his late disclosures to oppose BCPD's Motion for Summary Judgment.

### 2.   Rule 56(c)(4)

Rule 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Federal Rule of Evidence 602 embodies the personal knowledge requirement. To satisfy Rule 602, evidence must be introduced that is "sufficient to support a finding that the witness has personal knowledge of the matter." The witness must have actually

observed the fact. Fed.R.Evid. 602 advisory committee's note to 1972 proposed rules.

In his late disclosures, Owens offers declarations from post-conviction attorneys who lack personal knowledge of whether BCPD maintained a custom, policy, or practice of withholding and suppressing <u>Brady</u> material. The declarations only describe experiences litigating alleged <u>Brady</u> violations by BCPD officers at the post-conviction stage. As a result, while they may have personal knowledge of <u>Brady</u> material they discovered in BCPD files relating to those cases, they do not have personal knowledge of whether the relevant BCPD officer withheld that material from prosecutors. Presumably, only the relevant BCPD officer and assistant state's attorney possess this personal knowledge, as Owens himself concedes. (<u>See</u> Pl.'s Opp'n Def.'s Mot. Strike at 22, ECF No. 177) ("It is difficult to imagine how defense counsel, whether trial or post-conviction, would have personal knowledge of internal communications between the BCPD and the State's Attorney's Office.").

Thus, some of the post-conviction attorney declarants rely on the personal knowledge of assistant state's attorneys or the findings of judges, rather than their own personal knowledge, to declare that the BCPD officers withheld <u>Brady</u> information from prosecutors. (<u>See, e.g.</u>, Decl. Michelle Nethercott at 12, ECF No. 166-34) ("According to the <u>prosecutors</u> who handled the

24

proceedings that resulted in the vacating of these convictions, the BCSAO was unaware of the Brady information previously described herein." (emphasis added)); Decl. Michelle M. Martz, ECF No. 166-43 (authenticating a transcript of an oral decision in Baltimore City Circuit Court granting a new trial based on a Brady violation).   None of this evidence demonstrates the post-conviction attorney declarants "actually observed the fact" of BCPD officers withholding Brady material from prosecutors, as required by Rule 602.[6]   Fed.R.Evid. 602 advisory committee's note to 1972 proposed rules.

The Court, therefore, concludes that Rule 56(c)(4) bars Owens's declarations from post-conviction attorneys because they lack personal knowledge concerning whether BCPD maintained a custom, policy, or practice of withholding and suppressing Brady material.

Rule 56(c)(4) bars the Court from considering the remaining late disclosures Owens offered because they set out facts that

_____

[6] The other two attorney declarants offered in Owens's late disclosures, Shawn Armbrust and C. Justin Brown, identified cases where Brady violations allegedly occurred but failed to describe the basis for their knowledge, other than declaring they were post-conviction counsel in those cases.   (See Decl. Shawn Armbrust, ECF No. 166-36; Decl. C. Justin Brown, ECF No. 166-44).   For the foregoing reasons, the Court finds that their litigation of alleged Brady violations, itself, does not sufficiently demonstrate they had personal knowledge bearing on whether BCPD maintained a custom, policy, or practice of withholding and suppressing Brady material.

would not be admissible.  Specifically, the facts Owens offers in these remaining late disclosures are irrelevant.

Under Rule 401 of the Federal Rules of Evidence, "[r]elevant evidence is admissible." "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed.R.Evid. 401. Evidence that is not relevant is generally not admissible. Fed.R.Evid. 402.  These evidentiary relevance "principles apply to summary judgment motions."  Ziskie v. Mineta, 547 F.3d 220, 225 (4th Cir. 2008).

The Affidavit of Joseph Wase describes a case that took place in 1975.  (Aff. Joseph Wase at 1, ECF No. 166-28). Similarly, the Declaration of Stephen B. Tabeling describes his personal knowledge of BCPD training practices until 1979, when he retired from BCPD.  (Decl. Stephen B. Tabeling at 1–2, ECF No. 166-21).  Tabeling eventually returned to BCPD from 2000– 2009.  Id. at 2.  But the investigation giving rise to Owens's Monell claims against BCPD took place in 1987 and 1988.[7]  Wase's affidavit and Tabeling's declaration, therefore, fail to offer evidence of BCPD practices during the relevant time period.  The

---

[7] Specifically, Owens alleges that "[a]t all times relevant to this case," BCPD violated his federal constitutional rights under a municipal custom, policy, or practice.  (See Compl. at 35, ECF No. 2).  The murder took place on August 2, 1987, and Owens was ultimately convicted in 1988.  Id. at 3, 7.

Court, therefore, concludes that Rule 56(c)(4) bars the
Affidavit of Joseph Wase and the Declaration of Stephen B.
Tabeling because they are not relevant.

Finally, Owens offers the following court documents in his
late disclosures: a post-conviction motion, transcripts, legal
opinions, and docket sheets from three cases in the Circuit
Court for Baltimore City where <u>Brady</u> violations were alleged --
<u>Austin v. Maryland</u>, <u>Coleman v. Maryland</u>, and <u>Maryland v.
Pettiford</u>. (ECF Nos. 166-26 through 166-28, 166-30 through 166-
32, 166-33, 166-37 through 166-42). Owens and BCPD agree that
the court documents cannot be admitted for the truth of the
<u>Brady</u> violations they may allege. (Pl.'s Opp'n Def.'s Mot.
Strike, ECF No. 177, at 18); (Def.'s Reply Pl.'s Opp'n Def.'s
Mot. Strike, ECF No. 178, at 24). Rather, Owens asserts these
documents would nonetheless be admissible because the Court may
take judicial notice of "docket information" relating to the
<u>Coleman</u> and <u>Pettiford</u> cases. Owens further asserts the Court
should take judicial notice of "the fact that" Austin raised a
<u>Brady</u> argument in his post-conviction motion, the Circuit Court
for Baltimore City's subsequent granting of Austin's motion, and
the Maryland Court of Special Appeals's decision to vacate the
Circuit Court's decision denying Coleman post-conviction relief.

Neither docket information, nor the raising of a <u>Brady</u>
argument in another case, is relevant to Owens's claim against

27

BCPD. Such evidence simply establishes that other litigation relating to <u>Brady</u> violations exists. The bare existence of other litigation does not make it any more or less probable that BCPD maintained a custom, policy, or practice of withholding and suppressing <u>Brady</u> material in the instant case. To infer anything further from the existence of the litigation would admit the court documents for the truth of the <u>Brady</u> violations they may allege, which as the parties already agree, the Court may not do. Similarly, the dispositions of the <u>Austin</u> and <u>Coleman</u> cases in the Circuit Court for Baltimore City and the Court of Special Appeals, respectively, either prove the existence of other litigation relating to <u>Brady</u> violations, which is irrelevant, or are being offered for the truth of the matters asserted in those cases, which the parties agree the Court may not consider.

The Court, therefore, concludes that Rule 56(c)(4) bars Owens's court documents because they are not relevant.

In sum, the Court concludes it must strike Owens's declarations, affidavits, and documents because (1) he failed to timely identify the relevant individuals and court cases in his responses to interrogatories in violation of Rule 37(c)(1), and (2) Rule 56(c)(4) bars the Court from considering the declarations, affidavits, and documents because some of the declarants lack personal knowledge, and because they set out

facts that would be inadmissible in evidence. As such, the Court will grant BCPD's Motion to Strike.[8]

### E.   __BCPD's Motion for Summary Judgment__

Having disposed of BCPD's Motion to Strike, the Court will now review BCPD's Motion for Summary Judgment.

A municipality, such as BCPD, is subject to suit under 42 U.S.C. § 1983. Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 690 (1978). Under Monell, "a municipality is liable only for its own illegal acts." Owens, 767 F.3d at 402. Liability under respondeat superior is insufficient under Monell's standard. See 436 U.S. at 693-94. Rather, "[o]nly if a municipality subscribes to a custom, policy, or practice can it be said to have committed an independent act, the sine qua non of Monell liability." Owens, 767 F.3d at 402. There are four theories that Owens can pursue to show a custom, policy, or practice:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an

---

[8] BCPD also challenges Owens's reliance on the documents identified in his Opposition to BCPD's Motion for Summary Judgment as "Other Authorities" and "Periodicals" in the Table of Authorities. Owens did not attach these documents as exhibits and states they were relied upon "to support Mr. Owens's legal analysis or demonstrate general public knowledge, not to prove the factual matters therein." (Pl.'s Opp'n Def.'s Mot. Strike at 25, ECF No. 177). Accordingly, the Court will not consider these documents as evidence when evaluating BCPD's Motion for Summary Judgment.

> omission, such as a failure to properly
> train officers, that "manifest[s] deliberate
> indifference to the rights of citizens"; or
> (4) through a practice that is so
> "persistent and widespread" as to constitute
> a "custom or usage with the force of law."

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting

Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)).  Here,

Owens's Complaint alleges that "[a]t all times relevant to this

case," BCPD "maintained a custom, policy, and/or practice" of

condoning its officers' conduct in "knowingly, consciously, and

repeatedly with[holding] and suppress[ing]" exculpatory

evidence.  (Compl. at 35, ECF No. 2).  Owens's Complaint thus

alleges the fourth way of proving a custom, policy, or practice:

a theory of condonation.

"Under th[e] [condonation] theory of liability, a city

violates § 1983 if municipal policymakers fail 'to put a stop to

or correct a widespread pattern of unconstitutional conduct.' "

Owens, 767 F.3d at 402 (quoting Spell v. McDaniel, 824 F.2d

1380, 1390 (4th Cir. 1987)) (alterations in original). Earlier

in this case, the Fourth Circuit provided further illumination

of what Owens is required to prove:

> Prevailing under such a theory is no easy
> task.  A plaintiff must point to a
> "persistent and widespread practice of
> municipal officials," the "duration and
> frequency" of which indicate that
> policymakers (1) had actual or constructive
> knowledge of the conduct, and (2) failed to
> correct it due to their "deliberate

> indifference."     Both   knowledge   and
> indifference  can  be  inferred  from  the
> "extent" of employees' misconduct.  Sporadic
> or  isolated  violations  of  rights  will  not
> give    rise    to    <u>Monell</u>    liability;    only
> "widespread or flagrant" violations will.

<u>Id.</u> at 402–03 (quoting Spell, 824 F.2d at 1386–91) (citations and alterations omitted).

Here, Owens has failed to present any evidence to support his <u>Monell</u> claim under a theory of condonation.  Most of the evidence Owens relies upon to support his claim has been stricken by the Court because it was untimely under Rule 37(c) and barred by Rule 56(c), as stated previously.  The only remaining evidence Owens offers to support his <u>Monell</u> claim under a theory of condonation is a reference to the case <u>Griffin v. Baltimore Police Department</u>, but the court in that case expressly held that it "expresses no view on the merits of Griffin's <u>Brady</u> claim . . ."  804 F.3d 692 (4th Cir. 2015).  The rest of Owens's Opposition to BCPD's Motion for Summary Judgment is dedicated towards arguing why summary judgment in favor of BCPD is precluded under a "failure to train" theory of <u>Monell</u> liability.  But Owens did not plead this theory in his Complaint; he only pled a theory of condonation. (<u>See</u> Compl. at 35, ECF No. 2) (alleging BCPD "maintained a custom, policy, or practice to allow" <u>Brady</u> violations "either directly or by facilitating it, approving it, <u>condoning it</u>, and/or knowingly

turning a blind eye to it" (emphasis added)); see also Owens, 767 F.3d at 402 ("Owens's complaint thus alleges a theory of custom 'by condonation.'" (citation omitted)).  Thus, the Court will not consider this theory of liability.

As such, the Court will grant BCPD's Motion for Summary Judgment.

### III.   CONCLUSION

For the reasons stated above, the Officers' Amended Motion for Summary Judgment (ECF No. 159) is DENIED.[9]  Brave's Motion for Summary Judgment (ECF No. 39) is GRANTED.  BCPD's Motion to Strike (ECF No. 171) and Motion for Summary Judgment (ECF No. 158) are GRANTED.  The Clerk is directed to amend the case caption and remove Baltimore City State's Attorneys Office as a Defendant.  A separate Order follows.

Entered this day 29th of September, 2016

/s/

_____

George L. Russell, III
United States District Judge

---

[9] See supra note 5.